Humberto M. Guizar, Esq., (SBN 125769); hguizar@ghclegal.com
Kent M. Henderson, Esq. (SBN 139530) hendolaw@gmail.com
GUIZAR, HENDERSON & CARRAZCO, L.L.P.
3500 West Beverly Blvd., Montebello, CA 90640
Telephone: (323) 725-1151
Facsimile: (323) 597-0101
Attorneys for Plaintiff,
LISA VARGAS

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| LISA VARGAS<br>        Plaintiff<br><br>        v.<br><br>COUNTY OF LOS ANGELES,<br>NIKOLIS PEREZ, JONATHAN<br>ROJAS, and DOES 1 through 10,<br>inclusive,<br><br>        Defendants | **CASE NO.: 2:19-cv-03279-PSG-AS**<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>1. Battery (Wrongful Death)<br>2. Negligence (Wrongful Death)<br>3. Violation Of 52.1 Of The California Civil Code<br>4. Unreasonable Search and Seizure—Excessive Force and Denial of Medical Care (42 U.S.C. § 1983);<br>5. Substantive Due Process (42 U.S.C. § 1983);<br>6. Municipal Liability for Unconstitutional Custom, Practice, or Policy (42 U.S.C. § 1983);<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR DAMAGES

1.      Plaintiff LISA VARGAS individually in her Complaint against Defendants COUNTY OF LOS ANGELES (hereinafter also sometimes referred to as, "COUNTY" or "County" or "COLA"); NIKOLIS PEREZ, JONATHAN ROJAS, and DOES 1 THROUGH 10, inclusive (collectively "Defendants"), allege as follows:

## INTRODUCTION

2.      This action seeks compensatory and punitive damages from individual deputy sheriffs, from senior sheriff's department officials, and from the County of Los Angeles for violations state law and fundamental rights under the United States Constitution in connection with the brutal police shooting and killing of ANTHONY VARGAS on August 12, 2018.  Decedent ANTHONY VARGAS was shot dead by Defendants, Los Angeles County Sheriff Deputies; NIKOLIS PEREZ, and JONATHAN ROJAS on August 12, 2018.

3.      Decedent ANTHONY VARGAS is but one of many recent victims of a disturbing trend featuring unarmed citizens shot dead by sheriff deputies employed by the County of Los Angeles.  Rather than take measures to address the staggering epidemic and wave of such shootings, such as holding the culprits accountable, local authorities have fomented a culture pursuant to which individual deputies and their supervisors look the other way when such shootings take place and when deputies involved fabricate stories that purport to justify the shootings. There have been numerous shootings per year every year by COUNTY OF LOS ANGELES Sheriff Deputies who shoot and kill unarmed persons who have fired no shots, including from 2007 through the date of the shooting of Decedent ANTHONY VARGAS. From at least 2008 through the date of the shooting of Decedent ANTHONY VARGAS, Defendant COUNTY OF LOS ANGELES has maintained a custom, policy and practice in which its Deputies are permitted to shoot persons who are

2

1  visibly unarmed and who have fired no shots and in which the COUNTY OF LOS
2  ANGELES Sheriff Deputies are not fired or disciplined for such unjustified
3  shootings, thereby condoning this practice of over and over, time and again shooting
4  unarmed civilians.  This policy of shooting unarmed civilians was a moving force in
5  the shooting of Decedent ANTHONY VARGAS on August 12, 2018.

6  4.      The policies and customs behind shootings of unarmed civilians such as
7  ANTHONY VARGAS are fundamentally unconstitutional and constitute a menace
8  of major proportions to the public.  Accordingly, insofar as Plaintiff herein seeks by
9  means of this action to hold accountable those responsible for the killing of
10  ANTHONY VARGAS and to challenge the County's unconstitutional policies and
11  practices, this civil rights action is firmly in the public interest.

12                                       **PARTIES**

13  5.      At all relevant times, ANTHONY VARGAS (hereinafter, sometimes referred
14  to herein as "Decedent") was an individual residing in the County of Los Angeles,
15  California.

16  6.      Plaintiff LISA VARGAS is an individual residing in the COUNTY OF LOS
17  ANGELES and is the mother of Decedent. Plaintiff LISA VARGAS sues in her
18  individual capacity as the mother of the Decedent, and in a representative capacity as
19  a successor-in-interest to Decedent and THE ESTATE OF ANTHONY VARGAS
20  pursuant to California C.C.P. Section 377.32. Plaintiff LISA VARGAS is an "heir
21  at law" (C.C.P. Section 373.60, wrongful death) and a "successor-in-interest" (C.C.P.
22  Section 377.30, survival) to Decedent ANTHONY VARGAS. Plaintiff LISA
23  VARGAS seeks both wrongful death and survival damages under federal and state
24  law. Furthermore, Plaintiff LISA VARGAS seeks all damages available under
25  federal and state law including under C.C.P. Section 373.60 (wrongful death); C.C.P.
26  Section 373.30 (survival) and under federal law for wrongful death and survival. The
27  damages sought by Plaintiff LISA VARGAS for the death of her son, ANTHONY
28  VARGAS, include for loss of Decedent's love, companionship, comfort, care,

1  assistance, protection, affection, society, moral support; loss of financial support and
2  earning capacity; loss of gifts and benefits; funeral and burial expenses; loss of
3  relationship with Decedent, including loss of society and companionship and the
4  mental, physical and emotional pain and suffering of Decedent and all other damages
5  allowed under federal and state law. Plaintiff the ESTATE OF ANTHONY
6  VARGAS appears through its successor-in-interest, the Plaintiff LISA VARGAS.

7  7.    Defendant COUNTY OF LOS ANGELES (hereinafter, referred to as
8  "COLA") is a public entity whose deputies operate under color of law or authority,
9  in their individual and representative capacities and in the course and scope of their
10  employment with the capacity to sue and be sued. Defendant COLA is responsible
11  for the actions, omissions, policies, procedures, practices and customs of its various
12  agents and agencies. At all times relevant to the facts alleged herein, Defendant
13  COLA was responsible for assuring that the actions, omissions, policies, procedures,
14  practices, and customs of its employees complied with the laws and the Constitutions
15  of the United States and the State of California. Defendant COLA employs persons
16  including through Departments that include the LOS ANGELES COUNTY
17  SHERIFF'S DEPARTMENT (hereinafter, sometimes referred to as "LASD").

18  8.    Defendants Deputy NIKOLIS PEREZ, (hereinafter also referred to as
19  "PEREZ") and Deputy JONATHAN ROJAS, (hereinafter also referred to as
20  "ROJAS") (hereinafter also referred to as are LASD   sheriff deputies working for
21  COLA and LASD. On August 12, 2018, Defendants PEREZ, and ROJAS, in their
22  individual capacities, acting under color of law and in the course and scope of their
23  employment with COLA shot and killed Decedent.

24  9.    At all relevant times, defendants PEREZ, ROJAS, and Does 1 Through 10
25  were employees of the LASD. At all times relevant herein, defendant NIKOLIS
26  PEREZ, JONATHAN ROJAS and each of the defendants Does 1 Through 10 were
27  an employee and/or agent of defendant COUNTY and each of these individual
28  defendants acted under color of law, to wit, under the color of the statutes, ordinances,

1   regulations, policies, customs, and usages of Defendant COLA and the LASD, as

2   well as under the color of the statutes and regulations of the State of California.

3   10.    At all relevant times, defendants PEREZ, ROJAS, and each of the Defendant's

4   Does 1 Through 10 was acting within his or her capacity as an employee, agent,

5   representative and/or servant of COLA.

6   11.    Defendants PEREZ, ROJAS, and Does 1 Through 10 are sued in their

7   individual capacities for damages only.

8   12.    On information and belief, at all relevant times, Defendants PEREZ, ROJAS

9   and Does 1 Through 10, inclusive, were residents of County of Los Angeles,

10  California. Defendants PEREZ, and ROJAS, are sued herein in their individual

11  and/or representative capacity and/or in their capacity as employees and agents of

12  Defendant COLA.

13  13.    At all relevant times, PEREZ, ROJAS, and Does 1 Through 10, inclusive, were

14  duly authorized employees and agents of COLA, who were acting under color of law

15  within the course and scope of their individual and/or representative capacities and

16  respective duties as deputies and law enforcement agents and with the complete

17  authority and ratification of their principal, Defendant COLA.

18  14.    At all relevant times, Defendants PEREZ, ROJAS, and Does 1 Through 10,

19  inclusive, were duly appointed officers and/or employees or agents of COLA, subject

20  to oversight and supervision by COLA's elected and non-elected officials.

21  15.    In doing the acts and failing and omitting to act as hereinafter described,

22  defendants PEREZ, ROJAS, and Does 1 Through 10 were acting on the implied and

23  actual permission and consent of COLA.

24  16.    The true names of defendants Does 1 Through 10, inclusive, are unknown to

25  Plaintiffs, who therefore sues these defendants by such fictitious names.  Plaintiffs

26  will seek leave to amend this complaint to show the true names and capacities of

27  these defendants when they have been ascertained.  Each of the fictitious named

28

1     defendants is responsible in some manner for the conduct and liabilities alleged
2     herein.

3     17.     Each of the Defendants caused and is responsible for the unlawful conduct and
4     resulting, by, inter alia, personally participating in the conduct, or acting jointly and
5     in concert with others who did so; by authorizing, acquiescing or failing to take action
6     to prevent the unlawful conduct; by promulgating policies and procedures pursuant
7     to which the unlawful conduct occurred; by failing and refusing, with deliberate
8     indifference to Plaintiffs and Decedent's rights, to initiate and maintain adequate
9     supervision and/or training; and, by ratifying the unlawful conduct that occurred by
10     agents and peace officers under their direction and control. Whenever and wherever
11     reference is made in this Complaint to any act by a Defendant, such allegation and
12     reference shall also be deemed to mean the acts and failures to act of each Defendant
13     individually, joint, and severally. They are sued in their individual and official
14     capacities and in some manner are responsible for the acts and omissions alleged
15     herein. Plaintiffs will ask leave of this Court to amend this Complaint to allege such
16     name and responsibility when that information is ascertained. Each of Defendants is
17     the agent of the other and the actions of each of the Defendants were ratified by the
18     other Defendants.

19     **JURISDICTION AND VENUE**

20     18.     This action is properly filed in the Los Angeles Superior Court, Central
21     District, as it is a wrongful death case and seeks remedies under state law for the
22     personal injuries suffered by the Decedent, ANTHONY VARGAS, as well as his
23     mother, plaintiff LISA VARGAS. Furthermore, this civil action is brought by
24     plaintiff LISA VARGAS for the redress of alleged depravations of constitutional
25     rights as protected by 42 U.S.C. §§ 1983, 1985, 1986, 1988, the Fourth and
26     Fourteenth Amendment of the United States Constitution, and the California
27     Constitution. Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

28

19.     Venue is proper in this Court because defendants reside in, and in all incidents, events, and occurrences giving rise to this action occurred in, the County of Los Angeles, California. Each Plaintiff herein timely and properly filed tort claims pursuant to Cal. Gov. Code § 910 et seq., and this action is timely filed within all applicable statutes of limitations.

///

///

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

20.     Plaintiff repeats and re-alleges each allegation in paragraphs 1 through 19 of this Complaint with same force and effect as if fully set forth herein.

21.     Decedent was born on July 27, 1997, and he was 21 years old at the time of his death.

22.     On the evening of August 12, 2018, Decedent, ANTHONY VARGAS was walking in the Maravilla community located in East Los Angeles, California intending to go home. Defendants PEREZ, ROJAS, and Does 1 Through 10 observed Decedent and they attempted to question him. Decedent panicked as he fled on foot. Defendants PEREZ, ROJAS, and Does 1 Through 10 shot Decedent multiple times and killed him.

23.     Without issuing any warning that shots were going to be fired, and in violation of COLA policy, Defendants PEREZ, and ROJAS, fired their firearms at Decedent.

24      Decedent sustained injuries, pain, and suffering, and death when he was shot dead by Defendants PEREZ, and ROJAS, who were acting under color of law, in their individual and official capacities and as employees of COLA/LASD. The Decedent was unarmed and at the time of the shooting posed no imminent threat of death or serious bodily injury to any person and the force that was used by Defendants NIKOLIS PEREZ, JONATHAN ROJAS was unreasonable, excessive deadly force.

25.     Upon information and belief, at the time he was shot, Decedent was not in possession of a weapon.  Moreover, Decedent was leaving the scene of the incident.

7

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1   There was no crime in progress. Decedent posed no imminent threat of death or

2   serious bodily injury to Defendant NIKOLIS PEREZ, JONATHAN ROJAS, or any

3   other sheriff deputy or person.

4   26.   Defendants PEREZ and ROJAS did not warn Decedent that they were about

5   to shoot hm.

6   27.   Upon information and belief, after being shot, Decedent collapsed was

7   immobile and bleeding profusely and in obvious critical need of immediate

8   emergency care and treatment.   Instead of immediately providing or facilitating

9   emergency care and treatment, Decedent's need for immediate medical care was

10  ignored. Defendant's NIKOLIS PEREZ, JONATHAN ROJAS and DOES 1

11  THROUGH 10, inclusive did not timely summon medical care or permit medical

12  personnel to treat Decedent. The delay of medical care to Decedent caused Decedent

13  extreme physical and emotional pain and suffering and was a contributing cause of

14  Decedent's death.

15  28.   Within six months of the Incident, Plaintiffs timely and appropriately

16  presented and filed Government Claims with the Defendant COLA in this action.

17  The Government Claims were rejected and the filing of this action, as to the State

18  Claims for Relief, within six months of the rejection, are timely filed.   Additionally,

19  the Federal Claims for Relief are also timely filed within two years of the Incident.

20            **FIRST CLAIM FOR RELIEF**
              **FOR BATTERY CAUSING WRONGFUL DEATH)**
21            **(Cal. Govt. Code §820 And California Common Law);**
              **(BY PLAINTIFF LISA VARGAS AND THE ESTATE OF ANTHONY**
22            **VARGAS, AGAINST DEFENDANTS NIKOLIS PEREZ,**
              **JONATHAN ROJAS)**
23

24  29.   Plaintiff repeats and re-alleges each allegation in paragraphs 1 through 58 of

25  this Complaint with the same force and effect as if fully set forth herein.

26  30.   Defendants PEREZ, ROJAS, while working as a deputy sheriff for COLA, and

27  acting within the course and scope of their duties, intentionally shot Decedent.   As a

28

1  result of these actions, Decedent suffered severe pain and suffering and ultimately
2  died from his injuries and lost earning capacity. Defendant PEREZ, ROJAS, had no
3  legal justification for using force against Decedent and the use of force was excessive
4  and unreasonable.

5  31.    As a direct and proximate result of the actions of Defendants, Plaintiff LISA
6  VARGAS suffered the loss of her Father, Decedent ANTHONY VARGAS,
7  including damages for the loss of Decedent's life-long love, companionship, comfort,
8  care, assistance, protection, affection, society, moral support; loss of financial
9  support, sustenance and earning capacity; loss of gifts and benefits; funeral and burial
10  expenses; loss of the reasonable value of household services; loss of relationship with
11  Decedent, including loss of society and companionship and all other damages
12  allowed under state law.

13  32.    COLA is vicariously liable for the wrongful acts of Defendants PEREZ and
14  ROJAS pursuant to section 815.2(a) of the California Government Code, which
15  provides that a public entity is liable for the injuries caused by its employees within
16  the scope of the employment if the employee's acts would subject him or her to
17  liability.

18  33.    The conduct of Defendants PEREZ and ROJAS was malicious, wanton,
19  oppressive, and accomplished with a conscious disregard for the rights of Plaintiff
20  LISA VARGAS and Decedent, entitling Plaintiff LISA VARGAS in each case
21  individually and as a successor-in-interest to Decedent, to an award of exemplary and
22  punitive damages as to Defendants PEREZ, and ROJAS.

23  **SECOND CLAIM FOR RELIEF**
24  **(BY PLAINTIFF LISA VARGAS AND THE ESTATE OF ANTHONY VARGAS, FOR NEGLIGENCE, (WRONGFUL DEATH) (BY PLAINTIFF LISA VARGAS AGAINST DEFENDANTS NIKOLIS PEREZ, JONATHAN ROJAS and DOES 1 THROUGH 10)**
25
26
27  34.    Plaintiff repeats and reallege each allegation in paragraphs 1 through 33 of this
28  Complaint with the same force and effect as if fully set forth herein.

35.    The actions and inactions of Defendants, including the actions of Defendants PEREZ, ROJAS, and Does 1 Through 10, were negligent and reckless, including but not limited to:

(a) the failure to properly and adequately assess the need to detain, arrest, and use force or deadly force against Decedent ANTHONY VARGAS;

(b) the negligent tactics and handling of the situation with Decedent ANTHONY VARGAS, including pre-shooting negligence;

(c) the negligent detention, arrest, and use of force, including deadly force, against Decedent ANTHONY VARGAS;

(d) the failure to provide prompt medical care to Decedent ANTHONY VARGAS;

(e) the failure to properly train and supervise employees, both professional and non-professional, including Defendants PEREZ, ROJAS, and Does 1 Through 10, including, but not limited to the failure to train to follow the COUNTY OF LOS ANGELES Sheriff Department Manual of Policies and Procedures;

(f) the failure to ensure that adequate numbers of employees with appropriate education and training were available to meet the needs of and protect the rights of Decedent ANTHONY VARGAS;

(g) the violation of Defendant COUNTY OF LOS ANGELES Sheriff Department Manual of Policies and Procedures regarding use of force, and violation of other portions of the Manual and tactics;

36.    As a direct and proximate result of Defendants' conduct as alleged above, and other undiscovered negligent conduct, Decedent was caused to suffer severe pain and suffering and ultimately died and lost earning capacity. Also, as a direct and proximate result of Defendants' conduct as alleged above, Plaintiffs suffered extreme and severe mental anguish and pain and have been injured in mind and body. Plaintiffs also have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of Decedent, and will continue to be so deprived

1    for the remainder of their natural lives. Plaintiffs also are claiming funeral and burial
2    expenses and a loss of financial support.

3    37.    The COUNTY is vicariously liable for the wrongful acts of Defendants
4    PEREZ, ROJAS, and Does 1 Through 10 pursuant to section 815.2(a) of the
5    California Government Code, which provides that a public entity is liable for the
6    injuries caused by its employees within the scope of the employment if the
7    employee's act would subject him or her to liability.

8    38.    The conduct of Defendants PEREZ, ROJAS, and Does 1 Through 10 was
9    malicious, wanton, oppressive, and accomplished with a conscious disregard for the
10   rights of Plaintiffs and Decedent, entitling Plaintiff, individually and as successor-in-
11   interest to Decedent, to an award of exemplary and punitive damages as to individual
12   Defendants NIKOLIS PEREZ, JONATHAN ROJAS and DOES 2-10.

13   39.    Plaintiffs LISA VARGAS brings her claim in each case, individually as an
14   heir at law of Decedent in wrongful death and as successor-in-interest to the
15   Decedent and to The Estate of ANTHONY VARGAS, and in each case, seek both
16   survival and wrongful death damages for the violation of Decedent's rights.

17                    **THIRD CLAIM FOR RELIEF**

18   **BY PLAINTIFF LISA VARGAS AND THE ESTATE OF ANTHONY**
19   **VARGAS, FOR VIOLATION OF THE SECTION 52.1 OF THE**
20   **CALIFORNIA CIVIL CODE - AGAINST DEFENDANTS NIKOLIS PEREZ,**
21   **JONATHAN ROJAS and DOES 1 THROUGH 10)**

22   40.    Plaintiff repeats and reallege each allegation in paragraphs 1 through 39 of this
23   Complaint with the same force and effect as if fully set forth herein.

24   41.    This action is brought pursuant to section 52.1 of the California Civil Code.
25   The present action is also brought pursuant to section 820 and 815.2 of the
26   Government Code. Pursuant to section 820 of the California Government Code, as
27   a public employee, Defendants PEREZ, ROJAS, and Does 1 Through 10 are liable

28

1    for injuries caused by their acts or omissions to the same extent as a private person.

2    At all times mentioned herein, Defendants PEREZ, ROJAS, and Does 1 Through 10

3    were acting within the course and scope of their employment and/or agency with

4    defendant COUNTY OF LOS ANGELES. As such defendant COUNTY OF LOS

5    ANGELES is liable in respondent superior for the injuries caused by the acts and

6    omissions of Defendants PEREZ, ROJAS, and Does 1 Through 10 pursuant to

7    section 815.2 of the California Government Code.

8    42.     Plaintiff's Decedent, ANTHONY VARGAS was subjected to excessive force

9    by Defendants PEREZ, ROJAS, and Does 1 Through 10 in the form of gunshots fired

10   by said defendants which struck ANTHONY VARGAS and caused him serious

11   personal injuries from which he eventually died. The shooting was unreasonable and

12   unwarranted as the circumstances under which the shooting occurred did not require

13   the use of any force whatsoever. As an unreasonable use of force, the shooting

14   constituted a violation of ANTHONY VARGAS's constitutional rights against

15   unreasonable searches and seizures protected by the Constitution of the State of

16   California.

17   43.     All of the above acts and omissions of Defendants PEREZ, ROJAS, and Does

18   1 Through 10 were willful, wanton, malicious and oppressive thereby justifying the

19   awarding of exemplary and punitive damages as to said defendant.

20   44.     As a proximate result of the acts of Defendants PEREZ, ROJAS, and Does 1

21   Through 10, ANTHONY VARGAS's suffered multiple gunshot wounds which

22   caused him severe injuries from which he eventually died.

23   45.     The above acts of defendants violated ANTHONY VARGAS's civil rights as

24   protected by section 52.1 of the Civil Code. As such, Plaintiff LISA VARGAS is

25   entitled to compensatory damages according to proof, including those permitted by

26   Section 52 of the Civil Code, punitive and exemplary damages, the costs of suit

27

28

1  incurred in this action, reasonable attorney's fees as permitted by the Civil Code

2  section 51.7 and 52, and any other additional relief that the court deems proper.

3

4  ## FOURTH CLAIM FOR RELIEF

5  **FOR UNREASONABLE SEARCH AND SEIZURE— UNREASONABLE**

6  **AND/OR EXCESSIVE FORCEAND DENIAL OF MEDICAL CARE (42**

7  **U.S.C. § 1983); (By Plaintiff LISA VARGAS individually, and as successor in**

8  **interest to DECEDENT ANTHONY VARGAS, by and Through her Guardian**

9  **Ad Litem, ESMERALDA ESTEBAN; and THE ESTATE OF ANTHONY**

10  **VARGAS, Against Defendants NIKOLIS PEREZ,**

11  **JONATHAN ROJAS and DOES 1 THROUGH 10, inclusive)**

12  46.    Plaintiffs repeat and re-allege each allegation in paragraphs 1 through 45 of

13  this Complaint with the same force and effect as if fully set forth herein.

14  47.    The unjustified shooting of Decedent by Defendants PEREZ, ROJAS, and

15  other unknown DOE defendants deprived Decedent of his right to be secure in his

16  person against unreasonable searches and seizures as guaranteed to Decedent under

17  the Fourth Amendment to the United States Constitution and applied to state actors

18  by the Fourteenth Amendment.  On August 12, 2018, Defendants PEREZ, ROJAS,

19  and Does 1-10, acting in their individual and/or representative capacities, in the

20  course and scope of their employment with Defendant COLA, acting under color of

21  law, used unreasonable and excessive deadly force and violated the Constitutional

22  Rights of when they shot and killed Decedent. Decedent did not represent an

23  imminent threat of death or serious bodily injury and the deadly force used by

24  Defendants PEREZ, ROJAS, and Does 1-10, was objectively unreasonable force that

25  proximately caused the death of Decedent in violation of 42 U.S.C. Section 1983.

26  48.    By virtue of their misconduct, defendants PEREZ, ROJAS, and Does 1

27  Through 10, inclusive are liable for Decedent's injuries, either because these

28

defendants were integral participants in the use of excessive force, or because they failed to intervene to prevent these violations.

49.     Defendants PEREZ, ROJAS, and Does 1 Through 10, inclusive knew that failure to provide timely medical treatment to Decedent could result in further significant injury or the unnecessary and wanton infliction of pain, but nevertheless disregarded his serious medical needs, causing him great bodily harm, physical and emotional pain and suffering, and death.

50.     This use of deadly force was excessive and objectively unreasonable under the circumstances.  Defendants' actions thus deprived Decedent of his right to be free from unreasonable searches and seizures under the Fourth Amendment and applied to state actors by the Fourteenth Amendment.

51.     As a direct and proximate result of the actions of Defendants, Plaintiff LISA VARGAS suffered the loss of her loving son, Decedent ANTHONY VARGAS, including damages for the loss of Decedent's life-long love, companionship, comfort, care, assistance, protection, affection, society, moral support; loss of financial support, sustenance and earning capacity; loss of gifts and benefits; funeral and burial expenses; loss of the reasonable value of household services; loss of relationship with Decedent, including loss of society and companionship and the mental, physical and emotional pain and suffering of Decedent and all other damages allowed under federal and state law.  Plaintiff LISA VARGAS by this action, further claims all of Plaintiffs' attorneys' fees and costs incurred and to be incurred in Plaintiff presenting, maintaining and prosecuting this action under 42 U.S.C. Section 1988.

52.     The conduct of Defendants PEREZ, ROJAS, and Does 1 Through 10, inclusive was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Decedent and therefore warrants the imposition of exemplary and punitive damages as to Defendants PEREZ, ROJAS, and DOES 1 THROUGH 10, inclusive.

///

1
2
3
4

### FIFTH CLAIM FOR RELIEF

### FOR VIOLATION OF SUBSTANTIVE DUE PROCESS (42 U.S.C. § 1983);

### (By Plaintiff LISA VARGAS Against Defendants NIKOLIS PEREZ,

### JONATHAN ROJAS, and DOES 1 THROUGH 10, inclusive)

5   53.   Plaintiffs repeat and re-allege each allegation in paragraphs 1 through 52 of
6   this Complaint with the same force and effect as if fully set forth herein.

7   54.   Plaintiff LISA VARGAS, as the parent of Decedent ANTHONY VARGAS,
8   had a cognizable interest under the Due Process Clause of the Fourteenth Amendment
9   of the United States Constitution to be free from state actions that deprive them life,
10  liberty, or property in such a manner as to be deliberately indifferent to the
11  constitutional rights of the Decedent, including but not limited to unwarranted state
12  interference in Plaintiff's familial relationship with their son, Decedent ANTHONY
13  VARGAS.

14  55.   Decedent ANTHONY VARGAS had a cognizable interest under the Due
15  Process Clause of the Fourteenth Amendment of the United States Constitution to be
16  free from state actions that would deprive him of life, liberty, or property in such a
17  manner as to be deliberately indifferent to the constitutional rights of the Decedent.

18  56.   The aforementioned actions of Defendants PEREZ, ROJAS,  and Does 1
19  Through 10, along with other undiscovered conduct, were deliberately indifferent to
20  the constitutional rights of the Decedent and Plaintiff  LISA VARGAS, in that said
21  Defendants had time to deliberate and then used deadly force that shocks the
22  conscience in violation of the constitutional rights of Decedent and Plaintiff LISA
23  VARGAS,  and with purpose to harm unrelated to any legitimate law enforcement
24  objective in violation of 42 U.S.C. Section 1983.

25  ///
26
27
28

57.   Defendants PEREZ, ROJAS, and Does 1 Through 10 thus violated the substantive due process rights of Plaintiffs LISA VARGAS to be free from unwarranted interference with their familial relationship with Decedent.

58.   As a direct and proximate cause of the acts of Defendants PEREZ, ROJAS, and Does 1 Through 10, Plaintiffs have been deprived of the life-long love, companionship, support, society, care, and sustenance of Decedent, and will continue to be so deprived for the remainder of their natural lives.

59.   Plaintiffs ANTHONY VARGAS Sr., and MARIA REZA bring this claim in each case individually, and in each case, seek death damages for the violation of their constitutional rights to a familial relationship with Decedent. Plaintiffs ANTHONY VARGAS Sr., and MARIA REZA by this action further claim all of Plaintiffs' attorneys' fees and costs incurred and to be incurred in Plaintiffs presenting, maintaining and prosecuting this action under 42 U.S.C. Section 1988.

60.   The conduct of PEREZ, ROJAS, and Does 1 Through 10 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Decedent and Plaintiffs and therefore warrants the imposition of exemplary and punitive damages as to Defendants PEREZ, ROJAS,  and Does 1 Through 10.

## SIXTH CLAIM FOR RELIEF

### FOR MUNICIPAL LIABILITY FOR UNCONSTITUTIONAL CUSTOM OR POLICY (42 U.S.C. § 1983);

### (By Plaintiff LISA VARGAS Against COUNTY OF LOS ANGELES and DOES 1 THROUGH 10)

61.   Plaintiffs repeat and re-allege each allegation in paragraphs 1 through 60 of this Complaint with the same force and effect as if fully set forth herein.

62.   On information and belief, Defendants PEREZ, ROJAS, unjustified shooting of Decedent was found to be within COLA/LASD policy.

63.     On information and belief, Defendants PEREZ, ROJAS, unjustified shooting of Decedent was ratified by COLA/LASD supervisorial officers.

64.     On information and belief, Defendants PEREZ, ROJAS, were not disciplined for the unjustified shooting of DECEDENT.

65.     On and for some time prior to August 12, 2018 (and continuing to the present date) at the East Los Angeles Precinct of the Los Angeles County Sheriff's Department, there is a group of deputies who have been acting as "gang members", as defined by Penal Code Section 186.22. These deputies have identified themselves as the "bandidos". These are Latino deputies who wear tattoos of a skeleton with a sombrero, bandolier and pistol. The Bandidos from the Sheriff's department use gang tactics of fear and intimidation during work hours to silence deputies from reporting deputy acts of misconduct, including the use of excessive force. The command staff is aware of this behavior and has failed to take reasonable steps to stop this egregious behavior. By failing to stop these deputies from being involved in this gang culture the ELA precinct has fostered a custom and practice that encourages deputies to engage in unconstitutional conduct such as using excessive force on civilians. This gang culture has created a custom and practice within the precinct that encourages deputies to not report and account for the use of force on civilians with candor and honesty. This Sheriff gang culture was a moving force behind the use of excessive force on the decedent, Anthony Vargas, by defendants PEREZ, and ROJAS because said defendants knew they could use excessive force on Anthony Vargas with impunity, and they also knew they could also use excessive deadly force on civilians without any accountability to anyone, including their supervisors.

66.     On and for some time prior to August 12, 2018 (and continuing to the present date), Defendants COLA and DOES 1-10, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, and of Plaintiffs and DECEDENT, and of persons in their class, situation and

17

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

comparable position in particular, knowingly maintained, enforced and applied an official recognized custom, policy, and practice of:

(a) Employing and retaining as deputy sheriffs and other personnel, including Defendants PEREZ, ROJAS, whom Defendants COUNTY and Does 1-10 at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens by acting as gang members and failing to follow written LASD policies, including the use of excessive force;

(b) Of inadequately supervising, training, controlling, assigning, and disciplining COL Sheriff deputies and other personnel, including Defendants PEREZ, ROJAS, whom Defendants COLA and Does 1-10 knew or in the exercise of reasonable care should have known had the propensities and character traits, including the propensity for violence and the use of excessive force;

(c) By maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling the intentional misconduct by Defendants PEREZ and ROJAS, who are Sheriff Deputies and/or agents of COLA.

(d) By failing to discipline COLA Deputies' and/or agents' conduct, including but not limited to, unlawful detention and excessive force;

(e) By ratifying the intentional misconduct of PEREZ, ROJAS, and other COLA Deputies and/ or agents, who are COLA Deputies and/or agents of COUNTY;

(f) By having and maintaining an unconstitutional policy, custom, and practice of detaining and arresting individuals without probable cause or reasonable suspicion, and using excessive force, including deadly force, which also is demonstrated by inadequate training regarding these subjects. The policies,

customs, and practices of Defendants COLA and Does 1-10 were maintained with a deliberate indifference to individuals' safety and rights; and

(g) By failing to properly investigate claims of unlawful detention and excessive force by COLA Sheriff Deputies.

67.    By reason of the policies and practices of Defendants COLA and DOES 1-10, including allowing deputies to perform their jobs like gang members, Decedent was severely injured and subjected to pain and suffering and lost his life. The aforementioned policies and practices of Defendants, including the custom, policy and practice of Defendant COLA in allowing its sheriff Deputies to use unjustified, excessive and unreasonable deadly force in shooting unarmed persons who had fired no shots with no punishment for the involved Deputies was a moving force that caused Defendants PEREZ and ROJAS to use unreasonable deadly force on Decedent (who was also unarmed and fired no shots).

68.    Defendants COLA and DOES 1-10, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above.  Despite having knowledge as stated above, these defendants condoned, tolerated and through actions and inactions thereby ratified such policies.  Said defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Decedent, Plaintiffs, and other individuals similarly situated.

69.    By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, Defendants Does 1-10 acted with intentional, reckless, and callous disregard for the life of Decedent and for Decedent's and Plaintiffs' constitutional rights. Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by Defendants COLA and Does 1-10 were

affirmatively linked to and were a significantly influential force behind the injuries of Decedent and Plaintiffs.

70. The actions of each of Defendants Does 1-10 were willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities, and therefore warrants the imposition of exemplary and punitive damages as to Defendants Does 1-10.

71. By reason of the acts and omissions of Defendants COLA and Does 1-10, Plaintiffs were caused to incur damages as stated elsewhere herein.

72. By reason of the acts and omissions of Defendants COLA and Does 1-10, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, society, and future support.

73. Accordingly, Defendants COLA and Does 1-10 each are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

74. Plaintiffs seek both wrongful death damages and survival damages under this claim. Plaintiffs further claim all of Plaintiffs' attorneys' fees and costs incurred and to be incurred in Plaintiffs presenting, maintaining and prosecuting this action under 42 U.S.C. Section 1988.

75. At all times herein mentioned, Leroy Baca served as Los Angeles County Sheriff from December 7, 1998 to December 1, 2014. John Scott served as interim Sheriff from January 30, 2014 to December 1, 2014. Jim McDonell served as Los Angeles County Sheriff from December 1, 2014 to December 3, 2018. Alex Villanueva served (and currently serves) as Los Angeles County Sheriff from December 3, 2018 to present. At all times herein mentioned, Defendant County of Los Angeles (COLA) established a custom and practice of excessive use of force within its Sheriff's Department (LASD) by the Sheriff and by the Supervisors at the station level and by an informal custom with the ranks of the Deputies.

76.   ANTHONY VARGAS was shot on August 12, 2018.  At all times herein mentioned, during the time that Leroy Baca, John Scott, Jim McDonell and Alex Villanueva have been Sheriff, Defendant County of Los Angeles and the LASD has instituted formal and informal policies and practices that condone excessive use of force shootings and do not discipline Deputies who shoot unarmed persons.  The toleration of the shooting of unarmed persons and of deputy gangs that use excessive force was the moving force behind the shooting of ANOTHONY VARGAS on August 12, 2018.  Some of the specific shootings are identified herein.

77.   At all times herein mentioned, the Banditos gang members oversaw all the operations at the East LA Station including the activities of Defendants NIKOLIS ROJAS and JONATHON PEREZ who were members or prospects (aka "puppies").  At all times herein mentioned, actions of excessive use of force, were and are, protected by superiors at the East LA station who make sure they are not disciplined or face any consequences for their actions.  In May 2018, training officers Benjamin Zaredini and Louis Granados took their concerns about harassment from the gang to their superiors.  Multiple officers were interviewed as part of an investigation that ultimately went nowhere as is verified by five deputies and two veteran officers who filed claims with COLA.  This is because COLA already knew had decided to do nothing about Sheriff's gangs, including the Banditos.

78.   At all times herein mentioned, and before the shooting of ANTHONY VARGAS, a superior officer, Sgt. Patty Estrada – referred to as "Pink Hand," a play on the Black Hand tattoo worn by the Mexican Mafia prison gang – made sure the Banditos members were not disciplined.  The Banditos are Deputies who work out of the department's East Los Angeles station and have for years driven non-gang members out of the station.  The Captain, sergeants and others who supervised the

East LA Station, on and before the shooting of ANTHONY VARGAS, were Banditos gang members and/or were deliberately indifferent and ratified the actions of the Banditos gang. Some of these Captain(s), sergeants, lieutenants, sergeants and supervisors were transferred *after* the shooting of ANTHONY VARGAS but they were there supervising the East LA station on and before the time of the shooting of ANTHONY VARGAS and encouraging, ratifying and endorsing a formal and informal custom and practice of excessive, unconstitutional use of force and a code of silence. This custom and practice that existed at the East LA station on and before August 12, 2018 was a moving force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force shooting of ANOTHONY VARGAS on August 12, 2018.

79.    At all times herein mentioned, there was a custom and practice of practice of allowing the sheriff gang members to conduct their own vigilante justice which created a de facto independent department, with a secret gang, with front line supervisors  in on the special cover, stopping some of the complaints from reaching elected officials. Those in the gang of deputies were used in a way that brought rewards to those within the gang of deputies, in extrajudicial uses of state authority whereas it was well known that those deputies who did not do what the Banditos gang wanted would suffer consequences including in their employment. This gang of street officers, including the supervisors at the East LA station, including the Captain, sergeants, lieutenants, sergeants and supervisors who were transferred *after* the shooting of ANTHONY VARGAS, was operating under color of law for their own purposes and not within the law. This existing sheriff gang was well known, including being known to Defendants NIKOLIS ROJAS and JONATHON PEREZ and was a moving force in their excessive force shooting of ANOTHONY VARGAS on August 12, 2018.

80.     In addition, COLA and LASD failed to discipline excessive force shootings, as was well known and is as set forth below in detail below regarding numerous previous incidents.  This failure to discipline was well known, including being known to Defendants NIKOLIS ROJAS and JONATHON PEREZ and was a moving force in their excessive force shooting of ANOTHONY VARGAS on August 12, 2018.

81.     In addition, and in the alternative, even policy makers, up to an including the elected Sheriffs Baca, Scott and McDonell (and now Villanueva), were and are aware of the deputy gang and its tactics, aware of the cover by first line and mid-level supervisors, but policy-makers were and are turning a blind eye, because there is a public perception that the Department is actively engaging is tough law enforcement, ratifying its existence by deliberate indifference.

82.     At all times herein mentioned, the deputy gang in the east LA station and the excessive use of force generally, were so severe and outrageous, that the absence of discipline as to Deputies NIKOLIS ROJAS and JONATHON PEREZ, and other previous shootings described herein, makes it plausible that supervisors are covering similar violations of law by gang members, and that the supervisors themselves are acting in concert with gang members, and that policy-makers, in concert, are turning a blind eye, when they too should take a corrective action, like they should have in this case but did not, making it plausible that there is a unique custom and practice of deputy gang violence and selective excessive force, that caused the death challenged here.  Plaintiffs allege that the continued lack of correction and no discipline of Deputies NIKOLIS ROJAS and JONATHON PEREZ after the shooting of ANTHONY VARGAS supports the inference of a custom of excessive force.

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

83.    In 2014, a lawsuit was filed by a female deputy who was bullied by the Banditos Sheriff's gang at the East LA Station. That lawsuit was settled for $1.5 Million before the shooting of ANTHONY VARGAS and yet no one was fired or disciplined at the East LA Station. Instead COLA, LASD and its policymakers didn't do anything to fix the problem and the actions from the LASD were simply to quiet down the incident; no one was disciplined. COLA and LASD knew about the Badmito's gang at the East LA station before the shooting of ANTOHNY VARGAS, having been sued by the female deputy, conducting discovery and paying $1.5 Million and then being deliberately indifferent and ratifying the actions of the Badnitos by imposing no discipline. This was a ratification by COLA and LASD of the Banditos Sheriff's gang and was a moving force in the excessive force used by Defendants NIKOLIS ROJAS and JONATHON PEREZ when they shot and killed ANTHONY VARGAS by shooting him in the back and the back of the head 12 or more times and then lying about how it happened all the while knowing that COLA and LASD would never discipline them and protect them with the code of silence (as COLA and LASD continue to do to this day).

84.    In a Motion by COLA Supervisors Sheila Kuehl and Hilda Solis dated April 30, 2019, Defendant COLA admitted that "**The Los Angeles County Sheriff's Department (LASD or the Department) has a long and troubled history involving unauthorized, exclusive and secretive Department groups consisting of sworn deputies**, whose membership is based on a variety of factors, including station or unit assignment, ethnicity, involvement in excessive uses of force, intimidation of fellow deputies, and harassment **and even shootings of civilians**. Many of these groups are known for their identical, hidden, sinister tattoos, and have been the subjects of investigations, lawsuits and settlements involving excessive uses of force, violence and dishonesty, against other Sheriff's Deputies, as well as against members of the community." (See Motion by COLA Supervisors Sheila Kuehl and

1   Hilda Solis dated April 30, 2019 attached as Exhibit "A").  The Motion goes on to

2   state "Over the past several years, the violent, lawless conduct of many of these group

3   members has led to investigations, disciplinary actions, damage claims, lawsuits and

4   settlements reaching into the millions of dollars."

5   85.    The Motion recites the history of LASD gangs that existed in the LASD before

6   and at the time of the shooting of ANTHONY VARGAS and that still exist.  The

7   Motion notes that the "Citizens' Commission on Jail Violence (CCJV), in its

8   comprehensive report addressing dysfunction within **the Sheriff's Department**, then

9   run by Sheriff Leroy Baca, **noted a culture of tolerance and even "tacit approval"**

10  **of what the Commission termed 'violent cliques.'"**  The CCJV report was in 2012

11  and yet Defendant COLA through Baca, Scott, McDonell and Villanueva and the

12  supervisors at the East LA station have been deliberately indifferent and have

13  purposefully taken no action to curb Sheriff Gangs, including the Banditos, which

14  was a moving force in the shooting of ANTHONY VARGAS on August 12, 2018.

15  Specifically, Plaintiffs are informed and believe and thereon allege that Defendants

16  NIKOLIS ROJAS and JONATHON PEREZ were members of the Banditos gang or

17  "Prospects" and that membership in the Banditos gang included using excessive force

18  and shooting those who are unarmed.  Plaintiffs are informed and believe and thereon

19  allege that Prospects could gain entry into membership in the Banditos gang by using

20  excessive force, including shooting those who are unarmed (and were encouraged to

21  do so) and was the moving force in the shooting of the unarmed ANTHONY

22  VARGAS.

23  86.    The Motion by COLA Supervisors Sheila Kuehl and Hilda Solis dated April

24  30, 2019 at Exhibit "A" goes on to state: "This gang-style violence by sworn Deputies

25  is not limited to the jails or to conflicts between deputies.  In May 2012, discovery of

26  the existence of the Jump Out Boys was due to the accidental discovery of a printed

27  "creed" which stated members would receive a tattoo after being involved in a

28

shooting. The Jump Out Boys, a group of gang enforcement officers, were compared to the lawless Rampart Division of the LAPD in the 1980's, whose members had a similar tattoo: a skeleton holding a revolver. Whenever a deputy in the group was involved in a shooting, he would earn extra ink of smoke coming out of the barrel of the gun."

87.     The Motion by COLA Supervisors Sheila Kuehl and Hilda Solis dated April 30, 2019 at Exhibit "A" goes on to state: The Citizens' Commission on Jail Violence (CCJV), in its comprehensive report addressing dysfunction within the Sheriff's Department, then run by Sheriff Leroy Baca, noted a culture of tolerance and even "tacit approval" of what the Commission termed "violent cliques" ("Report of the Citizen's Commission on Jail Violence," p. 101). The Commission recommended that the agency ban visible tattoos associated with the groups because they had sometimes been used to reward aggressive behavior." Defendants COLA and LASD did not ban the Sheriff Gangs, did not band visible tattoos and, instead, deliberately let them flourish.  Defendant COLA and it LASD did not even ban visible tattoos after its Assistant Sheriff Paul Tanaka was criminally convicted in part based on evidence that he had a Sheriff gang tattoo.  This was a ratification or deliberate indifference by COLA and LASD of sheriff gangs. *After* the shooting of ANTHONY VARGAS, between 34 to 38 Deputies were transferred out or re-assigned from the East Los Angeles Station where Defendants NIKOLIS ROJAS and JONATHON PEREZ were stationed at the time of the shooting of ANTHONY VARGAS.

88.     Los Angeles County Sheriff Alex Villanueva, a policy maker for the LASD, has publicly admitted that the Banidtos Gang at the East Los Angeles Sheriff's Station was run by "supervisors" who had an official policy, custom and practice to violate civil rights during the time that Jim McDonell was Sheriff and when ANOTHONY VARGAS was shot. Sheriff Villanueva, who once worked at the East L.A. station acknowledges there was a "bully culture" in the East LA station at the

1   time that McDonell was Sheriff (when ANTHONY VARGAS was shot).    Alex

2   Villanueva admits that, during the time that Jim McDonell was Sheriff, the Banditos

3   gang came to control even the station captain in the East LA station.    Sheriff Alex

4   Villanueva stated: **"Some of the supervisors were part of the problem, they were**

5   **facilitating this and that really it made matters even worse -- it's like pouring**

6   **gasoline on fire,"** Villanueva said.   Villanueva previously trained a deputy who later

7   became a Bandito.   Villanueva has admitted that "this [sheriff's gangs existing in

8   COLA, LASD] is a concern that goes back to the 1970's and it resurfaces every ten

9   years or so."   Plaintiffs are informed and believe and thereon allege that the Sheriff's

10  gangs do not "resurface", they are consistently there and COLA's toleration of,

11  deliberate indifference to and ratification of sheriff gangs, including the Banditos in

12  the East LA station, were a moving force in Defendants NIKOLIS ROJAS and

13  JONATHON PEREZ excessive force shooting of ANTHONY VARGAS.

14  89.    Policymakers including Sheriffs Baca, Scott and McDonell turned a blind eye

15  to and were deliberately indifferent to the sheriff's gangs, including the Banditos.

16  Moreover, the Captain, the Sergeants, supervisors and other policy makers who

17  controlled the East Los Angeles station were transferred *after* the shooting of

18  VARGAS for the very reason that they were part of and leading a sheriff's gang

19  inside the East Los Angeles Station.   The Captain, the Sergeants, supervisors and

20  other policy makers who controlled the East Los Angeles station, encouraged and

21  ratified the use of excessive force prior to the shooting of ANTHONY VARGAS.

22  The Captain, the Sergeants, supervisors and other policy makers who controlled the

23  East Los Angeles station, encouraged and ratified the use of a code of silence to cover

24  up unjustified, excessive force shootings prior to the shooting of ANTHONY

25  VAGAS.    This was a moving force in Defendants NIKOLIS ROJAS' and

26  JONATHON PEREZ' excessive force shooting of ANTHONY VARGAS.

27  Defendants NIKOLIS ROJAS and JONATHON PEREZ shot ANTHONY VARGAS

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

12 or more times in the back and the back of the head when he posed no threat. Defendants NIKOLIS ROJAS and JONATHON PEREZ knew they could shoot ANTHONY VARGAS in the back and the back of the head and that the Captain, the Sergeants and the other members, Prospects (aka "puppies") of the Banditos gang in the East Los Angeles Sheriff's Station would not discipline them; in fact, they would support the shooting no matter how egregious. Defendants NIKOLIS ROJAS and JONATHON PEREZ fabricated stories about how the shooting took place, including to investigators which they knew they could do before the shooting based on the existing code of silence endorsed by policymakers, including Sheriffs Baca, Scott and McDonell (and continuing with Villanueva) and The Captain, the Sergeants, supervisors and other policy makers who controlled the East Los Angeles station (including those transferred after the shooting because they were policymakers who supported a sheriff's gang inside the East LA Station).

90.     In the Motion by COLA Supervisors Sheila Kuehl and Hilda Solis, Defendant COLA also admitted "The CCJV further alleged that Department management "has known about and failed to address the longstanding problem of deputy cliques," and "also has failed to address with appropriate rigor the 'code of silence' that is an inherent concern among law enforcement agencies. It rarely finds or meaningfully punishes dishonesty and failure to report force incidents, and it takes months, (or even years) to address deputy misbehavior." The twin dysfunctions of secret and unauthorized members-only deputy groups, paired with an intimidating code of silence that denies, ignores or minimizes deputy misconduct, have fostered the toxic dynamic cited in numerous claims, lawsuits and disciplinary actions involving **Sheriff tattoo groups or gangs**. **Unfortunately, LASD management** through the years has not been particularly effective in investigating, or thwarting the rise of sheriff gangs, and this ambivalence **has likely enabled their continuation and expansion. Sheriff Baca vowed to address the problem, but as it turned out, he**

and some of his executive team were instrumental in <u>**creating the conditions that**</u> <u>**actually contributed to the uses of excessive force and the code of silence, tactics**</u> <u>**much favored by these groups. The culture within these groups enforced their**</u> <u>**code of silence, and made investigation difficult and dangerous.**</u>" (See Exhibit "A" hereto).  Defendant COLA admits that LASD and its Sheriff "**create[ed] the** **conditions that actually contributed to the uses of excessive force and the code** **of silence**" and Plaintiffs allege that this creation of conditions that contribute to excessive use of force and a code of silence, along with the admitted existence of the Banditos gang was moving force in Banditos members or Prospects, Defendants NIKOLIS ROJAS and JONATHON PEREZ shooting ANTHONY VARGAS in the back and back of the head when he posed no threat.  When shooting ANTHONY VARGAS, Defendants NIKOLIS ROJAS and JONATHON PEREZ not only knew they would suffer no discipline as a result of shooting ANTHONY VARGAS, they also knew that the shooting would be celebrated by the Supervisors at the East Los Angeles Station, by the Banditos gang that they were members of or Prospects of and that the code of silence would cover up their excessive use of force.

91.    In the Motion by COLA Supervisors Sheila Kuehl and Hilda Solis, Defendant COLA also admitted "<u>**There was no significant investigation or response in the**</u> <u>**department during the term of former Sheriff Jim McDonnell**</u>."  Plaintiffs are informed and believe and thereon allege that Sheriff McDonell promised to investigate the East Los Angeles Sheriff Gangs including the Banditos and produce a report after "the county paid a $1.5 million dollar settlement to a 10 year veteran female deputy assigned to ELA, in which she claimed that members of this gang "sexually harassed, threatened and demanded sex from her" as part of 'training' [and] that "also alleged observing favors being demanded from other female probationary deputies, including in one case, a trainee being asked to write arrest reports "that were essentially fabricated."  Instead, Sheriff McDonell, as an LASD and COLA policy

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1   maker, produced no report and was deliberately indifferent to the Banditos Sheriff
2   gang to continue at the East Los Angeles Station (which was endorsement of its
3   activities) which was a moving force in Banditos gang members or Prospects (aka
4   "puppies") Defendants NIKOLIS ROJAS and JONATHON PEREZ shooting
5   ANTHONY VARGAS.  Defendants NIKOLIS ROJAS and JONATHON PEREZ
6   having seen that there was an existing sheriff gang called the "Banditos" in which
7   they could advance their careers as members or Prospects (aka "puppies"), and seeing
8   that Sheriff McDonell would not only not investigate but bury any reports of such
9   misconduct and thereby endorse such misconduct, Defendants NIKOLIS ROJAS and
10  JONATHON PEREZ knew they could shoot ANTHONY VARGAS in the back and
11  he back of the head 12 or more times when he posed no threat, with no consequences
12  and this was the moving force in the excessive use of force by Defendants NIKOLIS
13  ROJAS and JONATHON PEREZ.  Plaintiffs allege that the way for Deputies to
14  advance at the East Los Angeles Station was to use excessive force and a code of
15  silence, Defendants NIKOLIS ROJAS and JONATHON PEREZ knew this and this
16  was the moving force in the excessive force shooting of ANTHONY VARGAS.
17  92.     In the Motion by COLA Supervisors Sheila Kuehl and Hilda Solis, Defendant
18  COLA also admitted "It is unacceptable that unauthorized, **exclusive self-affiliated**
19  **groups involving a code of silence and violence be part of the Sheriff's**
20  **Department. To continue to deny or minimize the impact their existence has on**
21  **custody <u>and station culture, as well as on the communities these groups serve, is</u>**
22  **<u>to foment and encourage their growth. Actions of these groups have actively</u>**
23  **<u>harmed residents of the County</u>**, other Sheriff's deputies and have cost the County
24  millions of dollars in lawsuits and settlements."  Defendants COLA and its LASD
25  have admitted that there exists and there existed at the time of the shooting of
26  ANTHONY VARGAS "a station culture" of sheriff's gangs that was a formal or
27  informal custom, policy and practice of violation of civil rights including using
28

excessive force and a code of silence "on the communities these groups serve." This station culture that included the Banditos gang was the moving force in the Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force shooting of ANTHONY VARGAS. At all times herein mentioned, Defendants COLA and its LASD and its policy makers, including, Baca, Scott, McDonell and supervisors at the East LA station, "fomented and encouraged the growth" of the Banditos gang and the actions of the Banditos gang "actively harmed residents of the County" including being this fomenting and encouraging, representing an unconstitutional custom, policy and practice, being the moving force in the Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force shooting of ANTHONY VARGAS.

93.    Plaintiffs are informed and believe and thereon allege that in 2016, Sheriff Jim McDonell knew the names of approximately 300 deputies who had committed misconduct so serious that it had to be disclosed to criminal defense attorneys in a Brady List. Defendants COLA and its LASD, through McDonell, did not fire the 300 but rather continued them in their employment. Additionally, the Sheriff's Deputies union, campaigned to not have the list released to anyone so that those Deputies who commit misconduct could continue to do so in secret with no consequences. As of the date of the shooting of ANTHONY VARGAS, this toleration of approximately 300 deputies who committed misconduct of such a nature continuing to be retained was widely known by Deputies including Defendants NIKOLIS ROJAS and JONATHON PEREZ and was a moving force in the excessive force shooting of ANTHONY VARGAS.

94.    At all times herein mentioned, Deputies employed by Defendants COLA and its LASD were, and, are regularly deploying excessive force. In particular, Deputies employed by Defendants COLA and LASD used excessive force on persons who were unarmed and/or did not represent a threat to life or of serious bodily injury as identified below. These incidents did not result in discipline and were a moving

1  force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force

2  shooting of ANTHONY VARGAS.

3  95.  **Deondre "Trey" Brunston.**  On or about August 24, 2003, Brunston died in

4  a hail of 81 bullets, fired by Los Angeles County Sheriff's Deputies, 22 of which hit

5  him, and which also fatally wounded a police dog.  There was no discipline for this

6  incident prior to the shooting of ANTHONY VARGAS.

7  96.  **Carl Williams.**  On or about June 13, 2006, Six Los Angeles County Sheriff's

8  Deputies fired about 70 rounds into the car occupied by Williams after a chase when

9  he represented no threat to life or serious bodily injury.  There was no discipline for

10  this incident prior to the shooting of ANTHONY VARGAS.

11  97.  **Bryan Moore.**  On or about June 26, 2008, Moore and he ran, jumped over a

12  fence holding his waist, and when officers ordered him to raise his hands, he looked

13  at the Deputies, who shot him to death.  Moore represented no threat to life or serious

14  bodily injury.  There was no discipline for this incident prior to the shooting of

15  ANTHONY VARGAS.

16  98.  **Christian Portillo.**  On or about June 13, 2006, Six Los Angeles County

17  Sheriff's Deputies approached a man in a parked car and one of the Deputies shot

18  him to death.  No drugs or weapons were found, but the police say Portillo had a

19  suspended license.  Portillo represented no threat to life or serious bodily injury.

20  There was no discipline for this incident prior to the shooting of ANTHONY

21  VARGAS.

22  99.  **Darrick Collins.**  On or about September 14, 2009, a Los Angeles County

23  Sheriff's Deputy chased Collins up his driveway and into his own backyard,

24  believing he was a robbery suspect.  The deputy fired at Collins through a wooden

25  gate, fatally hitting him in the back of the neck.  Portillo represented no threat to life

26  or serious bodily injury.  There was no discipline for this incident prior to the shooting

27  of ANTHONY VARGAS.

28

1    100.   On or about April 13, 2010 at approximately 10:00 p.m., near Kern Avenue
2    in East Los Angeles, Los Angeles County Sheriff Deputies shot and killed a subject
3    and no firearm was recovered.  The subject represented no threat to life or serious
4    bodily injury.  There was no discipline for this incident prior to the shooting of
5    ANTHONY VARGAS.

6    101.   **Dexter Luckett.**  On or about June 16, 2010, Los Angeles County Sheriff's
7    Deputies shot and killed Dexter Luckett.  Dexter Lucket was unarmed.  No weapon
8    was recovered at the scene.  Luckett represented no threat to life or serious bodily
9    injury.  There was no discipline for this incident prior to the shooting of ANTHONY
10   VARGAS.

11   102.   **Johnathan Cuevas.** On or about October 10, 2010, a Los Angeles County
12   Sheriff's Deputy shot and killed Johnathan Cuevas.  The deputy stopped next to men
13   walking, Cuevas ran and fell, then the deputy shot him on the ground.  The LA
14   County Sheriff's Office settled by paying the son of Cuevas $875,000 for a deputy
15   shooting Cuevas.  Despite this, there was no discipline for this incident prior to the
16   shooting of ANTHONY VARGAS.

17   103.   On or about December 1, 2010, on Hammel Street in East Los Angeles, Los
18   Angeles County Sheriff Deputies shot and killed a subject and no firearm was
19   recovered.  The subject represented no threat to life or serious bodily injury.  There
20   was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

21   104.   **Darrell Logan.**   On or about October 13, 2011, a Los Angeles County
22   Sheriff's Deputy shot and killed Darrell Logan.  A lawsuit alleged that the Sheriff's
23   Department contained a clique of deputies for whom it was a badge of honor to kill
24   a gang member, which Logan may have been suspected of being.  There was no
25   discipline for this incident prior to the shooting of ANTHONY VARGAS nor any
26   action to break up Sheriff gangs even after being sued for it.

27

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

105. **Jazmyne Ha Eng.**  On or about January 4, 2012, Los Angeles County Sheriff's Deputies shot and killed Jazmyne Ha Eng.  Eng, standing 4-foot-9 and weighing 93 pounds, was shot to death in the lobby of a mental health clinic where she was a schizophrenia patient.  Witnesses described her as sitting calmly before the arrival of the county police.  In February 2014 the family settled with the County of Los Angeles for $1.8 Million.  Eng represented no threat to life or serious bodily injury.  There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

106. **Christian Cobian.**  On or about January 21, 2012, Los Angeles County Sheriff's Deputies shot and killed Christian Cobian.  Deputies reported that they attempted to stop Cobian because he was riding a bike with no light, and he ran.  Deputies shot him to death.  No weapon was found.  Cobian represented no threat to life or serious bodily injury.  There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

107. **Arturo Cabrales.**  On or about March 7, 2012, Los Angeles County Sheriff's Deputies shot and killed Arturo Cabrales.  The family of Cabrales settled for $1.5 million because it was alleged that the deputies involved shot him when he was at his home, running away, and unarmed.  The deputies were alleged to be a part of a clique called The Regulators.  The Regulators are one of the Los Angeles County Sheriff's gangs that operates in East Los Angeles and it was not disbanded between March 7, 2012 and the August 12, 2018 shooting of ANTHONY VARGAS.  There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

108. **Tony Louis Francis.**  On or about August 28, 2012, a Los Angeles County Sheriff's Deputy shot and killed Tony Louis Francis.  The deputy followed Francis into a driveway and ended up shooting and killing him while he was still inside his vehicle.  No gun was found.  There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

109. **Jose de la Trinidad.** On or about November 10, 2012, Los Angeles County Sheriff's Deputies shot and killed Jose de La Trinidad. Deputies attempted a traffic stop on a vehicle in which De la Trinidad was a passenger. After a brief chase, he got out of the car and deputies shot him five times in the back, according to an autopsy. He was unarmed. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

110. **Rigoberto Arceo.** On or about May 5, 2013, a Los Angeles County Sheriff's Deputy shot and killed Rigoberto Arceo. Rigoberto Arceo was killed by a Sheriff deputy, on May 11, 2013, Mother's Day. The engaged 34-year old young father was returning home from a party, celebrating Mother's Day, when a Los Angeles County Sheriff's Deputy, L Mendoza, ordered Rigo to the ground. Rigo with his hands raised in the air, was telling Deputy Mendoza that he did not have to do anything, when the deputy shot him once in the chest. In order to try and justify the shooting Deputy Mendoza claimed that Rigo was trying to grab his gun. However, independent percipient witnesses who saw the shooting, described Rigo as having his hands raised over his head when he was shot and that he was approximately 10 feet away from the deputy when the deputy shot and killed him. Rigoberto Arceo was unarmed. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

111. **Ignacio Ochoa.** On or about May 14, 2013, a Los Angeles County Sheriff's Deputy shot and killed Ignacio Ochoa. Witnesses reported that Ochoa was riding his bike home after buying something to drink. He had his headphones on and couldn't hear a deputy's orders. A resident reported that the deputy handcuffed Ochoa and then shot him in the back of the head. He was unarmed. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

112. **Carlos Ernesto Oliva Sola.** On or about September 10, 2013, Los Angeles County Sheriff's Deputies shot and killed Carlos Ernesto Oliva Silva. Deputies were flagged by a bystander who reported a "man with gun" in the vicinity. They report

that they saw Oliva on the street, and that when they confronted him, he pointed a gun at them. Deputy Anthony Forlano shot and killed him. <u>Oliva reportedly was not the man they were looking for, and the autopsy report shows he was shot eight times from behind</u>. The family announced they would file a lawsuit against the LASD. <u>The family requested Forlano, who had shot 7 people, be fired</u>. Plaintiffs are informed and believe and thereon allege that there was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

113. **Salvador Martin Palencia Cruz.** On or about April 25, 2014, Los Angeles County Sheriff's Deputies Andrew Alatorre and Daniel Marquez shot and killed Salvador Martin Palencia Cruz. Salvador Martin Palencia Cruz was a 42-year-old loving husband and father. The deputies shot Palencia Cruz nine times as they stood within six feet while Mr. Palencia Cruz held a pastry spatula. A lawsuit was filed against COLA. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

114. **Noel Enrique Aguilar.** On or about May 26, 2014, Los Angeles County Sheriff's Deputies shot and killed Noel Enrique Aguiar Ignacio Ochoa. Aguilar was riding a bicycle, committing no crime. Los Angeles County Sheriff's Deputies disarmed Aguilar and shot him to death. The incident was captured on video and witnesses confirmed that Aguilar was unarmed when he was shot to death. The County of Los Angeles settled a lawsuit in the amount of $2,970,000.00 regarding the excessive force shooting death of Aguilar in September of 2017. Aguilar was unarmed when he was shot and he even told the deputies he was unarmed (captured on video). They shot him anyway. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

115. **Antoine Hunter and Geremy Evans.** On or about June 24. 2014, Los Angeles County Sheriff's Deputies Timothy Lee and Gregory Rodriguez, shot and killed Antoine Hunter and severely wounded Geremey Evans. Antoine Hunter and

Geremy Evans were in a vehicle that had come to a stop when the Deputies poured shots into the vehicle. Hunter did not have a gun in his hand. Evans dove in the back seat and was totally unarmed while the Deputies shot at him when he posed no threat whatsoever. COLA and LASD knew that Gregory Rodriguez was a member of a sheriff's gang and that he had gang tattoos but they withheld this information, including while represented by the same counsel who represent the deputies in the current case. The case of Antoine Hunter and Geremy Evans was settled for a substantial sum and only after it was settled was it revealed publicly that Deputy Rodriguez is sheriff's gang member with a sheriff's gang tattoo. Deputy Gregory Rodriguez aka "G-Rod" is one of the Deputies named in government claims filed by fellow deputies regarding a beating of fellow deputies from the East LA Station that took place in September, 2018. Although that beating of fellow sheriff's deputies by Banditos gang members took place in September, 2018, the Banditos gang existed on and before the August 12, 2018 shooting of ANTHONY VARGAS. This is part of a consistent pattern of COLA and LASD hiding information regarding deputy gang membership and is a moving force to deputies using excessive force knowing there are no consequences and that their use of force will always be ratified by COLA and its LASD. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS

116. **Johnny Ray Anderson.** On or about July 5, 2015, Los Angeles County Sheriff's Deputies shot and killed Johnny Ray Anderson. Deputies responding to reports of a prowler found Anderson and his wife, Kathleen, trespassing in a backyard and fatally shot the 42-year-old. Hundreds of people later protested the shooting. Johnny Ray Anderson was unarmed when he shot to death. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

117. **Eduardo Rodriguez.** On or about February 14, 2016, Los Angeles County Sheriff's Deputies shot and killed Eduardo Rodriguez. During the course of a traffic

stop, which deputies made in the course of a stolen-vehicle investigation, Deputies shot and killed Eduardo Rodriguez, who was unarmed.  There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

118.  **Francisco Garcia.**  On or about February 24, 2016, Los Angeles County Sheriff's Deputy Luke Liu shot and killed Francisco Garcia who was driving away in a car, completely unarmed and he was shot in the back.  The incident was caught on video.  No criminal charges were filed as of the date of the shooting of Anthony Vargas on August 12, 2018.  *After* the shooting of ANTHONY VARGAS, the Los Angeles County District Attorney has filed criminal charges against Deputy Luke Liu for this clearly excessive force shooting.  A lawsuit was filed and Defendant COLA paid a settlement of $1,750,000.00 in April of 2017 to Francisco Garcia's survivors.  Plaintiffs are informed and believe and thereon allege, that there was no discipline for this incident prior to the shooting of ANTHONY VARGAS or even to date.  In fact, the Deputy's union backs his actions and endorses them and other LASD deputies showed up to his arraignment to support Luke Liu who shot an unarmed man in the back. It appears that COLA and LASD are endorsing the obvious excessive force deadly shooting by LASD Deputy Luke Liu even *after* he is being criminally prosecuted.  There was no discipline for this incident prior to the shooting of ANTHONY VARGAS (or at all to date).

119.  **Christian Rene Medina.**  On or about March 16, 2016, Los Angeles County Sheriff's Deputies shot and killed Christian Rene Medina.  Deputies responded to a false robbery report and found Medina.  Medina was unarmed and he was shot and killed.  There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

120.  **Carmelo Pizarro, Jr.**  On or about July 19, 2018, Los Angeles County Sheriff's Deputy shot and killed Carmelo Pizarro, Jr.  Deputies chased Pizarro and caught up to him and then shot him to death. Pizzaro was unarmed when he was shot

1   and killed. There was no discipline for this incident prior to the shooting of
2   ANTHONY VARGAS.

3   121. These specific shooting incidents identified above, indicate that Defendant
4   COLA's the deputies were and are regularly deploying excessive force and these
5   specific incidents with no discipline demonstrate that COLA's policymakers and
6   supervisors had a custom, policy and practice of endorsing excessive force
7   shootings. This custom, policy and practice of endorsing excessive force shootings
8   was a moving force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ'
9   excessive force shooting of ANOTHONY VARGAS on August 12, 2018 when the
10  deputies shot ANOTHONY VARGAS 12 or more times in the back and the back of
11  the head knowing they could shoot him when he posed no threat and not be
12  disciplined. Additionally, Defendants NIKOLIS ROJAS and JONATHON PEREZ
13  knew that if they shot ANOTHONY VARGAS the Banditos gang would look
14  favorably on this and this also was a moving force in Defendants NIKOLIS ROJAS'
15  and JONATHON PEREZ' excessive force shooting of ANOTHONY VARGAS on
16  August 12, 2018. Defendants NIKOLIS ROJAS and JONATHON PEREZ were, at
17  all times herein mentioned members or prospects (aka "puppies") and/or wanted to
18  be looked upon favorably by the Banditos gang and shooting ANTHONY VARGAS
19  12 or more times in the back and the back of the head was a means to win favor with
20  the Banditos gang (who controlled the East LA station) and was a moving force in
21  Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force shooting
22  of ANOTHONY VARGAS on August 12, 2018.

23  122. The specific facts that there existed a Banditos gang in the East LA station
24  include that Sgt. Patty Estrada (referred to as "Pink Hand," a play on the Black Hand
25  tattoo worn by the Mexican Mafia prison gang) made sure the Banditos members
26  were not disciplined; that the Captain, sergeants, lieutenants, sergeants and
27  supervisors who were transferred *after* the shooting of ANTHONY VARGAS also

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1   made sure no deputies were disciplined for excessive force shootings and this was a

2   moving force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive

3   force shooting of ANOTHONY VARGAS on August 12, 2018.

4   123.   Defendants COLA and its LASD had not only constructive but *actual*

5   *knowledge* of the LASD sheriff gang problem and the Banditos in particular in the

6   East LA station when they were sued by the female deputy and when they settled her

7   action before the shooting of ANTHONY VARGAS.   The Captain, sergeants,

8   lieutenants, sergeants and supervisors who were transferred *after* the shooting of

9   ANTHONY VARGAS were known about by COLA *before* the shooting of

10  ANTHONY VARGAS but COLA and its LASD, including the policy makers, fired

11  no one, transferred no one, disciplined no one and paid $1.5 Million without taking

12  any action against the known Banditos gang whatsoever.   COLA and LASD just

13  knowingly left the Banditos in place.   This endorsement of the Banditos gang by

14  deliberate indifference and ratification of their actions let Defendants NIKOLIS

15  ROJAS and JONATHON PEREZ know that they could use excessive force with

16  impunity and that they would never be disciplined.   To date, Defendants NIKOLIS

17  ROJAS and JONATHON PEREZ have not been disciplined and COLA continues to

18  endorse their actions even after it is known that they have told inconsistent stories

19  and they shot ANTHONY VARGAS 12 or more times in the back and the back of

20  the head when he clearly represented no threat.

21  124.   The training that existed for Defendants NIKOLIS ROJAS and JONATHON

22  PEREZ before the shooting of ANTHONY VARGAS included the training at the

23  East LA station.   This training was by Sgt. Patty Estrada and the Captain, sergeants,

24  lieutenants, sergeants and supervisors who were transferred *after* the shooting of

25  ANTHONY VARGAS who trained NIKOLIS ROJAS and JONATHON PEREZ that

26  they could use excessive force and shoot those who posed no threat because there

27  would be no discipline for such excessive force shootings.   This training was a

28

40

moving force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force, unconstitutional shooting of ANTHONY VARGAS on August 12, 2018.

125. **Donta Taylor.** In addition to the other shootings identified above, in or about June of 2016, Los Angeles County Sheriff's Deputies shot and killed Donta Taylor. One of the deputies was Samuel Aldama who was a deputy at the center of controversy regarding sheriff gang tattoos. Deputy Aldama admitted that he had such a tattoo that he got two months before he shot Donta Taylor. Donta Taylor was unarmed when he was shot. In June of 2019, COLA paid $7 Million regarding the excessive force shooting of Donta Taylor. There was no discipline for this June 2016 incident prior to the shooting of ANTHONY VARGAS.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs requests entry of judgment in their favor and against Defendants as follows:

A. For compensatory damages, for wrongful death including damages for the loss of Decedent's life-long love, companionship, comfort, care, assistance, protection, affection, society; moral support; and the loss of relationship with Decedent, including loss of society, familial relationship and companionship in an amount according to proof at the time of trial;

B. For compensatory damages, for Survival for the mental, physical and emotional pain and suffering of Decedent in an amount according to proof at the time of trial;

C. For loss of financial support, sustenance and earning capacity in an amount according to proof at the time of trial;

D. For loss of gifts and benefits in an amount according to proof at the time of trial;

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1     E.  For punitive damages against the individual defendants in an amount to

2     be proven at trial;

3     F. For interest;

4     G. For reasonable costs of this suit and attorneys' fees, including pursuant to

5     42 U.S.C. § 1988;

6     H.  For all other damages allowed under federal and state law and;

7     I. For such further other relief as the Court may deem just, proper, and

8     appropriate.

9

10    Respectfully Submitted,

11    Dated:  August 19, 2019          GUIZAR, HENDERSON & CARRAZCO

12

13                       /S/ Humberto Guizar

14                By _____

                      HUMBERTO GUIZAR

15                       Attorney for Plaintiffs,

                      LISA VARGAS

16

17                 **DEMAND FOR JURY TRIAL**

18    Plaintiffs hereby demand a trial by jury.

19

20    Dated:  August 19, 2019          GUIZAR, HENDERSON & CARRAZCO

21

22                       /S/ Humberto Guizar

23                By _____

                      HUMBERTO GUIZAR

24                       Attorney for Plaintiffs,

                      LISA VARGAS

25

26

27

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**