# EXHIBIT [A]

**Humberto Guizar, Esq.**
**Kent Henderson, Esq.**
**Angel Carrazco, Esq.**



Tustin Office:
18301 Irvine Blvd.
Tustin, CA 92780
Tel: (714)541-8600
Fax: (714) 541-8601

# Guizar, Henderson & Carrazco
### LLP
#### Civil Rights | Trial Lawyers

3500 West Beverly Blvd., Montebello, CA 90640
Telephone: (323) 725-1151   Facsimile: (323) 597-0101

August 6, 2020

VIA U.S. & ELECTRONIC MAIL: akizzie@imwlaw.com
Mr. Antonio K. Kizzie, Esq.
Ivie, McNeil, Wyatt, Purcell & Diggs, APLC
444 S. Flower St., Suite 1800
Los Angeles, CA 90071

RE:     Meet and Confer regarding Discovery Dispute
        Vargas v. County of Los Angeles
        Case No. 8:19-cv-02313-DOC-KES

Dear Mr. Kinzie:

This correspondence is submitted for the purpose of addressing defendant's failure to produce the proper person as the PMK regarding the Banditos deputy gang/clique.

It is the Plaintiff's position you produced Sgt. Paul Valle of the LACSD as a ploy to preclude Plaintiff from obtaining evidence regarding the Banditos gang.  Mr. Valle cleared stated ion the record that he never heard of the Banditos gang until 4 months prior to the date of the deposition, which was today August 6, 2020. Sgt. Paul Valle further stated on the record that he was assigned to investigate an alleged hostile work environment at the ELA Sheriff's Department 4 months prior to his noticed deposition. Most importantly, he was ordered not to answer the most fundamental question regarding the Banditos. Specifically, I asked him who are the Banditos? You instructed him not to answer the question by stating he is not going to answer because the information is part of the so-called ongoing investigation. There were also many other questions that you instructed the witness not to answer by use of the pretext that anything he knows about the Banditos is part of the investigation that is ongoing.

Defendants production of Sgt. Valle was a form of classic gamesmanship and grounds for sanctions. You knew that by producing this witness Plaintiff would not be able to obtain any meaningful information regarding the Banditos. This failure to produce the proper witness is a direction violation of FRCP Rule 30 (b) (6) and an obstruction of justice. The notice in the deposition was stated with Reasonable particularity in compliance with rule30 (b) (6). The notice specifically requested the Deposition of *The Person Most Knowledgeable From The Los Angeles County Sheriff's Department Regarding The Deputy Gangs And The Banditos Gang Operating Out Of The East Los Angeles Station.*

Unlike a deposition notice pursuant to Rule 30(b)(1) for the deposition of percipient witnesses, the Rule 30(b)(6) notice must describe with reasonable particularity the matters to be examined.

1

The notice must inform the noticed organization of matters that will be inquired about so that the organization can determine the identity and number of people whose presence will be necessary to provide an adequate response. These matters must be tied to claims at issue and structured to address questions related to the claims.  You knew the substance of the information Plaintiff was seeking and you intentionally produced the wrong person.

Pursuant to Federal Rules of Civil Procedure 37 (a)(l), please allow this letter to serve as our attempt to meet and confer to resolve this discovery dispute. I intend to file a Joint Discovery Motion to compel the COLA to produce the proper PMK regarding the deputy gangs and the banditos gang operating out of the East Los Angeles precinct.  The deposition of the proper PMK is essential to Plaintiff's Monell cause of action and that person must be produced.

Under Local Rule 37-1, an in-person meeting is required to discuss these matters. Please advise as to your availability to complete the meeting within the next ten (10) days in order to resolve the above issues without seeking relief from the court. As you know, because of the current situation with the COVID-19 pandemic we can proceed telephonically, and or virtually via Zoom.

Referencing the LR 37-1 10-day requirement, we must confer no later than August 17, 2020. Currently, I am available to meet and confer on August 12, August 13, August 14, or August 17, 2020 at 1:00 p.m., on either day. Please let me know which day is your preference.

If you have any other questions about this letter or anything else, please do not hesitate to contact me.

Sincerely,

/s/
Humberto Guizar, Esq.,

# EXHIBIT [B]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.   2:19–cv–03279–PSG–AS                          Date   3/10/2020
Title     LISA VARGAS V. COUNTY OF LOS ANGELES ET AL

Present: The Honorable  **PHILIP S. GUTIERREZ**

|             Wendy K. Hernandez             |              Not Reported              |
| :----------------------------------------: | :------------------------------------: |
|               Deputy Clerk                 |              Court Reporter            |

|    Attorneys Present for Plaintiffs:    |    Attorneys Present for Defendants:    |
| :------------------------------------: | :------------------------------------: |
|              Not Present                |              Not present               |

**Proceedings (In Chambers):  VACATING SCHEDULING CONFERENCE**

On the Court's own motion, the Scheduling Conference presently set for hearing on 3/16/20 is **VACATED**, and the following dates are hereby set.  Please review the Court's trial order for further details.

| | |
|---|---|
| Last Day to Add Parties & Amend Pleadings:<br>(Doe defendants are dismissed as of cut–off to add parties) | 4/16/2020 |
| Discovery Cut–Off: | 11/10/2020 |
| Last Day to File Motion: | 11/24/2020 |
| Opening Expert Witness Disclosure:<br>[See F.R.Civ.P. 26(a)(2)] | 11/17/20 |
| Rebuttal Expert Witness Disclosure: | 12/15/20 |
| Expert Discovery Cut–Off: | 1/05/20 |
| Final Pretrial Conference (2:30 p.m.): | 2/1/2021 |
| Jury Trial (9:00 a.m.): | 2/16/2021 |
| Estimated Length: | 5 days |

Initials of Preparer:  wm

# EXHIBIT [C]

Humberto M. Guizar, Esq., (SBN 125769); hguizar@ghclegal.com
Kent M. Henderson, Esq. (SBN 139530) hendolaw@gmail.com
GUIZAR, HENDERSON & CARRAZCO, L.L.P.
3500 West Beverly Blvd., Montebello, CA 90640
Telephone: (323) 725-1151
Facsimile: (323) 597-0101
Attorneys for Plaintiff,
LISA VARGAS

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| LISA VARGAS<br>　　　　Plaintiff<br><br>　　　v.<br><br>COUNTY OF LOS ANGELES,<br>NIKOLIS PEREZ, JONATHAN<br>ROJAS, and DOES 1 through 10,<br>inclusive,<br><br>　　　Defendants | **CASE NO.: 2:19-cv-03279-PSG-AS**<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>1. Battery (Wrongful Death)<br>2. Negligence (Wrongful Death)<br>3. Violation Of 52.1 Of The California Civil Code<br>4. Unreasonable Search and Seizure—Excessive Force and Denial of Medical Care (42 U.S.C. § 1983);<br>5. Substantive Due Process (42 U.S.C. § 1983);<br>6. Municipal Liability for Unconstitutional Custom, Practice, or Policy (42 U.S.C. § 1983);<br><br>**DEMAND FOR JURY TRIAL** |

1  **COMPLAINT FOR DAMAGES**

2  1.    Plaintiff LISA VARGAS individually in her Complaint against Defendants

3  COUNTY OF LOS ANGELES (hereinafter also sometimes referred to as,

4  "COUNTY" or "County" or "COLA"); NIKOLIS PEREZ, JONATHAN ROJAS,

5  and DOES 1 THROUGH 10, inclusive (collectively "Defendants"), allege as

6  follows:

7

8  **INTRODUCTION**

9  2.    This action seeks compensatory and punitive damages from individual deputy

10  sheriffs, from senior sheriff's department officials, and from the County of Los

11  Angeles for violations state law and fundamental rights under the United States

12  Constitution in connection with the brutal police shooting and killing of ANTHONY

13  VARGAS on August 12, 2018. Decedent ANTHONY VARGAS was shot dead by

14  Defendants, Los Angeles County Sheriff Deputies; NIKOLIS PEREZ, and

15  JONATHAN ROJAS on August 12, 2018.

16  3.    Decedent ANTHONY VARGAS is but one of many recent victims of a

17  disturbing trend featuring unarmed citizens shot dead by sheriff deputies employed

18  by the County of Los Angeles. Rather than take measures to address the staggering

19  epidemic and wave of such shootings, such as holding the culprits accountable, local

20  authorities have fomented a culture pursuant to which individual deputies and their

21  supervisors look the other way when such shootings take place and when deputies

22  involved fabricate stories that purport to justify the shootings. There have been

23  numerous shootings per year every year by COUNTY OF LOS ANGELES Sheriff

24  Deputies who shoot and kill unarmed persons who have fired no shots, including

25  from 2007 through the date of the shooting of Decedent ANTHONY VARGAS.

26  From at least 2008 through the date of the shooting of Decedent ANTHONY

27  VARGAS, Defendant COUNTY OF LOS ANGELES has maintained a custom,

28  policy and practice in which its Deputies are permitted to shoot persons who are

2

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1   visibly unarmed and who have fired no shots and in which the COUNTY OF LOS
2   ANGELES Sheriff Deputies are not fired or disciplined for such unjustified
3   shootings, thereby condoning this practice of over and over, time and again shooting
4   unarmed civilians.  This policy of shooting unarmed civilians was a moving force in
5   the shooting of Decedent ANTHONY VARGAS on August 12, 2018.

6   4.      The policies and customs behind shootings of unarmed civilians such as
7   ANTHONY VARGAS are fundamentally unconstitutional and constitute a menace
8   of major proportions to the public.  Accordingly, insofar as Plaintiff herein seeks by
9   means of this action to hold accountable those responsible for the killing of
10  ANTHONY VARGAS and to challenge the County's unconstitutional policies and
11  practices, this civil rights action is firmly in the public interest.

12                                    **PARTIES**

13  5.      At all relevant times, ANTHONY VARGAS (hereinafter, sometimes referred
14  to herein as "Decedent") was an individual residing in the County of Los Angeles,
15  California.

16  6.      Plaintiff LISA VARGAS is an individual residing in the COUNTY OF LOS
17  ANGELES and is the mother of Decedent. Plaintiff LISA VARGAS sues in her
18  individual capacity as the mother of the Decedent, and in a representative capacity as
19  a successor-in-interest to Decedent and THE ESTATE OF ANTHONY VARGAS
20  pursuant to California C.C.P. Section 377.32. Plaintiff LISA VARGAS is an "heir
21  at law" (C.C.P. Section 373.60, wrongful death) and a "successor-in-interest" (C.C.P.
22  Section 377.30, survival) to Decedent ANTHONY VARGAS. Plaintiff LISA
23  VARGAS seeks both wrongful death and survival damages under federal and state
24  law. Furthermore, Plaintiff LISA VARGAS seeks all damages available under
25  federal and state law including under C.C.P. Section 373.60 (wrongful death); C.C.P.
26  Section 373.30 (survival) and under federal law for wrongful death and survival. The
27  damages sought by Plaintiff LISA VARGAS for the death of her son, ANTHONY
28  VARGAS, include for loss of Decedent's love, companionship, comfort, care,

3
**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1   assistance, protection, affection, society, moral support; loss of financial support and
2   earning capacity; loss of gifts and benefits; funeral and burial expenses; loss of
3   relationship with Decedent, including loss of society and companionship and the
4   mental, physical and emotional pain and suffering of Decedent and all other damages
5   allowed under federal and state law. Plaintiff the ESTATE OF ANTHONY
6   VARGAS appears through its successor-in-interest, the Plaintiff LISA VARGAS.

7   7.      Defendant COUNTY OF LOS ANGELES (hereinafter, referred to as
8   "COLA") is a public entity whose deputies operate under color of law or authority,
9   in their individual and representative capacities and in the course and scope of their
10  employment with the capacity to sue and be sued. Defendant COLA is responsible
11  for the actions, omissions, policies, procedures, practices and customs of its various
12  agents and agencies. At all times relevant to the facts alleged herein, Defendant
13  COLA was responsible for assuring that the actions, omissions, policies, procedures,
14  practices, and customs of its employees complied with the laws and the Constitutions
15  of the United States and the State of California. Defendant COLA employs persons
16  including through Departments that include the LOS ANGELES COUNTY
17  SHERIFF'S DEPARTMENT (hereinafter, sometimes referred to as "LASD").

18  8.      Defendants Deputy NIKOLIS PEREZ, (hereinafter also referred to as
19  "PEREZ") and Deputy JONATHAN ROJAS, (hereinafter also referred to as
20  "ROJAS") (hereinafter also referred to as are LASD   sheriff deputies working for
21  COLA and LASD. On August 12, 2018, Defendants PEREZ, and ROJAS, in their
22  individual capacities, acting under color of law and in the course and scope of their
23  employment with COLA shot and killed Decedent.

24  9.      At all relevant times, defendants PEREZ, ROJAS, and Does 1 Through 10
25  were employees of the LASD. At all times relevant herein, defendant NIKOLIS
26  PEREZ, JONATHAN ROJAS and each of the defendants Does 1 Through 10 were
27  an employee and/or agent of defendant COUNTY and each of these individual
28  defendants acted under color of law, to wit, under the color of the statutes, ordinances,

4
**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1  regulations, policies, customs, and usages of Defendant COLA and the LASD, as

2  well as under the color of the statutes and regulations of the State of California.

3  10.    At all relevant times, defendants PEREZ, ROJAS, and each of the Defendant's

4  Does 1 Through 10 was acting within his or her capacity as an employee, agent,

5  representative and/or servant of COLA.

6  11.    Defendants PEREZ, ROJAS, and Does 1 Through 10 are sued in their

7  individual capacities for damages only.

8  12.    On information and belief, at all relevant times, Defendants PEREZ, ROJAS

9  and Does 1 Through 10, inclusive, were residents of County of Los Angeles,

10  California. Defendants PEREZ, and ROJAS, are sued herein in their individual

11  and/or representative capacity and/or in their capacity as employees and agents of

12  Defendant COLA.

13  13.    At all relevant times, PEREZ, ROJAS, and Does 1 Through 10, inclusive, were

14  duly authorized employees and agents of COLA, who were acting under color of law

15  within the course and scope of their individual and/or representative capacities and

16  respective duties as deputies and law enforcement agents and with the complete

17  authority and ratification of their principal, Defendant COLA.

18  14.    At all relevant times, Defendants PEREZ, ROJAS, and Does 1 Through 10,

19  inclusive, were duly appointed officers and/or employees or agents of COLA, subject

20  to oversight and supervision by COLA's elected and non-elected officials.

21  15.    In doing the acts and failing and omitting to act as hereinafter described,

22  defendants PEREZ, ROJAS, and Does 1 Through 10 were acting on the implied and

23  actual permission and consent of COLA.

24  16.    The true names of defendants Does 1 Through 10, inclusive, are unknown to

25  Plaintiffs, who therefore sues these defendants by such fictitious names. Plaintiffs

26  will seek leave to amend this complaint to show the true names and capacities of

27  these defendants when they have been ascertained. Each of the fictitious named

28

1   defendants is responsible in some manner for the conduct and liabilities alleged

2   herein.

3   17.    Each of the Defendants caused and is responsible for the unlawful conduct and

4   resulting, by, inter alia, personally participating in the conduct, or acting jointly and

5   in concert with others who did so; by authorizing, acquiescing or failing to take action

6   to prevent the unlawful conduct; by promulgating policies and procedures pursuant

7   to which the unlawful conduct occurred; by failing and refusing, with deliberate

8   indifference to Plaintiffs and Decedent's rights, to initiate and maintain adequate

9   supervision and/or training; and, by ratifying the unlawful conduct that occurred by

10   agents and peace officers under their direction and control.  Whenever and wherever

11   reference is made in this Complaint to any act by a Defendant, such allegation and

12   reference shall also be deemed to mean the acts and failures to act of each Defendant

13   individually, joint, and severally. They are sued in their individual and official

14   capacities and in some manner are responsible for the acts and omissions alleged

15   herein.  Plaintiffs will ask leave of this Court to amend this Complaint to allege such

16   name and responsibility when that information is ascertained.  Each of Defendants is

17   the agent of the other and the actions of each of the Defendants were ratified by the

18   other Defendants.

19                          **JURISDICTION AND VENUE**

20   18.    This action is properly filed in the Los Angeles Superior Court, Central

21   District, as it is a wrongful death case and seeks remedies under state law for the

22   personal injuries suffered by the Decedent, ANTHONY VARGAS, as well as his

23   mother, plaintiff LISA VARGAS. Furthermore, this civil action is brought by

24   plaintiff LISA VARGAS for the redress of alleged depravations of constitutional

25   rights as protected by 42 U.S.C. §§ 1983, 1985, 1986, 1988, the Fourth and

26   Fourteenth Amendment of the United States Constitution, and the California

27   Constitution. Jurisdiction is founded on 28 U.S.C. §§ 1331, 1343, and 1367.

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

19.     Venue is proper in this Court because defendants reside in, and in all incidents, events, and occurrences giving rise to this action occurred in, the County of Los Angeles, California. Each Plaintiff herein timely and properly filed tort claims pursuant to Cal. Gov. Code § 910 et seq., and this action is timely filed within all applicable statutes of limitations.

///

///

## **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

20.     Plaintiff repeats and re-alleges each allegation in paragraphs 1 through 19 of this Complaint with same force and effect as if fully set forth herein.

21.     Decedent was born on July 27, 1997, and he was 21 years old at the time of his death.

22.     On the evening of August 12, 2018, Decedent, ANTHONY VARGAS was walking in the Maravilla community located in East Los Angeles, California intending to go home. Defendants PEREZ, ROJAS, and Does 1 Through 10 observed Decedent and they attempted to question him. Decedent panicked as he fled on foot. Defendants PEREZ, ROJAS, and Does 1 Through 10 shot Decedent multiple times and killed him.

23.     Without issuing any warning that shots were going to be fired, and in violation of COLA policy, Defendants PEREZ, and ROJAS, fired their firearms at Decedent.

24     Decedent sustained injuries, pain, and suffering, and death when he was shot dead by Defendants PEREZ, and ROJAS, who were acting under color of law, in their individual and official capacities and as employees of COLA/LASD. The Decedent was unarmed and at the time of the shooting posed no imminent threat of death or serious bodily injury to any person and the force that was used by Defendants NIKOLIS PEREZ, JONATHAN ROJAS was unreasonable, excessive deadly force.

25.     Upon information and belief, at the time he was shot, Decedent was not in possession of a weapon.  Moreover, Decedent was leaving the scene of the incident.

7

1  There was no crime in progress. Decedent posed no imminent threat of death or
2  serious bodily injury to Defendant NIKOLIS PEREZ, JONATHAN ROJAS, or any
3  other sheriff deputy or person.

4  26.    Defendants PEREZ and ROJAS did not warn Decedent that they were about
5  to shoot hm.

6  27.    Upon information and belief, after being shot, Decedent collapsed was
7  immobile and bleeding profusely and in obvious critical need of immediate
8  emergency care and treatment.  Instead of immediately providing or facilitating
9  emergency care and treatment, Decedent's need for immediate medical care was
10 ignored. Defendant's NIKOLIS PEREZ, JONATHAN ROJAS and DOES 1
11 THROUGH 10, inclusive did not timely summon medical care or permit medical
12 personnel to treat Decedent. The delay of medical care to Decedent caused Decedent
13 extreme physical and emotional pain and suffering and was a contributing cause of
14 Decedent's death.

15 28.    Within six months of the Incident, Plaintiffs timely and appropriately
16 presented and filed Government Claims with the Defendant COLA in this action.
17 The Government Claims were rejected and the filing of this action, as to the State
18 Claims for Relief, within six months of the rejection, are timely filed.  Additionally,
19 the Federal Claims for Relief are also timely filed within two years of the Incident.

20 **FIRST CLAIM FOR RELIEF**
21 **FOR BATTERY CAUSING WRONGFUL DEATH)**
   **(Cal. Govt. Code §820 And California Common Law);**
22 **(BY PLAINTIFF LISA VARGAS AND THE ESTATE OF ANTHONY**
23 **VARGAS, AGAINST DEFENDANTS NIKOLIS PEREZ,**
   **JONATHAN ROJAS)**
24
25 29.    Plaintiff repeats and re-alleges each allegation in paragraphs 1 through 58 of
   this Complaint with the same force and effect as if fully set forth herein.
26
   30.    Defendants PEREZ, ROJAS, while working as a deputy sheriff for COLA, and
27
28 acting within the course and scope of their duties, intentionally shot Decedent.  As a

8

1    result of these actions, Decedent suffered severe pain and suffering and ultimately

2    died from his injuries and lost earning capacity. Defendant PEREZ, ROJAS, had no

3    legal justification for using force against Decedent and the use of force was excessive

4    and unreasonable.

5    31.    As a direct and proximate result of the actions of Defendants, Plaintiff LISA

6    VARGAS suffered the loss of her Father, Decedent ANTHONY VARGAS,

7    including damages for the loss of Decedent's life-long love, companionship, comfort,

8    care, assistance, protection, affection, society, moral support; loss of financial

9    support, sustenance and earning capacity; loss of gifts and benefits; funeral and burial

10    expenses; loss of the reasonable value of household services; loss of relationship with

11    Decedent, including loss of society and companionship and all other damages

12    allowed under state law.

13    32.    COLA is vicariously liable for the wrongful acts of Defendants PEREZ and

14    ROJAS pursuant to section 815.2(a) of the California Government Code, which

15    provides that a public entity is liable for the injuries caused by its employees within

16    the scope of the employment if the employee's acts would subject him or her to

17    liability.

18    33.    The conduct of Defendants PEREZ and ROJAS was malicious, wanton,

19    oppressive, and accomplished with a conscious disregard for the rights of Plaintiff

20    LISA VARGAS and Decedent, entitling Plaintiff LISA VARGAS in each case

21    individually and as a successor-in-interest to Decedent, to an award of exemplary and

22    punitive damages as to Defendants PEREZ, and ROJAS.

### SECOND CLAIM FOR RELIEF
**(BY PLAINTIFF LISA VARGAS AND THE ESTATE OF ANTHONY VARGAS, FOR NEGLIGENCE, (WRONGFUL DEATH) (BY PLAINTIFF LISA VARGAS AGAINST DEFENDANTS NIKOLIS PEREZ, JONATHAN ROJAS and DOES 1 THROUGH 10)**

34.    Plaintiff repeats and reallege each allegation in paragraphs 1 through 33 of this

Complaint with the same force and effect as if fully set forth herein.

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

35. The actions and inactions of Defendants, including the actions of Defendants PEREZ, ROJAS, and Does 1 Through 10, were negligent and reckless, including but not limited to:

(a) the failure to properly and adequately assess the need to detain, arrest, and use force or deadly force against Decedent ANTHONY VARGAS;

(b) the negligent tactics and handling of the situation with Decedent ANTHONY VARGAS, including pre-shooting negligence;

(c) the negligent detention, arrest, and use of force, including deadly force, against Decedent ANTHONY VARGAS;

(d) the failure to provide prompt medical care to Decedent ANTHONY VARGAS;

(e) the failure to properly train and supervise employees, both professional and non-professional, including Defendants PEREZ, ROJAS, and Does 1 Through 10, including, but not limited to the failure to train to follow the COUNTY OF LOS ANGELES Sheriff Department Manual of Policies and Procedures;

(f) the failure to ensure that adequate numbers of employees with appropriate education and training were available to meet the needs of and protect the rights of Decedent ANTHONY VARGAS;

(g) the violation of Defendant COUNTY OF LOS ANGELES Sheriff Department Manual of Policies and Procedures regarding use of force, and violation of other portions of the Manual and tactics;

36. As a direct and proximate result of Defendants' conduct as alleged above, and other undiscovered negligent conduct, Decedent was caused to suffer severe pain and suffering and ultimately died and lost earning capacity. Also, as a direct and proximate result of Defendants' conduct as alleged above, Plaintiffs suffered extreme and severe mental anguish and pain and have been injured in mind and body. Plaintiffs also have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of Decedent, and will continue to be so deprived

10

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1   for the remainder of their natural lives. Plaintiffs also are claiming funeral and burial

2   expenses and a loss of financial support.

3   37.   The COUNTY is vicariously liable for the wrongful acts of Defendants

4   PEREZ, ROJAS, and Does 1 Through 10 pursuant to section 815.2(a) of the

5   California Government Code, which provides that a public entity is liable for the

6   injuries caused by its employees within the scope of the employment if the

7   employee's act would subject him or her to liability.

8   38.   The conduct of Defendants PEREZ, ROJAS, and Does 1 Through 10 was

9   malicious, wanton, oppressive, and accomplished with a conscious disregard for the

10  rights of Plaintiffs and Decedent, entitling Plaintiff, individually and as successor-in-

11  interest to Decedent, to an award of exemplary and punitive damages as to individual

12  Defendants NIKOLIS PEREZ, JONATHAN ROJAS and DOES 2-10.

13  39.   Plaintiffs LISA VARGAS brings her claim in each case, individually as an

14  heir at law of Decedent in wrongful death and as successor-in-interest to the

15  Decedent and to The Estate of ANTHONY VARGAS, and in each case, seek both

16  survival and wrongful death damages for the violation of Decedent's rights.

17  **THIRD CLAIM FOR RELIEF**

18  **BY PLAINTIFF LISA VARGAS AND THE ESTATE OF ANTHONY**

19  **VARGAS, FOR VIOLATION OF THE SECTION 52.1 OF THE**

20  **CALIFORNIA CIVIL CODE – AGAINST DEFENDANTS NIKOLIS PEREZ,**

21  **JONATHAN ROJAS and DOES 1 THROUGH 10)**

22  40.   Plaintiff repeats and reallege each allegation in paragraphs 1 through 39 of this

23  Complaint with the same force and effect as if fully set forth herein.

24  41.   This action is brought pursuant to section 52.1 of the California Civil Code.

25  The present action is also brought pursuant to section 820 and 815.2 of the

26  Government Code. Pursuant to section 820 of the California Government Code, as

27  a public employee, Defendants PEREZ, ROJAS, and Does 1 Through 10 are liable

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1   for injuries caused by their acts or omissions to the same extent as a private person.

2   At all times mentioned herein, Defendants PEREZ, ROJAS, and Does 1 Through 10

3   were acting within the course and scope of their employment and/or agency with

4   defendant COUNTY OF LOS ANGELES. As such defendant COUNTY OF LOS

5   ANGELES is liable in respondent superior for the injuries caused by the acts and

6   omissions of Defendants PEREZ, ROJAS, and Does 1 Through 10 pursuant to

7   section 815.2 of the California Government Code.

8   42.    Plaintiff's Decedent, ANTHONY VARGAS was subjected to excessive force

9   by Defendants PEREZ, ROJAS, and Does 1 Through 10 in the form of gunshots fired

10   by said defendants which struck ANTHONY VARGAS and caused him serious

11   personal injuries from which he eventually died. The shooting was unreasonable and

12   unwarranted as the circumstances under which the shooting occurred did not require

13   the use of any force whatsoever. As an unreasonable use of force, the shooting

14   constituted a violation of ANTHONY VARGAS's constitutional rights against

15   unreasonable searches and seizures protected by the Constitution of the State of

16   California.

17   43.    All of the above acts and omissions of Defendants PEREZ, ROJAS, and Does

18   1 Through 10 were willful, wanton, malicious and oppressive thereby justifying the

19   awarding of exemplary and punitive damages as to said defendant.

20   44.    As a proximate result of the acts of Defendants PEREZ, ROJAS, and Does 1

21   Through 10, ANTHONY VARGAS's suffered multiple gunshot wounds which

22   caused him severe injuries from which he eventually died.

23   45.    The above acts of defendants violated ANTHONY VARGAS's civil rights as

24   protected by section 52.1 of the Civil Code. As such, Plaintiff LISA VARGAS is

25   entitled to compensatory damages according to proof, including those permitted by

26   Section 52 of the Civil Code, punitive and exemplary damages, the costs of suit

27

28

incurred in this action, reasonable attorney's fees as permitted by the Civil Code section 51.7 and 52, and any other additional relief that the court deems proper.

## FOURTH CLAIM FOR RELIEF

### FOR UNREASONABLE SEARCH AND SEIZURE— UNREASONABLE AND/OR EXCESSIVE FORCEAND DENIAL OF MEDICAL CARE (42 U.S.C. § 1983); (By Plaintiff LISA VARGAS individually, and as successor in interest to DECEDENT ANTHONY VARGAS, by and Through her Guardian Ad Litem, ESMERALDA ESTEBAN; and THE ESTATE OF ANTHONY VARGAS, Against Defendants NIKOLIS PEREZ, JONATHAN ROJAS and DOES 1 THROUGH 10, inclusive)

46.    Plaintiffs repeat and re-allege each allegation in paragraphs 1 through 45 of this Complaint with the same force and effect as if fully set forth herein.

47.    The unjustified shooting of Decedent by Defendants PEREZ, ROJAS, and other unknown DOE defendants deprived Decedent of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Decedent under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.  On August 12, 2018, Defendants PEREZ, ROJAS, and Does 1-10, acting in their individual and/or representative capacities, in the course and scope of their employment with Defendant COLA, acting under color of law, used unreasonable and excessive deadly force and violated the Constitutional Rights of when they shot and killed Decedent. Decedent did not represent an imminent threat of death or serious bodily injury and the deadly force used by Defendants PEREZ, ROJAS, and Does 1-10, was objectively unreasonable force that proximately caused the death of Decedent in violation of 42 U.S.C. Section 1983.

48.    By virtue of their misconduct, defendants PEREZ, ROJAS, and Does 1 Through 10, inclusive are liable for Decedent's injuries, either because these

13

1  defendants were integral participants in the use of excessive force, or because they

2  failed to intervene to prevent these violations.

3  49.     Defendants PEREZ, ROJAS, and Does 1 Through 10, inclusive knew that

4  failure to provide timely medical treatment to Decedent could result in further

5  significant injury or the unnecessary and wanton infliction of pain, but nevertheless

6  disregarded his serious medical needs, causing him great bodily harm, physical and

7  emotional pain and suffering, and death.

8  50.     This use of deadly force was excessive and objectively unreasonable under the

9  circumstances. Defendants' actions thus deprived Decedent of his right to be free

10  from unreasonable searches and seizures under the Fourth Amendment and applied

11  to state actors by the Fourteenth Amendment.

12  51.     As a direct and proximate result of the actions of Defendants, Plaintiff LISA

13  VARGAS suffered the loss of her loving son, Decedent ANTHONY VARGAS,

14  including damages for the loss of Decedent's life-long love, companionship, comfort,

15  care, assistance, protection, affection, society, moral support; loss of financial

16  support, sustenance and earning capacity; loss of gifts and benefits; funeral and burial

17  expenses; loss of the reasonable value of household services; loss of relationship with

18  Decedent, including loss of society and companionship and the mental, physical and

19  emotional pain and suffering of Decedent and all other damages allowed under

20  federal and state law. Plaintiff LISA VARGAS by this action, further claims all of

21  Plaintiffs' attorneys' fees and costs incurred and to be incurred in Plaintiff presenting,

22  maintaining and prosecuting this action under 42 U.S.C. Section 1988.

23  52.     The conduct of Defendants PEREZ, ROJAS, and Does 1 Through 10, inclusive

24  was willful, wanton, malicious, and done with reckless disregard for the rights and

25  safety of Decedent and therefore warrants the imposition of exemplary and punitive

26  damages as to Defendants PEREZ, ROJAS, and DOES 1 THROUGH 10, inclusive.

27  ///

28

# FIFTH CLAIM FOR RELIEF

## FOR VIOLATION OF SUBSTANTIVE DUE PROCESS (42 U.S.C. § 1983);

### (By Plaintiff LISA VARGAS Against Defendants NIKOLIS PEREZ,

### JONATHAN ROJAS, and DOES 1 THROUGH 10, inclusive)

53.     Plaintiffs repeat and re-allege each allegation in paragraphs 1 through 52 of this Complaint with the same force and effect as if fully set forth herein.

54.     Plaintiff LISA VARGAS, as the parent of Decedent ANTHONY VARGAS, had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive them life, liberty, or property in such a manner as to be deliberately indifferent to the constitutional rights of the Decedent, including but not limited to unwarranted state interference in Plaintiff's familial relationship with their son, Decedent ANTHONY VARGAS.

55.     Decedent ANTHONY VARGAS had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that would deprive him of life, liberty, or property in such a manner as to be deliberately indifferent to the constitutional rights of the Decedent.

56.     The aforementioned actions of Defendants PEREZ, ROJAS, and Does 1 Through 10, along with other undiscovered conduct, were deliberately indifferent to the constitutional rights of the Decedent and Plaintiff LISA VARGAS, in that said Defendants had time to deliberate and then used deadly force that shocks the conscience in violation of the constitutional rights of Decedent and Plaintiff LISA VARGAS, and with purpose to harm unrelated to any legitimate law enforcement objective in violation of 42 U.S.C. Section 1983.

///

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1  57.   Defendants PEREZ, ROJAS, and Does 1 Through 10 thus violated the
2  substantive due process rights of Plaintiffs LISA VARGAS to be free from
3  unwarranted interference with their familial relationship with Decedent.

4  58.   As a direct and proximate cause of the acts of Defendants PEREZ, ROJAS,
5  and Does 1 Through 10, Plaintiffs have been deprived of the life-long love,
6  companionship, support, society, care, and sustenance of Decedent, and will continue
7  to be so deprived for the remainder of their natural lives.

8  59.   Plaintiffs ANTHONY VARGAS Sr., and MARIA REZA bring this claim in
9  each case individually, and in each case, seek death damages for the violation of their
10 constitutional rights to a familial relationship with Decedent. Plaintiffs ANTHONY
11 VARGAS Sr., and MARIA REZA by this action further claim all of Plaintiffs'
12 attorneys' fees and costs incurred and to be incurred in Plaintiffs presenting,
13 maintaining and prosecuting this action under 42 U.S.C. Section 1988.

14 60.   The conduct of PEREZ, ROJAS, and Does 1 Through 10 was willful, wanton,
15 malicious, and done with reckless disregard for the rights and safety of Decedent and
16 Plaintiffs and therefore warrants the imposition of exemplary and punitive damages
17 as to Defendants PEREZ, ROJAS, and Does 1 Through 10.

## SIXTH CLAIM FOR RELIEF

### FOR MUNICIPAL LIABILITY FOR UNCONSTITUTIONAL CUSTOM OR POLICY (42 U.S.C. § 1983);

### (By Plaintiff LISA VARGAS Against COUNTY OF LOS ANGELES and DOES 1 THROUGH 10)

61.   Plaintiffs repeat and re-allege each allegation in paragraphs 1 through 60 of this Complaint with the same force and effect as if fully set forth herein.

62.   On information and belief, Defendants PEREZ, ROJAS, unjustified shooting of Decedent was found to be within COLA/LASD policy.

63. On information and belief, Defendants PEREZ, ROJAS, unjustified shooting of Decedent was ratified by COLA/LASD supervisorial officers.

64. On information and belief, Defendants PEREZ, ROJAS, were not disciplined for the unjustified shooting of DECEDENT.

65. On and for some time prior to August 12, 2018 (and continuing to the present date) at the East Los Angeles Precinct of the Los Angeles County Sheriff's Department, there is a group of deputies who have been acting as "gang members", as defined by Penal Code Section 186.22. These deputies have identified themselves as the "bandidos". These are Latino deputies who wear tattoos of a skeleton with a sombrero, bandolier and pistol. The Bandidos from the Sheriff's department use gang tactics of fear and intimidation during work hours to silence deputies from reporting deputy acts of misconduct, including the use of excessive force. The command staff is aware of this behavior and has failed to take reasonable steps to stop this egregious behavior. By failing to stop these deputies from being involved in this gang culture the ELA precinct has fostered a custom and practice that encourages deputies to engage in unconstitutional conduct such as using excessive force on civilians. This gang culture has created a custom and practice within the precinct that encourages deputies to not report and account for the use of force on civilians with candor and honesty. This Sheriff gang culture was a moving force behind the use of excessive force on the decedent, Anthony Vargas, by defendants PEREZ, and ROJAS because said defendants knew they could use excessive force on Anthony Vargas with impunity, and they also knew they could also use excessive deadly force on civilians without any accountability to anyone, including their supervisors.

66. On and for some time prior to August 12, 2018 (and continuing to the present date), Defendants COLA and DOES 1-10, acting with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, and of Plaintiffs and DECEDENT, and of persons in their class, situation and

comparable position in particular, knowingly maintained, enforced and applied an official recognized custom, policy, and practice of:

(a) Employing and retaining as deputy sheriffs and other personnel, including Defendants PEREZ, ROJAS, whom Defendants COUNTY and Does 1-10 at all times material herein knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens by acting as gang members and failing to follow written LASD policies, including the use of excessive force;

(b) Of inadequately supervising, training, controlling, assigning, and disciplining COL Sheriff deputies and other personnel, including Defendants PEREZ, ROJAS, whom Defendants COLA and Does 1-10 knew or in the exercise of reasonable care should have known had the propensities and character traits, including the propensity for violence and the use of excessive force;

(c) By maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, disciplining and controlling the intentional misconduct by Defendants PEREZ and ROJAS, who are Sheriff Deputies and/or agents of COLA.

(d) By failing to discipline COLA Deputies' and/or agents' conduct, including but not limited to, unlawful detention and excessive force;

(e) By ratifying the intentional misconduct of PEREZ, ROJAS, and other COLA Deputies and/ or agents, who are COLA Deputies and/or agents of COUNTY;

(f) By having and maintaining an unconstitutional policy, custom, and practice of detaining and arresting individuals without probable cause or reasonable suspicion, and using excessive force, including deadly force, which also is demonstrated by inadequate training regarding these subjects. The policies,

18

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1    customs, and practices of Defendants COLA and Does 1-10 were maintained

2    with a deliberate indifference to individuals' safety and rights; and

3    (g) By failing to properly investigate claims of unlawful detention and

4    excessive force by COLA Sheriff Deputies.

5    67.    By reason of the policies and practices of Defendants COLA and DOES 1-10,

6    including allowing deputies to perform their jobs like gang members, Decedent was

7    severely injured and subjected to pain and suffering and lost his life. The

8    aforementioned policies and practices of Defendants, including the custom, policy

9    and practice of Defendant COLA in allowing its sheriff Deputies to use unjustified,

10   excessive and unreasonable deadly force in shooting unarmed persons who had fired

11   no shots with no punishment for the involved Deputies was a moving force that

12   caused Defendants PEREZ and ROJAS to use unreasonable deadly force on

13   Decedent (who was also unarmed and fired no shots).

14   68.    Defendants COLA and DOES 1-10, together with various other officials,

15   whether named or unnamed, had either actual or constructive knowledge of the

16   deficient policies, practices and customs alleged in the paragraphs above. Despite

17   having knowledge as stated above, these defendants condoned, tolerated and through

18   actions and inactions thereby ratified such policies. Said defendants also acted with

19   deliberate indifference to the foreseeable effects and consequences of these policies

20   with respect to the constitutional rights of Decedent, Plaintiffs, and other individuals

21   similarly situated.

22   69.    By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct

23   and other wrongful acts, Defendants Does 1-10 acted with intentional, reckless, and

24   callous disregard for the life of Decedent and for Decedent's and Plaintiffs'

25   constitutional rights. Furthermore, the policies, practices, and customs implemented,

26   maintained, and still tolerated by Defendants COLA and Does 1-10 were

27

28

affirmatively linked to and were a significantly influential force behind the injuries of Decedent and Plaintiffs.

70.    The actions of each of Defendants Does 1-10 were willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities, and therefore warrants the imposition of exemplary and punitive damages as to Defendants Does 1-10.

71.    By reason of the acts and omissions of Defendants COLA and Does 1-10, Plaintiffs were caused to incur damages as stated elsewhere herein.

72.    By reason of the acts and omissions of Defendants COLA and Does 1-10, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, society, and future support.

73.    Accordingly, Defendants COLA and Does 1-10 each are liable to Plaintiffs for compensatory damages under 42 U.S.C. § 1983.

74.    Plaintiffs seek both wrongful death damages and survival damages under this claim. Plaintiffs further claim all of Plaintiffs' attorneys' fees and costs incurred and to be incurred in Plaintiffs presenting, maintaining and prosecuting this action under 42 U.S.C. Section 1988.

75.    At all times herein mentioned, Leroy Baca served as Los Angeles County Sheriff from December 7, 1998 to December 1, 2014. John Scott served as interim Sheriff from January 30, 2014 to December 1, 2014. Jim McDonell served as Los Angeles County Sheriff from December 1, 2014 to December 3, 2018. Alex Villanueva served (and currently serves) as Los Angeles County Sheriff from December 3, 2018 to present. At all times herein mentioned, Defendant County of Los Angeles (COLA) established a custom and practice of excessive use of force within its Sheriff's Department (LASD) by the Sheriff and by the Supervisors at the station level and by an informal custom with the ranks of the Deputies.

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

76. ANTHONY VARGAS was shot on August 12, 2018. At all times herein mentioned, during the time that Leroy Baca, John Scott, Jim McDonell and Alex Villanueva have been Sheriff, Defendant County of Los Angeles and the LASD has instituted formal and informal policies and practices that condone excessive use of force shootings and do not discipline Deputies who shoot unarmed persons. The toleration of the shooting of unarmed persons and of deputy gangs that use excessive force was the moving force behind the shooting of ANOTHONY VARGAS on August 12, 2018. Some of the specific shootings are identified herein.

77. At all times herein mentioned, the Banditos gang members oversaw all the operations at the East LA Station including the activities of Defendants NIKOLIS ROJAS and JONATHON PEREZ who were members or prospects (aka "puppies"). At all times herein mentioned, actions of excessive use of force, were and are, protected by superiors at the East LA station who make sure they are not disciplined or face any consequences for their actions. In May 2018, training officers Benjamin Zaredini and Louis Granados took their concerns about harassment from the gang to their superiors. Multiple officers were interviewed as part of an investigation that ultimately went nowhere as is verified by five deputies and two veteran officers who filed claims with COLA. This is because COLA already knew had decided to do nothing about Sheriff's gangs, including the Banditos.

78. At all times herein mentioned, and before the shooting of ANTHONY VARGAS, a superior officer, Sgt. Patty Estrada – referred to as "Pink Hand," a play on the Black Hand tattoo worn by the Mexican Mafia prison gang – made sure the Banditos members were not disciplined. The Banditos are Deputies who work out of the department's East Los Angeles station and have for years driven non-gang members out of the station. The Captain, sergeants and others who supervised the

1    East LA Station, on and before the shooting of ANTHONY VARGAS, were

2    Banditos gang members and/or were deliberately indifferent and ratified the actions

3    of the Banditos gang. Some of these Captain(s), sergeants, lieutenants, sergeants and

4    supervisors were transferred *after* the shooting of ANTHONY VARGAS but they

5    were there supervising the East LA station on and before the time of the shooting of

6    ANTHONY VARGAS and encouraging, ratifying and endorsing a formal and

7    informal custom and practice of excessive, unconstitutional use of force and a code

8    of silence. This custom and practice that existed at the East LA station on and before

9    August 12, 2018 was a moving force in Defendants NIKOLIS ROJAS' and

10   JONATHON PEREZ' excessive force shooting of ANOTHONY VARGAS on

11   August 12, 2018.

12   79.    At all times herein mentioned, there was a custom and practice of practice of

13   allowing the sheriff gang members to conduct their own vigilante justice which

14   created a de facto independent department, with a secret gang, with front line

15   supervisors  in on the special cover, stopping some of the complaints from reaching

16   elected officials. Those in the gang of deputies were used in a way that brought

17   rewards to those within the gang of deputies, in extrajudicial uses of state authority

18   whereas it was well known that those deputies who did not do what the Banditos

19   gang wanted would suffer consequences including in their employment. This gang

20   of street officers, including the supervisors at the East LA station, including the

21   Captain, sergeants, lieutenants, sergeants and supervisors who were transferred

22   *after* the shooting of ANTHONY VARGAS, was operating under color of law for

23   their own purposes and not within the law. This existing sheriff gang was well

24   known, including being known to Defendants NIKOLIS ROJAS and JONATHON

25   PEREZ and was a moving force in their excessive force shooting of ANOTHONY

26   VARGAS on August 12, 2018.

27

28

80.    In addition, COLA and LASD failed to discipline excessive force shootings, as was well known and is as set forth below in detail below regarding numerous previous incidents.  This failure to discipline was well known, including being known to Defendants NIKOLIS ROJAS and JONATHON PEREZ and was a moving force in their excessive force shooting of ANOTHONY VARGAS on August 12, 2018.

81.    In addition, and in the alternative, even policy makers, up to an including the elected Sheriffs Baca, Scott and McDonell (and now Villanueva), were and are aware of the deputy gang and its tactics, aware of the cover by first line and mid-level supervisors, but policy-makers were and are turning a blind eye, because there is a public perception that the Department is actively engaging is tough law enforcement, ratifying its existence by deliberate indifference.

82.    At all times herein mentioned, the deputy gang in the east LA station and the excessive use of force generally, were so severe and outrageous, that the absence of discipline as to Deputies NIKOLIS ROJAS and JONATHON PEREZ, and other previous shootings described herein, makes it plausible that supervisors are covering similar violations of law by gang members, and that the supervisors themselves are acting in concert with gang members, and that policy-makers, in concert, are turning a blind eye, when they too should take a corrective action, like they should have in this case but did not, making it plausible that there is a unique custom and practice of deputy gang violence and selective excessive force, that caused the death challenged here.  Plaintiffs allege that the continued lack of correction and no discipline of Deputies NIKOLIS ROJAS and JONATHON PEREZ after the shooting of ANTHONY VARGAS supports the inference of a custom of excessive force.

83.    In 2014, a lawsuit was filed by a female deputy who was bullied by the Banditos Sheriff's gang at the East LA Station.  That lawsuit was settled for $1.5 Million before the shooting of ANTHONY VARGAS and yet no one was fired or disciplined at the East LA Station. Instead COLA, LASD and its policymakers didn't do anything to fix the problem and the actions from the LASD were simply to quiet down the incident; no one was disciplined.  COLA and LASD knew about the Badmito's gang at the East LA station before the shooting of ANTOHNY VARGAS, having been sued by the female deputy, conducting discovery and paying $1.5 Million and then being deliberately indifferent and ratifying the actions of the Badnitos by imposing no discipline.  This was a ratification by COLA and LASD of the Banditos Sheriff's gang and was a moving force in the excessive force used by Defendants NIKOLIS ROJAS and JONATHON PEREZ when they shot and killed ANTHONY VARGAS by shooting him in the back and the back of the head 12 or more times and then lying about how it happened all the while knowing that COLA and LASD would never discipline them and protect them with the code of silence (as COLA and LASD continue to do to this day).

84.    In a Motion by COLA Supervisors Sheila Kuehl and Hilda Solis dated April 30, 2019, Defendant COLA admitted that "**The Los Angeles County Sheriff's Department (LASD or the Department) has a long and troubled history involving unauthorized, exclusive and secretive Department groups consisting of sworn deputies**, whose membership is based on a variety of factors, including station or unit assignment, ethnicity, involvement in excessive uses of force, intimidation of fellow deputies, and harassment **and even shootings of civilians**. Many of these groups are known for their identical, hidden, sinister tattoos, and have been the subjects of investigations, lawsuits and settlements involving excessive uses of force, violence and dishonesty, against other Sheriff's Deputies, as well as against members of the community." (See Motion by COLA Supervisors Sheila Kuehl and

1    Hilda Solis dated April 30, 2019 attached as Exhibit "A"). The Motion goes on to
2    state "Over the past several years, the violent, lawless conduct of many of these group
3    members has led to investigations, disciplinary actions, damage claims, lawsuits and
4    settlements reaching into the millions of dollars."

5    85.    The Motion recites the history of LASD gangs that existed in the LASD before
6    and at the time of the shooting of ANTHONY VARGAS and that still exist. The
7    Motion notes that the "Citizens' Commission on Jail Violence (CCJV), in its
8    comprehensive report addressing dysfunction within **the Sheriff's Department**, then
9    run by Sheriff Leroy Baca, **noted a culture of tolerance and even "tacit approval"**
10   **of what the Commission termed 'violent cliques.'"** The CCJV report was in 2012
11   and yet Defendant COLA through Baca, Scott, McDonell and Villanueva and the
12   supervisors at the East LA station have been deliberately indifferent and have
13   purposefully taken no action to curb Sheriff Gangs, including the Banditos, which
14   was a moving force in the shooting of ANTHONY VARGAS on August 12, 2018.
15   Specifically, Plaintiffs are informed and believe and thereon allege that Defendants
16   NIKOLIS ROJAS and JONATHON PEREZ were members of the Banditos gang or
17   "Prospects" and that membership in the Banditos gang included using excessive force
18   and shooting those who are unarmed. Plaintiffs are informed and believe and thereon
19   allege that Prospects could gain entry into membership in the Banditos gang by using
20   excessive force, including shooting those who are unarmed (and were encouraged to
21   do so) and was the moving force in the shooting of the unarmed ANTHONY
22   VARGAS.

23   86.    The Motion by COLA Supervisors Sheila Kuehl and Hilda Solis dated April
24   30, 2019 at Exhibit "A" goes on to state: "This gang-style violence by sworn Deputies
25   is not limited to the jails or to conflicts between deputies. In May 2012, discovery of
26   the existence of the Jump Out Boys was due to the accidental discovery of a printed
27   "creed" which stated members would receive a tattoo after being involved in a
28

25
**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

shooting. The Jump Out Boys, a group of gang enforcement officers, were compared to the lawless Rampart Division of the LAPD in the 1980's, whose members had a similar tattoo: a skeleton holding a revolver. Whenever a deputy in the group was involved in a shooting, he would earn extra ink of smoke coming out of the barrel of the gun."

87.     The Motion by COLA Supervisors Sheila Kuehl and Hilda Solis dated April 30, 2019 at Exhibit "A" goes on to state: The Citizens' Commission on Jail Violence (CCJV), in its comprehensive report addressing dysfunction within the Sheriff's Department, then run by Sheriff Leroy Baca, noted a culture of tolerance and even "tacit approval" of what the Commission termed "violent cliques" ("Report of the Citizen's Commission on Jail Violence," p. 101). The Commission recommended that the agency ban visible tattoos associated with the groups because they had sometimes been used to reward aggressive behavior." Defendants COLA and LASD did not ban the Sheriff Gangs, did not band visible tattoos and, instead, deliberately let them flourish. Defendant COLA and it LASD did not even ban visible tattoos after its Assistant Sheriff Paul Tanaka was criminally convicted in part based on evidence that he had a Sheriff gang tattoo. This was a ratification or deliberate indifference by COLA and LASD of sheriff gangs. *After* the shooting of ANTHONY VARGAS, between 34 to 38 Deputies were transferred out or re-assigned from the East Los Angeles Station where Defendants NIKOLIS ROJAS and JONATHON PEREZ were stationed at the time of the shooting of ANTHONY VARGAS.

88.     Los Angeles County Sheriff Alex Villanueva, a policy maker for the LASD, has publicly admitted that the Banidtos Gang at the East Los Angeles Sheriff's Station was run by "supervisors" who had an official policy, custom and practice to violate civil rights during the time that Jim McDonell was Sheriff and when ANOTHONY VARGAS was shot. Sheriff Villanueva, who once worked at the East L.A. station acknowledges there was a "bully culture" in the East LA station at the

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

time that McDonell was Sheriff (when ANTHONY VARGAS was shot). Alex Villanueva admits that, during the time that Jim McDonell was Sheriff, the Banditos gang came to control even the station captain in the East LA station. Sheriff Alex Villanueva stated: **"Some of the supervisors were part of the problem, they were facilitating this and that really it made matters even worse -- it's like pouring gasoline on fire,"** Villanueva said. Villanueva previously trained a deputy who later became a Bandito. Villanueva has admitted that "this [sheriff's gangs existing in COLA, LASD] is a concern that goes back to the 1970's and it resurfaces every ten years or so." Plaintiffs are informed and believe and thereon allege that the Sheriff's gangs do not "resurface", they are consistently there and COLA's toleration of, deliberate indifference to and ratification of sheriff gangs, including the Banditos in the East LA station, were a moving force in Defendants NIKOLIS ROJAS and JONATHON PEREZ excessive force shooting of ANTHONY VARGAS.

89.    Policymakers including Sheriffs Baca, Scott and McDonell turned a blind eye to and were deliberately indifferent to the sheriff's gangs, including the Banditos. Moreover, the Captain, the Sergeants, supervisors and other policy makers who controlled the East Los Angeles station were transferred *after* the shooting of VARGAS for the very reason that they were part of and leading a sheriff's gang inside the East Los Angeles Station. The Captain, the Sergeants, supervisors and other policy makers who controlled the East Los Angeles station, encouraged and ratified the use of excessive force prior to the shooting of ANTHONY VARGAS. The Captain, the Sergeants, supervisors and other policy makers who controlled the East Los Angeles station, encouraged and ratified the use of a code of silence to cover up unjustified, excessive force shootings prior to the shooting of ANTHONY VAGAS.    This was a moving force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force shooting of ANTHONY VARGAS. Defendants NIKOLIS ROJAS and JONATHON PEREZ shot ANTHONY VARGAS

1   12 or more times in the back and the back of the head when he posed no threat.

2   Defendants NIKOLIS ROJAS and JONATHON PEREZ knew they could shoot

3   ANTHONY VARGAS in the back and the back of the head and that the Captain, the

4   Sergeants and the other members, Prospects (aka "puppies") of the Banditos gang in

5   the East Los Angeles Sheriff's Station would not discipline them; in fact, they would

6   support the shooting no matter how egregious. Defendants NIKOLIS ROJAS and

7   JONATHON PEREZ fabricated stories about how the shooting took place, including

8   to investigators which they knew they could do before the shooting based on the

9   existing code of silence endorsed by policymakers, including Sheriffs Baca, Scott

10   and McDonell (and continuing with Villanueva) and The Captain, the Sergeants,

11   supervisors and other policy makers who controlled the East Los Angeles station

12   (including those transferred after the shooting because they were policymakers who

13   supported a sheriff's gang inside the East LA Station).

14   90.   In the Motion by COLA Supervisors Sheila Kuehl and Hilda Solis, Defendant

15   COLA also admitted "The CCJV further alleged that Department management "has

16   known about and failed to address the longstanding problem of deputy cliques," and

17   "also has failed to address with appropriate rigor the 'code of silence' that is an

18   inherent concern among law enforcement agencies. It rarely finds or meaningfully

19   punishes dishonesty and failure to report force incidents, and it takes months, (or

20   even years) to address deputy misbehavior." The twin dysfunctions of secret and

21   unauthorized members-only deputy groups, paired with an intimidating code of

22   silence that denies, ignores or minimizes deputy misconduct, have fostered the toxic

23   dynamic cited in numerous claims, lawsuits and disciplinary actions involving

24   **Sheriff tattoo groups or gangs**. **Unfortunately, LASD management** through the

25   years has not been particularly effective in investigating, or thwarting the rise of

26   sheriff gangs, and this ambivalence **has likely enabled their continuation and**

27   **expansion**. **Sheriff Baca vowed to address the problem, but as it turned out, he**

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1  and some of his executive team were instrumental in **creating the conditions that**

2  **actually contributed to the uses of excessive force and the code of silence, tactics**

3  **much favored by these groups. The culture within these groups enforced their**

4  **code of silence, and made investigation difficult and dangerous**." (See Exhibit

5  "A" hereto).  Defendant COLA admits that LASD and its Sheriff "**create[ed] the**

6  **conditions that actually contributed to the uses of excessive force and the code**

7  **of silence**" and Plaintiffs allege that this creation of conditions that contribute to

8  excessive use of force and a code of silence, along with the admitted existence of the

9  Banditos gang was moving force in Banditos members or Prospects, Defendants

10  NIKOLIS ROJAS and JONATHON PEREZ shooting ANTHONY VARGAS in the

11  back and back of the head when he posed no threat.  When shooting ANTHONY

12  VARGAS, Defendants NIKOLIS ROJAS and JONATHON PEREZ not only knew

13  they would suffer no discipline as a result of shooting ANTHONY VARGAS, they

14  also knew that the shooting would be celebrated by the Supervisors at the East Los

15  Angeles Station, by the Banditos gang that they were members of or Prospects of and

16  that the code of silence would cover up their excessive use of force.

17  91.     In the Motion by COLA Supervisors Sheila Kuehl and Hilda Solis, Defendant

18  COLA also admitted "**There was no significant investigation or response in the**

19  **department during the term of former Sheriff Jim McDonnell**."  Plaintiffs are

20  informed and believe and thereon allege that Sheriff McDonell promised to

21  investigate the East Los Angeles Sheriff Gangs including the Banditos and produce

22  a report after "the county paid a $1.5 million dollar settlement to a 10 year veteran

23  female deputy assigned to ELA, in which she claimed that members of this gang

24  "sexually harassed, threatened and demanded sex from her" as part of 'training' [and]

25  that "also alleged observing favors being demanded from other female probationary

26  deputies, including in one case, a trainee being asked to write arrest reports "that were

27  essentially fabricated."  Instead, Sheriff McDonell, as an LASD and COLA policy

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

maker, produced no report and was deliberately indifferent to the Banditos Sheriff gang to continue at the East Los Angeles Station (which was endorsement of its activities) which was a moving force in Banditos gang members or Prospects (aka "puppies") Defendants NIKOLIS ROJAS and JONATHON PEREZ shooting ANTHONY VARGAS. Defendants NIKOLIS ROJAS and JONATHON PEREZ having seen that there was an existing sheriff gang called the "Banditos" in which they could advance their careers as members or Prospects (aka "puppies"), and seeing that Sheriff McDonell would not only not investigate but bury any reports of such misconduct and thereby endorse such misconduct, Defendants NIKOLIS ROJAS and JONATHON PEREZ knew they could shoot ANTHONY VARGAS in the back and he back of the head 12 or more times when he posed no threat, with no consequences and this was the moving force in the excessive use of force by Defendants NIKOLIS ROJAS and JONATHON PEREZ. Plaintiffs allege that the way for Deputies to advance at the East Los Angeles Station was to use excessive force and a code of silence, Defendants NIKOLIS ROJAS and JONATHON PEREZ knew this and this was the moving force in the excessive force shooting of ANTHONY VARGAS.

92.     In the Motion by COLA Supervisors Sheila Kuehl and Hilda Solis, Defendant COLA also admitted "It is unacceptable that unauthorized, **exclusive self-affiliated groups involving a code of silence and violence be part of the Sheriff's Department. To continue to deny or minimize the impact their existence has on custody <u>and station culture, as well as on the communities these groups serve, is to foment and encourage their growth</u>. <u>Actions of these groups have actively harmed residents of the County</u>**, other Sheriff's deputies and have cost the County millions of dollars in lawsuits and settlements." Defendants COLA and its LASD have admitted that there exists and there existed at the time of the shooting of ANTHONY VARGAS "a station culture" of sheriff's gangs that was a formal or informal custom, policy and practice of violation of civil rights including using

excessive force and a code of silence "on the communities these groups serve." This station culture that included the Banditos gang was the moving force in the Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force shooting of ANTHONY VARGAS. At all times herein mentioned, Defendants COLA and its LASD and its policy makers, including, Baca, Scott, McDonell and supervisors at the East LA station, "fomented and encouraged the growth" of the Banditos gang and the actions of the Banditos gang "actively harmed residents of the County" including being this fomenting and encouraging, representing an unconstitutional custom, policy and practice, being the moving force in the Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force shooting of ANTHONY VARGAS.

93. Plaintiffs are informed and believe and thereon allege that in 2016, Sheriff Jim McDonell knew the names of approximately 300 deputies who had committed misconduct so serious that it had to be disclosed to criminal defense attorneys in a Brady List. Defendants COLA and its LASD, through McDonell, did not fire the 300 but rather continued them in their employment. Additionally, the Sheriff's Deputies union, campaigned to not have the list released to anyone so that those Deputies who commit misconduct could continue to do so in secret with no consequences. As of the date of the shooting of ANTHONY VARGAS, this toleration of approximately 300 deputies who committed misconduct of such a nature continuing to be retained was widely known by Deputies including Defendants NIKOLIS ROJAS and JONATHON PEREZ and was a moving force in the excessive force shooting of ANTHONY VARGAS.

94. At all times herein mentioned, Deputies employed by Defendants COLA and its LASD were, and, are regularly deploying excessive force. In particular, Deputies employed by Defendants COLA and LASD used excessive force on persons who were unarmed and/or did not represent a threat to life or of serious bodily injury as identified below. These incidents did not result in discipline and were a moving

1    force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force

2    shooting of ANTHONY VARGAS.

3    95.    **Deondre "Trey" Brunston.**  On or about August 24, 2003, Brunston died in

4    a hail of 81 bullets, fired by Los Angeles County Sheriff's Deputies, 22 of which hit

5    him, and which also fatally wounded a police dog.  There was no discipline for this

6    incident prior to the shooting of ANTHONY VARGAS.

7    96.    **Carl Williams.**  On or about June 13, 2006, Six Los Angeles County Sheriff's

8    Deputies fired about 70 rounds into the car occupied by Williams after a chase when

9    he represented no threat to life or serious bodily injury.  There was no discipline for

10    this incident prior to the shooting of ANTHONY VARGAS.

11    97.    **Bryan Moore.**  On or about June 26, 2008, Moore and he ran, jumped over a

12    fence holding his waist, and when officers ordered him to raise his hands, he looked

13    at the Deputies, who shot him to death.  Moore represented no threat to life or serious

14    bodily injury.  There was no discipline for this incident prior to the shooting of

15    ANTHONY VARGAS.

16    98.    **Christian Portillo.**  On or about June 13, 2006, Six Los Angeles County

17    Sheriff's Deputies approached a man in a parked car and one of the Deputies shot

18    him to death.  No drugs or weapons were found, but the police say Portillo had a

19    suspended license.  Portillo represented no threat to life or serious bodily injury.

20    There was no discipline for this incident prior to the shooting of ANTHONY

21    VARGAS.

22    99.    **Darrick Collins.**  On or about September 14, 2009, a Los Angeles County

23    Sheriff's Deputy chased Collins up his driveway and into his own backyard,

24    believing he was a robbery suspect.  The deputy fired at Collins through a wooden

25    gate, fatally hitting him in the back of the neck.  Portillo represented no threat to life

26    or serious bodily injury.  There was no discipline for this incident prior to the shooting

27    of ANTHONY VARGAS.

28

100. On or about April 13, 2010 at approximately 10:00 p.m., near Kern Avenue in East Los Angeles, Los Angeles County Sheriff Deputies shot and killed a subject and no firearm was recovered. The subject represented no threat to life or serious bodily injury. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

101. **Dexter Luckett.** On or about June 16, 2010, Los Angeles County Sheriff's Deputies shot and killed Dexter Luckett. Dexter Lucket was unarmed. No weapon was recovered at the scene. Luckett represented no threat to life or serious bodily injury. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

102. **Johnathan Cuevas.** On or about October 10, 2010, a Los Angeles County Sheriff's Deputy shot and killed Johnathan Cuevas. The deputy stopped next to men walking, Cuevas ran and fell, then the deputy shot him on the ground. The LA County Sheriff's Office settled by paying the son of Cuevas $875,000 for a deputy shooting Cuevas. Despite this, there was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

103. On or about December 1, 2010, on Hammel Street in East Los Angeles, Los Angeles County Sheriff Deputies shot and killed a subject and no firearm was recovered. The subject represented no threat to life or serious bodily injury. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

104. **Darrell Logan.** On or about October 13, 2011, a Los Angeles County Sheriff's Deputy shot and killed Darrell Logan. A lawsuit alleged that the Sheriff's Department contained a clique of deputies for whom it was a badge of honor to kill a gang member, which Logan may have been suspected of being. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS nor any action to break up Sheriff gangs even after being sued for it.

1   105. **Jazmyne Ha Eng.** On or about January 4, 2012, Los Angeles County

2   Sheriff's Deputies shot and killed Jazmyne Ha Eng. Eng, standing 4-foot-9 and

3   weighing 93 pounds, was shot to death in the lobby of a mental health clinic where

4   she was a schizophrenia patient. Witnesses described her as sitting calmly before the

5   arrival of the county police. In February 2014 the family settled with the County of

6   Los Angeles for $1.8 Million. Eng represented no threat to life or serious bodily

7   injury. There was no discipline for this incident prior to the shooting of ANTHONY

8   VARGAS.

9   106. **Christian Cobian.** On or about January 21, 2012, Los Angeles County

10  Sheriff's Deputies shot and killed Christian Cobian. Deputies reported that they

11  attempted to stop Cobian because he was riding a bike with no light, and he ran.

12  Deputies shot him to death. No weapon was found. Cobian represented no threat to

13  life or serious bodily injury. There was no discipline for this incident prior to the

14  shooting of ANTHONY VARGAS.

15  107. **Arturo Cabrales.** On or about March 7, 2012, Los Angeles County Sheriff's

16  Deputies shot and killed Arturo Cabrales. The family of Cabrales settled for $1.5

17  million because it was alleged that the deputies involved shot him when he was at his

18  home, running away, and unarmed. The deputies were alleged to be a part of a clique

19  called The Regulators. The Regulators are one of the Los Angeles County Sheriff's

20  gangs that operates in East Los Angeles and it was not disbanded between March 7,

21  2012 and the August 12, 2018 shooting of ANTHONY VARGAS. There was no

22  discipline for this incident prior to the shooting of ANTHONY VARGAS.

23  108. **Tony Louis Francis.** On or about August 28, 2012, a Los Angeles County

24  Sheriff's Deputy shot and killed Tony Louis Francis. The deputy followed Francis

25  into a driveway and ended up shooting and killing him while he was still inside his

26  vehicle. No gun was found. There was no discipline for this incident prior to the

27  shooting of ANTHONY VARGAS.

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

109. **Jose de la Trinidad.** On or about November 10, 2012, Los Angeles County Sheriff's Deputies shot and killed Jose de La Trinidad. Deputies attempted a traffic stop on a vehicle in which De la Trinidad was a passenger. After a brief chase, he got out of the car and deputies shot him five times in the back, according to an autopsy. He was unarmed. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

110. **Rigoberto Arceo.** On or about May 5, 2013, a Los Angeles County Sheriff's Deputy shot and killed Rigoberto Arceo. Rigoberto Arceo was killed by a Sheriff deputy, on May 11, 2013, Mother's Day. The engaged 34-year old young father was returning home from a party, celebrating Mother's Day, when a Los Angeles County Sheriff's Deputy, L Mendoza, ordered Rigo to the ground. Rigo with his hands raised in the air, was telling Deputy Mendoza that he did not have to do anything, when the deputy shot him once in the chest. In order to try and justify the shooting Deputy Mendoza claimed that Rigo was trying to grab his gun. However, independent percipient witnesses who saw the shooting, described Rigo as having his hands raised over his head when he was shot and that he was approximately 10 feet away from the deputy when the deputy shot and killed him. Rigoberto Arceo was unarmed. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

111. **Ignacio Ochoa.** On or about May 14, 2013, a Los Angeles County Sheriff's Deputy shot and killed Ignacio Ochoa. Witnesses reported that Ochoa was riding his bike home after buying something to drink. He had his headphones on and couldn't hear a deputy's orders. A resident reported that the deputy handcuffed Ochoa and then shot him in the back of the head. He was unarmed. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

112. **Carlos Ernesto Oliva Sola.** On or about September 10, 2013, Los Angeles County Sheriff's Deputies shot and killed Carlos Ernesto Oliva Silva. Deputies were flagged by a bystander who reported a "man with gun" in the vicinity. They report

that they saw Oliva on the street, and that when they confronted him, he pointed a gun at them. Deputy Anthony Forlano shot and killed him. <u>Oliva reportedly was not the man they were looking for, and the autopsy report shows he was shot eight times from behind</u>. The family announced they would file a lawsuit against the LASD. <u>The family requested Forlano, who had shot 7 people, be fired</u>. Plaintiffs are informed and believe and thereon allege that there was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

113. **Salvador Martin Palencia Cruz.** On or about April 25, 2014, Los Angeles County Sheriff's Deputies Andrew Alatorre and Daniel Marquez shot and killed Salvador Martin Palencia Cruz. Salvador Martin Palencia Cruz was a 42-year-old loving husband and father. The deputies shot Palencia Cruz nine times as they stood within six feet while Mr. Palencia Cruz held a pastry spatula. A lawsuit was filed against COLA. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

114. **Noel Enrique Aguilar.** On or about May 26, 2014, Los Angeles County Sheriff's Deputies shot and killed Noel Enrique Aguiar Ignacio Ochoa. Aguilar was riding a bicycle, committing no crime. Los Angeles County Sheriff's Deputies disarmed Aguilar and shot him to death. The incident was captured on video and witnesses confirmed that Aguilar was unarmed when he was shot to death. The County of Los Angeles settled a lawsuit in the amount of $2,970,000.00 regarding the excessive force shooting death of Aguilar in September of 2017. Aguilar was unarmed when he was shot and he even told the deputies he was unarmed (captured on video). They shot him anyway. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

115. **Antoine Hunter and Geremy Evans.** On or about June 24. 2014, Los Angeles County Sheriff's Deputies Timothy Lee and Gregory Rodriguez, shot and killed Antoine Hunter and severely wounded Geremey Evans. Antoine Hunter and

Geremy Evans were in a vehicle that had come to a stop when the Deputies poured shots into the vehicle. Hunter did not have a gun in his hand. Evans dove in the back seat and was totally unarmed while the Deputies shot at him when he posed no threat whatsoever. COLA and LASD knew that Gregory Rodriguez was a member of a sheriff's gang and that he had gang tattoos but they withheld this information, including while represented by the same counsel who represent the deputies in the current case. The case of Antoine Hunter and Geremy Evans was settled for a substantial sum and only after it was settled was it revealed publicly that Deputy Rodriguez is sheriff's gang member with a sheriff's gang tattoo. Deputy Gregory Rodriguez aka "G-Rod" is one of the Deputies named in government claims filed by fellow deputies regarding a beating of fellow deputies from the East LA Station that took place in September, 2018. Although that beating of fellow sheriff's deputies by Banditos gang members took place in September, 2018, the Banditos gang existed on and before the August 12, 2018 shooting of ANTHONY VARGAS. This is part of a consistent pattern of COLA and LASD hiding information regarding deputy gang membership and is a moving force to deputies using excessive force knowing there are no consequences and that their use of force will always be ratified by COLA and its LASD. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS

116. **Johnny Ray Anderson.** On or about July 5, 2015, Los Angeles County Sheriff's Deputies shot and killed Johnny Ray Anderson. Deputies responding to reports of a prowler found Anderson and his wife, Kathleen, trespassing in a backyard and fatally shot the 42-year-old. Hundreds of people later protested the shooting. Johnny Ray Anderson was unarmed when he shot to death. There was no discipline for this incident prior to the shooting of ANTHONY VARGAS.

117. **Eduardo Rodriguez.** On or about February 14, 2016, Los Angeles County Sheriff's Deputies shot and killed Eduardo Rodriguez. During the course of a traffic

1   stop, which deputies made in the course of a stolen-vehicle investigation, Deputies

2   shot and killed Eduardo Rodriguez, who was unarmed. There was no discipline for

3   this incident prior to the shooting of ANTHONY VARGAS.

4   118. **Francisco Garcia.** On or about February 24, 2016, Los Angeles County

5   Sheriff's Deputy Luke Liu shot and killed Francisco Garcia who was driving away

6   in a car, completely unarmed and he was shot in the back. The incident was caught

7   on video. No criminal charges were filed as of the date of the shooting of Anthony

8   Vargas on August 12, 2018. *After* the shooting of ANTHONY VARGAS, the Los

9   Angeles County District Attorney has filed criminal charges against Deputy Luke

10  Liu for this clearly excessive force shooting. A lawsuit was filed and Defendant

11  COLA paid a settlement of $1,750,000.00 in April of 2017 to Francisco Garcia's

12  survivors. Plaintiffs are informed and believe and thereon allege, that there was no

13  discipline for this incident prior to the shooting of ANTHONY VARGAS or even to

14  date. In fact, the Deputy's union backs his actions and endorses them and other

15  LASD deputies showed up to his arraignment to support Luke Liu who shot an

16  unarmed man in the back. It appears that COLA and LASD are endorsing the obvious

17  excessive force deadly shooting by LASD Deputy Luke Liu even *after* he is being

18  criminally prosecuted. There was no discipline for this incident prior to the shooting

19  of ANTHONY VARGAS (or at all to date).

20  119. **Christian Rene Medina.** On or about March 16, 2016, Los Angeles County

21  Sheriff's Deputies shot and killed Christian Rene Medina. Deputies responded to a

22  false robbery report and found Medina. Medina was unarmed and he was shot and

23  killed. There was no discipline for this incident prior to the shooting of ANTHONY

24  VARGAS.

25  120. **Carmelo Pizarro, Jr.** On or about July 19, 2018, Los Angeles County

26  Sheriff's Deputy shot and killed Carmelo Pizarro, Jr. Deputies chased Pizzaro and

27  caught up to him and then shot him to death. Pizzaro was unarmed when he was shot

28

1  and killed. There was no discipline for this incident prior to the shooting of

2  ANTHONY VARGAS.

3  121. These specific shooting incidents identified above, indicate that Defendant

4  COLA's the deputies were and are regularly deploying excessive force and these

5  specific incidents with no discipline demonstrate that COLA's policymakers and

6  supervisors had a custom, policy and practice of endorsing excessive force

7  shootings. This custom, policy and practice of endorsing excessive force shootings

8  was a moving force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ'

9  excessive force shooting of ANOTHONY VARGAS on August 12, 2018 when the

10  deputies shot ANOTHONY VARGAS 12 or more times in the back and the back of

11  the head knowing they could shoot him when he posed no threat and not be

12  disciplined. Additionally, Defendants NIKOLIS ROJAS and JONATHON PEREZ

13  knew that if they shot ANOTHONY VARGAS the Banditos gang would look

14  favorably on this and this also was a moving force in Defendants NIKOLIS ROJAS'

15  and JONATHON PEREZ' excessive force shooting of ANOTHONY VARGAS on

16  August 12, 2018. Defendants NIKOLIS ROJAS and JONATHON PEREZ were, at

17  all times herein mentioned members or prospects (aka "puppies") and/or wanted to

18  be looked upon favorably by the Banditos gang and shooting ANTHONY VARGAS

19  12 or more times in the back and the back of the head was a means to win favor with

20  the Banditos gang (who controlled the East LA station) and was a moving force in

21  Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive force shooting

22  of ANOTHONY VARGAS on August 12, 2018.

23  122. The specific facts that there existed a Banditos gang in the East LA station

24  include that Sgt. Patty Estrada (referred to as "Pink Hand," a play on the Black Hand

25  tattoo worn by the Mexican Mafia prison gang) made sure the Banditos members

26  were not disciplined; that the Captain, sergeants, lieutenants, sergeants and

27  supervisors who were transferred *after* the shooting of ANTHONY VARGAS also

28

1     made sure no deputies were disciplined for excessive force shootings and this was a

2     moving force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive

3     force shooting of ANOTHONY VARGAS on August 12, 2018.

4     123.   Defendants COLA and its LASD had not only constructive but *actual*

5     *knowledge* of the LASD sheriff gang problem and the Banditos in particular in the

6     East LA station when they were sued by the female deputy and when they settled her

7     action before the shooting of ANTHONY VARGAS.   The Captain, sergeants,

8     lieutenants, sergeants and supervisors who were transferred *after* the shooting of

9     ANTHONY VARGAS were known about by COLA *before* the shooting of

10     ANTHONY VARGAS but COLA and its LASD, including the policy makers, fired

11     no one, transferred no one, disciplined no one and paid $1.5 Million without taking

12     any action against the known Banditos gang whatsoever.   COLA and LASD just

13     knowingly left the Banditos in place.   This endorsement of the Banditos gang by

14     deliberate indifference and ratification of their actions let Defendants NIKOLIS

15     ROJAS and JONATHON PEREZ know that they could use excessive force with

16     impunity and that they would never be disciplined.   To date, Defendants NIKOLIS

17     ROJAS and JONATHON PEREZ have not been disciplined and COLA continues to

18     endorse their actions even after it is known that they have told inconsistent stories

19     and they shot ANTHONY VARGAS 12 or more times in the back and the back of

20     the head when he clearly represented no threat.

21     124.   The training that existed for Defendants NIKOLIS ROJAS and JONATHON

22     PEREZ before the shooting of ANTHONY VARGAS included the training at the

23     East LA station. This training was by Sgt. Patty Estrada and the Captain, sergeants,

24     lieutenants, sergeants and supervisors who were transferred *after* the shooting of

25     ANTHONY VARGAS who trained NIKOLIS ROJAS and JONATHON PEREZ that

26     they could use excessive force and shoot those who posed no threat because there

27     would be no discipline for such excessive force shootings.   This training was a

28

1  moving force in Defendants NIKOLIS ROJAS' and JONATHON PEREZ' excessive

2  force, unconstitutional shooting of ANTHONY VARGAS on August 12, 2018.

3  125. **Donta Taylor.** In addition to the other shootings identified above, in or about

4  June of 2016, Los Angeles County Sheriff's Deputies shot and killed Donta Taylor.

5  One of the deputies was Samuel Aldama who was a deputy at the center of

6  controversy regarding sheriff gang tattoos. Deputy Aldama admitted that he had such

7  a tattoo that he got two months before he shot Donta Taylor. Donta Taylor was

8  unarmed when he was shot. In June of 2019, COLA paid $7 Million regarding the

9  excessive force shooting of Donta Taylor. There was no discipline for this June 2016

10  incident prior to the shooting of ANTHONY VARGAS.

11  ## PRAYER FOR RELIEF

12  WHEREFORE, Plaintiffs requests entry of judgment in their favor and

13  against Defendants as follows:

14  A. For compensatory damages, for wrongful death including damages for

15  the loss of Decedent's life-long love, companionship, comfort, care,

16  assistance, protection, affection, society; moral support; and the

17  loss of relationship with Decedent, including loss of society, familial

18  relationship and companionship in an amount according to proof at the time

19  of trial;

20  B. For compensatory damages, for Survival for the mental, physical and

21  emotional pain and suffering of Decedent in an amount according to proof at

22  the time of trial;

23  C. For loss of financial support, sustenance and earning capacity in an

24  amount according to proof at the time of trial;

25  D. For loss of gifts and benefits in an amount according to proof at the time

26  of trial;

27

28

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

1   E. For punitive damages against the individual defendants in an amount to
2   be proven at trial;
3   F. For interest;
4   G. For reasonable costs of this suit and attorneys' fees, including pursuant to
5   42 U.S.C. § 1988;
6   H. For all other damages allowed under federal and state law and;
7   I. For such further other relief as the Court may deem just, proper, and
8   appropriate.
9
10  Respectfully Submitted,
11  Dated: August 19, 2019                GUIZAR, HENDERSON & CARRAZCO
12
13                                        /S/ Humberto Guizar
                                   By _____
14                                        HUMBERTO GUIZAR
                                          Attorney for Plaintiffs,
15                                        LISA VARGAS
16
17              **DEMAND FOR JURY TRIAL**
18  Plaintiffs hereby demand a trial by jury.
19
20  Dated: August 19, 2019                GUIZAR, HENDERSON & CARRAZCO
21
22                                        /S/ Humberto Guizar
                                   By _____
23                                        HUMBERTO GUIZAR
                                          Attorney for Plaintiffs,
24                                        LISA VARGAS
25
26
27
28

42

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES**

# EXHIBIT [D]

1

## **EXHIBIT D**

Recording of August 13, 2020 press conference regarding deputy gangs and 2018

Kennedy Hall Incident:

https://www.pscp.tv/w/1OyKAgAoXAMJb.

Villanueva to discipline 26 involved in Banditos fight - Los Angeles Times    Page 1 of 9
Case 2:19-cv-03279-MEMF-AS   Document 85-2   Filed 08/25/20   Page 51 of 149   Page ID
#:2267



ADVERTISEMENT

CALIFORNIA

# Sheriff Villanueva to fire or suspend 26 people involved in off-duty Banditos fight



Sheriff Alex Villanueva speaks at a news conference at the Hall of Justice in Los Angeles. (Irfan Khan/Los Angeles Times)

By ALENE TCHEKMEDYIAN  |  STAFF WRITER

AUG. 13, 2020 | 11:26 AM

Case 2:19-cv-03279-MEMF-AS   Document 85-2   Filed 08/25/20   Page 52 of 149   Page ID
#:2268

Los Angeles County Sheriff Alex Villanueva has moved to discipline 26 employees for misconduct related to a fight during an off-duty East L.A. station party at which several deputies said they were attacked by tattooed members of the Banditos clique.

Villanueva would not say how many employees he was seeking to fire, but a source with knowledge of the investigation said three deputies — Rafael Munoz, Gregory Rodriguez and David Silverio — face termination.

Cmdr. April Tardy said the policy violations included a failure to report the September 2018 incident to supervisors, as well as violations of policies that govern general behavior and conduct toward others. The administrative investigation, which involved interviews with 70 people, found that some employees at East L.A. station were acting as so-called "shot callers," controlling scheduling and events at the station, she said, using a term often used to describe top leaders in prisons and gangs.

An attorney for Munoz, Rodriguez and Silverio could not immediately be reached for comment.

ADVERTISEMENT

Villanueva said the Sheriff's Department will now begin asking deputies accused of misconduct about their membership in deputy cliques such as the Banditos, which have plagued the agency for decades.

"I'm adopting a zero-tolerance policy," Villanueva told reporters Thursday. "If you form a group, you mistreat people, yes, we will seek to make sure you're no longer a member of the department."

Villanueva to discipline 26 involved in Banditos fight - Los Angeles Times          Page 3 of 9
Case 2:19-cv-03279-MEMF-AS   Document 85-2   Filed 08/25/20   Page 53 of 149   Page ID
#:2269

Observers called the move potentially historic.

"If they really do that in all discipline cases going forward that will be historic," said Inspector General Max Huntsman. "I'll believe it when I see it."

ADVERTISEMENT

The discipline comes after the L.A. County district attorney's office in February declined to file charges against a sergeant and three deputies involved in the incident at Kennedy Hall, saying there was "insufficient evidence" that Sgt. Michael Hernandez as well as Munoz, Rodriguez and Silverio committed battery or any crimes. In a 28-page memo, prosecutors said 21 deputies identified as possible witnesses declined to be interviewed.

Because they weren't compelled to provide statements, Huntsman has said the criminal investigation amounted to a cover-up.

"So as a result, a criminal prosecution was avoided — one in which the facts and details of the Banditos might have come into public light," Huntsman said recently.

Villanueva's move follows recent allegations from a whistleblower deputy that a gang of deputies who call themselves the Executioners dominate the Compton sheriff's station. Recent claims and lawsuits have underscored that elected sheriffs have failed for decades to root out the problem of tattooed deputy subgroups operating out of several Sheriff's Department stations and using what critics allege are violent, intimidating tactics in communities. And it's been costly.

ADVERTISEMENT

Los Angeles County has paid out roughly $55 million in settlements in dozens of cases where sheriff's deputies are accused of belonging to cliques. Those cases involve incidents that date to the early 1990s, when what a federal judge described as a "neo-Nazi, white supremacist gang" called the Vikings operated within Lynwood station. Other payouts involve the 3000 Boys and the 2000 Boys involved in beatings at Men's Central Jail.

Last year, the county settled for $7 million a lawsuit brought by the family of a 31-year-old man who was shot and killed by deputies during a foot chase in 2016. Deputies claimed the man, Donta Taylor, had a handgun, but no weapon was found.

Samuel Aldama, one of two deputies who shot at Taylor, admitted under oath to having a tattoo on his calf depicting a skull with a rifle and a military-style helmet emerging from flames. Aldama said he knew of other deputies at the station with the tattoo, but he denied that the image represented membership in a club.

Aldama's captain at the time said under oath in 2018 that he didn't try to identify which deputies had tattoos out of respect for their 1st Amendment rights and the privileges granted to them by the Peace Officer Bill of Rights.

ADVERTISEMENT

According to the attorney for the Compton whistleblower, the image on Aldama's calf was found on a mouse pad and pencil holder at the station desk of an alleged member of the Executioners.

Villanueva has said that he put measures in place in February that prohibit deputies from participating in cliques.

Villanueva to discipline 26 involved in Banditos fight - Los Angeles Times    Page 5 of 9
Case 2:19-cv-03279-MEMF-AS    Document 85-2    Filed 08/25/20    Page 55 of 149    Page ID
#:2271

CALIFORNIA



# The stories shaping California

**Get up to speed with our Essential California newsletter, sent six days a week.**

Enter Email Address

SIGN ME UP

**You may occasionally receive promotional content from the Los Angeles Times.**



Alene Tchekmedyian

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Alene Tchekmedyian covers the Los Angeles County Sheriff's Department. She previously wrote about the county's criminal courts and breaking news throughout California. Before joining The Times in 2016, she reported on crime and policing for the Glendale News-Press and Burbank Leader. She grew up in Huntington Beach and graduated from UCLA.

**SUBSCRIBERS ARE READING**

SPORTS

**Plaschke: I had COVID-19, and these are the things nobody tells you**

# EXHIBIT [E]

AGN. NO._____

MOTION BY SUPERVISOR SHEILA KUEHL                         April 30, 2019

## ASSESSING COUNTY LIABILITY IN SETTLEMENTS INVOLVING SHERIFF "GANGS"

This past February, seven East Los Angeles Station (ELA) Sheriff's Deputies filed a multimillion dollar lawsuit against the County of Los Angeles, alleging that several members of the Banditos, an ELA station tattoo group or Sheriff "gang," viciously beat them up during an informal party when they were new recruits, as a way of ensuring their adherence to a "code of silence." One deputy was knocked unconscious,  and another choked to point of suffocation ("*L.A. County Deputies Claim Abuse by an East L.A. Sheriff's Station 'Gang',"* Joel Rubin, March 7, 2019 Los Angeles Times). This is the second lawsuit filed against the County alleging abusive conduct by the Banditos: In 2014, the county paid a $1.5 million dollar settlement to a 10 year veteran female deputy assigned to ELA, in which she claimed that members of this gang "sexually harassed, threatened and demanded sex from her" as part of "training." According to the lawsuit, after she  declined these advances, further harassment, hazing, and other forms of retaliation ensued, including being run off the road by another deputy, being slammed into a wall while she held a loaded shotgun, and having a dead rat placed under her car

MOTION

| | |
|---|---|
| Solis | _____ |
| Ridley-Thomas | _____ |
| Kuehl | _____ |
| Barger | _____ |
| Hahn | _____ |

after she reported the group's behavior.  This deputy also alleged observing favors being demanded from other female probationary deputies, including in one case, a trainee being asked to write arrest reports "that were essentially fabricated" ("*Members Of Deputy 'Gang' Reportedly Put Other LA County Sheriff's Deputies In Hospital After Off-Duty Brawl,"* Celeste Fremon, Witness LA, October 5, 2018).

The Banditos are not the only such Sheriff or station group named in multi-million dollar lawsuits alleging deputy misconduct.  In 2018, the County settled a lawsuit for $1.5 million dollars, in part because one deputy had likely committed perjury when he denied that he was a member of an LASD tattoo group known as the Regulators ("*L.A. County Sheriff's Department Pays Price as Clandestine Deputy Cliques Persist,"* Maya Lau, October 27, 2018, Los Angeles Times).

The Los Angeles County Sheriff's Department (LASD or the Department) has a long and troubled history involving unauthorized, exclusive and secretive Department groups consisting of sworn deputies, whose membership is based on a variety of factors, including station or unit assignment, ethnicity, involvement in excessive uses of force, intimidation of fellow deputies, and harassment and even shootings of civilians. Many of these groups are known for their identical, hidden, sinister tattoos, and have been the subjects of investigations, lawsuits and settlements involving excessive uses of force, violence and dishonesty, against other Sheriff's Deputies, as well as against members of the community. These groups of deputies, whose existence is not officially sanctioned by the Department, are variously referred to as "cliques," "violent cliques," "tattoo groups,"  "station groups," "secret deputy sub-groups," and "secret societies." Reports of intimidating, gang-like behavior, such as aggressive member self-identification, use of street-gang lingo, flashing hand signals, and violence in the

communities they serve, have led many to compare these groups to street gangs, and identify them as Sheriff's gangs.  Over the past several years, the violent, lawless conduct of many of these group members has led to investigations, disciplinary actions, damage claims, lawsuits and settlements reaching into the millions of dollars.

The first such identified  LASD group, in 1971, the Little Devils, consisted overwhelmingly of white officers who patrolled a community (East Los Angeles) primarily populated by Latinos and African-Americans. Throughout the 1980's, these groups, then dominated by white deputy sheriffs, proliferated in Sheriff's stations in Latino and African-American communities; the Vikings were one such group, with a tattoo that carried an overt reference to officer involved shootings. In a 1990 federal lawsuit involving LASD deputy misconduct, 9th Circuit District Court Judge Terry Hatter declared that the Vikings were essentially  running a "neo-Nazi, white supremacist gang" within the Lynwood station. In 1996, LASD paid out approximately $9 million dollars in damages related to lawsuits involving the Vikings ("*The Secret Society Among Lawmen,*" by Tina Daunt, Los Angeles Times, March 24, 1999).

The 1992 Kolts Commission on police brutality in Los Angeles found that groups consisting mostly of white deputies, such as the Vikings, the Grim Reapers (Lennox Station), the Regulators (Century Station), and the Jump Out Boys (Operation Safe Streets Gang Enforcement Team) were particularly predominant in areas with large minority populations.

The presence of violent, gang-like groups within the Department has not been limited to the patrol division. Department custody gangs such as the 2000 Block and 3000 Block (also known as the 2000 Boys and the 3000 Boys) were deeply involved in excessive uses of force in the jails, which played a role in precipitating a federal

Department of Justice lawsuit whose provisions and orders are still in effect today. Department management has known of the existence of these two groups at Men's Central Jail ("MCJ") since at least 2004, "if not earlier" ("*Report of the Citizen's Commission on Jail Violence,*" 2012, pp. 67, 102). These two groups identified themselves by jail floor assignment, in this case, the 2nd and 3rd floors of MCJ. The Los Angeles Times reported in 2012 that deputies assigned to the 3rd floor of the jail had a higher number of use-of-force incidents against inmates during a recent four-year period than those assigned to any other floor at MCJ ("*Los Angeles County Sheriff May Shut Down Part of Men's Central Jail,*" Jack Leonard and Robert Faturechi, Los Angeles Times, March 21, 2012).

Assaults against inmates were not the only activity of the 3000 Boys. In 2011, the Department disciplined a group of deputies who all worked on the third, or "3000," floor of MCJ, after the group fought two fellow deputies at an employee Christmas party and allegedly punched a female deputy in the face, after she attempted to mediate the dispute. Sheriff's officials later said the men had formed an aggressive "3000" group that used gang-like three-finger hand signs. A former top jail commander told The Times that sworn custody staff would "earn their ink" by breaking inmates' bones ("*KTLA Investigation Reveals Existence of Gang-Like Clique Within Men's Central Jail,*" KTLA News, May 4, 2011). In one episode, a deputy in the 2000 Boys group broke the eye socket of a "complacent" inmate during a beating to "earn his ink" — a tattoo with the Roman numeral "II" ("*After Decades of Problems, New Allegations Surface of a Secret Clique within L.A. County Sheriff's Department,*" Maya Lau and Joel Rubin, July 10, 2018).

This gang-style violence by sworn Deputies is not limited to the jails or to conflicts

between deputies.  In May 2012, discovery of the existence of the Jump Out Boys was

due to the accidental discovery of a printed "creed" which stated members would

receive a tattoo after being involved in a shooting. The Jump Out Boys, a group of gang

enforcement officers, were compared to the lawless Rampart Division of the LAPD in

the 1980's, whose members had a similar tattoo: a skeleton holding a revolver.

Whenever a deputy in the group was involved in a shooting, he would earn extra ink of

smoke coming out of the barrel of the gun ("*Sheriff's Clique May Have Celebrated

Shootings with Tattoos,*" Robert Faturechi, Los Angeles Times, May 10, 2012). Seven of

the Jump Out Boys members were fired ("*L.A. County Sheriff's Department Intends to

Fire Seven Deputies,*" Robert Faturechi, Los Angeles Times, February 6, 2013). Four of

those were ultimately reinstated.

        In 2012, Deputy Gregory Rodriguez, an alleged member of the Banditos, was

charged with filing a false police report and committing perjury, stemming from the arrest

of Christopher Gray. Rodriguez' claim that Gray was "inciting [the] crowd and

threatening deputies" was belied by video that showed Gray "calmly standing" nearby

and refusing to move off the sidewalk. Gray was arrested and jailed for five days before

the charges were dismissed, causing him to lose his job ("*LA County Sheriff's Deputy

Faces Jail Time After Allegedly Filing False Report, Committing Perjury*," CBSLA, June

10, 2015). While Deputy Rodriguez was not convicted, the incident led to the County

entering into a $549,000 settlement with Mr. Gray ("*What Is The LA County Sheriff's

Department Doing About Its Big, Bad Deputy Gang Problem?,*" Celeste Fremon,

WitnessLA, October 30, 2018).

        The Citizens' Commission on Jail Violence (CCJV), in its comprehensive report

addressing dysfunction within the Sheriff's Department, then run by Sheriff Leroy Baca,

noted a culture of tolerance and even "tacit approval" of what the Commission termed "violent cliques" ("*Report of the Citizen's Commission on Jail Violence,*" p. 101). The Commission recommended that the agency ban visible tattoos associated with the groups because they had sometimes been used to reward aggressive behavior.

The CCJV further alleged that Department management "has known about and failed to address the longstanding problem of deputy cliques," and "also has failed to address with appropriate rigor the 'code of silence' that is an inherent concern among law enforcement agencies. It rarely finds or meaningfully punishes dishonesty and failure to report force incidents, and it takes months, (or even years) to address deputy misbehavior."  The twin dysfunctions of secret and unauthorized members-only deputy groups, paired with an intimidating code of silence that denies, ignores or minimizes deputy misconduct, have fostered the toxic dynamic cited in numerous claims, lawsuits and disciplinary actions involving Sheriff tattoo groups or gangs.

Unfortunately, LASD management through the years has not been particularly effective in investigating, or thwarting the rise of sheriff gangs, and this ambivalence has likely enabled their continuation and expansion. Sheriff Baca vowed to address the problem, but as it turned out, he and some of his executive team were instrumental in creating the conditions that actually contributed to the uses of excessive force and the code of silence, tactics much favored by these groups. The culture within these groups enforced their code of silence, and made investigation difficult and dangerous.

There was no significant investigation or response in the department during the term of former Sheriff Jim McDonnell.

Recently, Sheriff Alex Villanueva  has acknowledged the problems presented by  these "inter-generational" groups as "hazing run amok," but also has characterized

them as "benign," and at a recent Civilian Oversight Commission meeting, even defined "hazing" to include working overtime without a jacket, or a rookie having to buy lunch for the entire station. Alarmingly, his sentiments echo those of disgraced and convicted former Sheriff Baca who, in 1999, attributed elaborate matching tattoos to nothing more than a response to "peer pressure," or "heavy drinking." Recent revelations such as those involving the Banditos' violent conduct, or that a recently reinstated Deputy admitted to being a member of the Reapers gang, and apparently used that connection as a means to intimidate his former girlfriend, continue to alarm this Board; these groups are not "benign." Sheriff Villanueva has also forcefully defended his deputies' right to have tattoos, for whatever reason, vigorously maintaining that it is a "private matter." His recent statements avowing to reinstate deputies who have been terminated, and his recent action reinstating one such deputy who used excessive force against an arrestee, heighten this Board's alarm that whatever progress was made under prior leadership will rapidly evaporate.

It is unacceptable that unauthorized, exclusive self-affiliated groups involving a code of silence and violence be part of the Sheriff's Department. To continue to deny or minimize the impact their existence has on custody and station culture, as well as on the communities these groups serve, is to foment and encourage their growth. Actions of these groups have actively harmed residents of the County, other Sheriff's deputies and have cost the County millions of dollars in lawsuits and settlements.

**I, THEREFORE, MOVE** that County Counsel, in consultation with the Office of Inspector General, the Civilian Oversight Commission, and other relevant Departments, provide a report back within 90 days, and provide:

1. A chronological list of all claims, lawsuits, and other settlement agreements of

any kind since the year 1990 in which the claim or lawsuit involved allegations that a sworn member of LASD was a member of a secret society or clique.  This list should:

a.  Include, but not be limited to cases that went to trial and all claims, lawsuits, or any settlement of any kind in which County Counsel recommended that the claim or lawsuit be settled in a CAR document or other proposed settlement (at least in part) due to a sworn member of LASD being a member (alleged or proven or acknowledged) of a secret society or clique, or station group or Sheriff gang.

b.  Include as to each case, the following:

    i.  The date and location of the initial incident causing the claim or lawsuit;

    ii.  The assignment of the deputy or deputies involved in the incident; deputies involved may be subjects or witnesses.

    iii.  The name of the secret society or clique of which the deputy or deputies are alleged to be members. The numbers of member deputies involved.

    iv.  The proposed or actual settlement amount or verdict award if the case went to trial.

    v.  Whether any Corrective Action Plan created in response to this incident addressed the violent clique, station group, secret society or Sheriff gang aspect of the case, including a description of the tattoo, if known.

2.  Membership in a secret society need not be the gravamen of the claim or lawsuit itself. If any discovery related to any claim or lawsuit or disciplinary action discusses deputy cliques, secret societies, or station groups or mentions any such group by its purported name, it would be included. This includes all station

house or specialized unit groups  including, but not limited to, the Vikings, Jump

Out Boys, Reapers, Regulators, Banditos and Spartans and custody groups such

as the 2000 Block and 3000 Block, also known as 2000 Boys and 3000 Boys.

S: NA/Assessing County Liability in Settlements Involving Sheriff "Gangs"

July 15, 2019

# A History of Deputy Gangs in the Los Angeles County Sheriff's Department

Bianca Torres Murray

Center for Juvenile Law and Policy Intern

# Table of Contents

**Executive Summary**                                                                3,4

**LASD's History of Justifying Deputy Gangs**
**5,6,7,8,9**

**LASD's History of Addressing Deputy Gangs**                                        10

**Acknowledgement of Deputy Gangs in 2014 L.A. County PPOA Debate for Sheriff**    11,12

**The Significance of the East Los Angeles Station**                          13,14,15,16

**The Little Devils -** *East L.A. Station*                                          17

**The Wayside Whites or Wayside Whiteys -** *Wayside Honor Rancho jail*
**18**

**The Vikings -** *Lynwood Station*
**19,20,21**

**The Pirates -** *Firestone Station*                                               22

**The Rattlesnakes**                                                                23

**The Cavemen -** *East L.A. Station*                                               24

**The Regulators -** *Century City Station*                                 25,26,27,28,29

**The Banditos -** *East L.A. Station*                                         30,31,32

**The 2,000 Boys -** *Second floor of Men's Central Jail*                     33,34

**The 3,000 Boys -** *Third floor of Men's Central Jail*
**35,36**

**The Jump Out Boys -** *Gang Enforcement Team*                                37,38

**The Grim Reapers -** *Lennox Station*      **39,40**

**The Buffalo Soldiers**
**41**

**CPT -** *Compton Station*      **42,43,44**

**The Cowboys -** *Palmdale Station*      **45**

**The Spartans**      **46**

**Bibliography**      **47,48,49,50,51,52,53,54,55**

3

**Executive Summary**

The internet was scoured for articles and reports regarding deputy gangs, past and
present, in the Los Angeles County Sheriff's Department(LASD). A deputy gang is defined as a
gang of deputies who engage in gang like activity.[1] A total of sixteen deputy gangs were found.
The CPT deputy gang was discovered quite recently. Each of the deputy gangs is individually
described below.

Each respective deputy gang has a set of similar traits. Some of these traits include:
having racist ideology, a code of silence, matching tattoos, hand symbols, creeds, and spraying
graffiti. Deputy gangs are also operated in areas with large minority populations. However,
deputies that are members of deputy gangs reject being compared to a gang.  Deputy gangs are
detrimental, destructive subcultures that undermine the core values of the LASD. The continuous
tolerance of deputy gangs within LASD has contributed to excessive force and insubordination
among deputies.

As stated above, deputy gangs within the LASD have similar traits, one being having
matching tattoos. Deputy gang tattoos often have an aspect of a skull or skeleton to them. These

---

[1] Loyola Law School's Center for Juvenile Law and Policy recognizes that sheriff deputy gangs are
indeed comparable to any other gang. Sheriff deputy gangs are made up of multiple people, utilize
intimidation, embrace a group identity and engage in criminal activity. The Center for Juvenile Law and
Policy considered using other terms such as "secret societies" and "cliques" however, we felt that the term
deputy gang is appropriate.

matching tattoos are generally placed at the ankle. Just to name a few deputy gangs, the Grim Reapers, Banditos, and Jump Out Boys all have an aspect of a skull or skeleton on their tattoo.

The earliest known deputy gang within LASD is the Little Devils, also known as the Red Devils, founded in 1971 at the East L.A. station. Following 1971, deputy gangs have been considered a very controversial facet to the LASD. Due to the controversy of deputy gangs, there is a very limited information with regards to specific gangs.

As stated above, there is a finite amount of information in regards to what these deputy gangs have done, whether or not they have been investigated, and when they were founded. Loyola Law School's Center for Juvenile Law and Policy made a public records act request for information concerning the LASD management's effort to uncover and address deputy gangs. A comprehensive review of articles and reports suggests that deputy gangs have been a decades long problem within the LASD that management has all but ignored.

## The Los Angeles County Sheriff's Department's History of Justifying Deputy gangs[2]

[2] Faturechi, Robert. "Secret Clique in L.A. County Sheriff's Gang Unit Probed." *Los Angeles Times*, Los Angeles Times, 20 Apr. 2012, www.latimes.com/local/california/la-me-sheriff-clique-20120420-story.html.

Voxxi. "'Jump Out Boys' Prided Themselves On Shooting Mostly Latino And Black Gang Bangers." *The Huffington Post*, TheHuffingtonPost.com, 8 Feb. 2013, www.huffingtonpost.com/2013/02/08/seven-members-of-la-sheriff-clique-fired_n_2645288.html.

Lau, Maya. "L.A. Sheriff Watchdogs Alarmed about New Claims of Secret Deputy Clique at Compton Station." *Los Angeles Times*, Los Angeles Times, 13 July 2018, www.latimes.com/local/lanow/la-me-sheriff-tattoo-compton-investigation-20180713-story.html.

Bermont, Bradley. "LA Sheriff Says He Won't Tolerate 'Renegade Cliques.' Here's The Backstory On Secret Societies." *LAist*, www.laist.com/2018/08/01/are_there_really_secret_societies_within_the_la_sheriffs_department.php.

Rubin, Joel, and Victoria Kim. "Former No. 2 in L.A. Sheriff's Office Surrenders to Prison to Serve 5-Year Sentence." *Los Angeles Times*, Los Angeles Times, 16 Jan. 2017, www.latimes.com/local/lanow/la-me-ln-tanaka-surrenders-20170116-story.html.

Philips, Darsha. "Tanaka Grilled about Ties to the 'Lynwood Vikings' Deputy Gang." *ABC7 Los Angeles*, 5 Apr. 2016, abc7.com/news/tanaka-grilled-about-ties-to-the-lynwood-vikings-deputy-gang/1276687/.

Faturechi, Robert. "L.A. County Sheriff's Department Intends to Fire Seven Deputies." *Los Angeles Times*, Los Angeles Times, 6 Feb. 2013, articles.latimes.com/2013/feb/06/local/la-me-jump-out-boys-20130207.

"Sheriff Moves to Fire Deputies in Jump Out Boys Clique." *Los Angeles Times*, Los Angeles Times, latimesblogs.latimes.com/lanow/2013/02/sheriff-fires-gang-unit-clique.html.
Lau, Maya. "Inked with a Skull in a Cowboy Hat, L.A. County Sheriff's Deputy Describes Exclusive

Society of Lawmen at California Station." *Los Angeles Times*, Los Angeles Times, 4 Aug. 2018, www.latimes.com/local/lanow/la-me-palmdale-sheriff-tattoo-20180804-story.html#.

"Long Beach Accountability Action Group™ LAAG | Www.LAAG.us | Long Beach, CA." *The "Regulators" and the "Vikings"*, www.laag.us/2007/10/regulators-and-vikings.html.

Bermont, Bradley. "LA Sheriff Says He Won't Tolerate 'Renegade Cliques.' Here's The Backstory On Secret Societies." *LAist*, www.laist.com/2018/08/01/are_there_really_secret_societies_within_the_la_sheriffs_department.php.

McMILLAN, PENELOPE, and LOUIS SAHAGUN | TIMES STAFF WRITERS. "Lynwood Deputies' Reported Gang-Style Activity Investigated." *Los Angeles Times*, Los Angeles Times, 4 Dec. 1990, articles.latimes.com/1990-12-04/local/me-5733_1_deputies.

Historically the LASD has had a long history of justifying deputy gangs. At former Sheriff Block's swearing in ceremony, Block made it clear that he did not disapprove of deputies forming deputy gangs. Block stated: "The fact that a group of people with a particular assignment band together in a sort of brotherhood could be a very positive thing. . . . In almost all of the stations there have been groups formed, as a badge of honor, if you will." With regards to the Lynwood Vikings using street jargon and hand signals Block stated, "I have no problem with street jargon. The fact they flash an L sign, L for Lynwood, 25 (the number for the Lynwood station), that in itself is meaningless. . . . Gangs get a kick out of the fact the deputies have their own sign." With regards to matching tattoos within deputy gangs, Fidel Gonzalez, Block's spokesman, cited Block as saying "a lot of guys in Saudi Arabia are wearing tattoos right now." Block refused to hold deputies belonging to deputy gangs accountable by continuously justifying their existence.

Service, City News. "LA County Calls for Study of Deputy Cliques." *NBC Southern California*, NBC Southern California, 13 Mar. 2019,
www.nbclosangeles.com/news/local/LA-County-Study-Deputy-Cliques-507079721.html.

Glickman, Paul. "LA Sheriff's Deputies Say Violence, Harassment And Bullying Ongoing At East LA Station."
*LAist*,laist.com/2019/05/29/sheriffs_deputies_say_violence_harassment_and_bullying_ongoing_at_east_l a_station.php.

Glickman, Paul. "Here Are The New Claims About A Violent Group Of LA Sheriff's Deputies Acting Like A Gang." *LAist*,
laist.com/2019/03/08/a_new_claim_about_a_violent_group_of_la_sheriffs_deputies_acting_as_a_gang.p hp.

Lau, Maya. "L.A. County Sheriff's Department Pays Price as Clandestine Deputy Cliques Persist." *Los Angeles Times*, Los Angeles Times, 27 Oct. 2018,
www.latimes.com/local/lanow/la-me-sheriff-tattoo-liability-20181027-story.html.

Garvey, Megan, and Southern California Public Radio. "L.A. County Supervisors Scathing Motion On Sheriff Cliques." *DocumentCloud*,
www.documentcloud.org/documents/5983471-L-A-County-Supervisors-Scathing-Memo-On-Sheriff.html#d ocument/p6/a498236.

When information regarding the Jump Out Boys arose in 2012, a spokesman for former Sheriff Lee Baca stated: "we're going to be looking at this right now, but it really could be a fantasy, something that's not true but right now we're going to find out exactly what is and what isn't and that will determine what our next step is." The spokesman refused to provide information regarding the investigation or details on the documents found. An anonymous member of the Jump Out Boys defended the existence of this gang by saying, "We get called a gang within the badge? It's unfair....people want to say you have a tattoo. So do fraternities. Go to Yale. Are they a gang?…. Boy Scouts have patches and they have mission statements, and so do we." The member continued to state, "We do not glorify shootings, what we do is commend and honor the shootings. I have to remember them because it can happen any time, any day. I don't want to forget them because I'm glad I'm alive." One member of the Jump Out Boys said "The group only promoted hard work and bravery." He continued to say there was "Nothing sinister about their creed or conduct" and that the pamphlet otherwise known as the creed for the Jump Out Boys "Supported proactive policing." In 2013, Charles McDaniel confessed under oath that his skull tattoo belonged to the Regulators; however, he emphasized that the tattoo only signifies "Friends, social group, camaraderie."

Recently, Sheriff McDonnell addressed the new CPT deputy gang at the Compton station. McDonnell stated: "We looked into the circumstances at Compton station: all the indicators of a well-run station are in place." McDonnell further observed that arrests have increased and crime has decreased. He added that the CPT tattoo "Does not in any way reflect the LASD of today." However, McDonnell did affirm that the Department will commence a study of "tattoos and secret societies." McDonnell seemed to be ambivalent when he was

8

conversing concerning the Compton tattoo. McDonnell stated, "I'm looking at what's behind it. Is it just body art? … Is it something that reflects well on our core values?" Deputy Samuel Aldama, a member of a deputy gang in Compton, recently testified in a recent lawsuit. Throughout the lawsuit, Aldama attempted to diminish the significance of acquiring the CPT tattoo when he said, "Working hard on the job — making arrests, responding to calls — was the only requirement for getting the tattoo." Aldama denied that himself and the ten to twenty other deputies with matching tattoos were apart of a gang.

Former Undersheriff Paul Tanaka was a member of the Lynwood Vikings and currently still has his tattoo. However, Tanaka denies that the Vikings were ever a gang. In cross examination Tanaka stated that the Vikings "Was nothing more than a station mascot," he added there was nothing "sinister" about this deputy gang. Furthermore Tanaka stated, "Just because you're trying to make it evil, doesn't make it evil." Tanaka is currently serving five years in prison for obstructing an FBI investigation and conspiracy.

Ron Hernandez, the current president of the Association for Los Angeles Deputy Sheriffs, admitted to having a tattoo from the Firestone station. However, Hernandez stated that the tattoo "Signified a fellowship of hard workers, not a rogue clique." Hernandez added, "I think the department should focus more on the value of a deputy's work product." Hernandez refused to discuss his tattoo's design and any name related to it.

Deputy Oleg Polissky of the Palmdale station attempted to justify his tattoo by saying that the tattoo signifies "Having good morals, following the law and avoiding heavy-handed tactics." He continued to justify his tattoo by expressing "It means that no one person has any less rights than any other person. You treat the public equally and without bias."

Deputy Jaimes, a member of the Regulators, stated that the Regulators are "Like the all-stars of a baseball team." He also said that the Regulators "Are nothing more than a close-knit group of deputies." Jaimes continued to justify this deputy gang by stating "[members of the Regulators] support one another and promote aggressive, ethical policing that keeps communities safe."

As one can see, the LASD has a long history of rationalizing and justifying deputy gangs. Deputy gangs have been passed off as anything from "mascots" to "baseball teams." However, at a Sheriff Civilian Oversight Committee meeting, McDonnell assured the public that he plans on addressing the prevalent issue of deputy gangs. At the committee meeting McDonnell said "No one has undertaken a serious, comprehensive study of the issue. And I intend, on my watch, to get to the bottom of this." McDonnell proceeded to state that "Renegade cliques erode public confidence as well as internal morale, and they will not be tolerated within LASD."

Newly elected Sheriff Alex Villanueva stated that "Every single station has a tattoo, a station logo and some type of tattoo. And so (do) most military units, fire departments, individual city police -- it's very common within the culture. The problem is not the tattoo or even the name, but the behavior." At a Sheriff Civilian Oversight Commission meeting, Villanueva claimed that most deputy gangs are harmless, and that issues of hostility are results of "hazing that went unchecked for a very, very long period of time." Villanueva further defined "hazing" to include a rookie having to buy lunch for an entire station, or working overtime without a jacket. During his election campaign Villanueva stated, "I worked with many people with these tattoos at different stations, and they were the most honorable, ethical people I have ever worked with." Furthermore, in a Civilian Oversight Commision meeting, Villanueva described deputy gangs as

"benign." Villanueva is a fierce advocate of allowing deputies to have these tattoos because, according to him, it is a "private matter."

## LASD's History of Addressing Deputy Gangs[3]

In 1992, after the Kolts Commission completed an investigation of LASD, the commission urged LASD officials to launch an inquiry and punish deputies who exhibit gang like behavior. However, then Sheriff Sherman Block stated that "The department is confident there are no racist deputy gangs or cliques within the organization and therefore disagrees that an internal investigation is appropriate." As demonstrated by Block's statement, a culture of denial and justification in LASD has allowed deputy gangs to go unpunished for decades. However in 2012, after the Citizens' Commission on Jail Violence delivered conclusions of widespread mismanagement in LASD, LASD took action to prevent deputy gangs from forming. LASD began training new deputies about deputy gangs and rotating jail assignments in an effort to prevent these gangs from developing. In 2014, then interim Sheriff John Scott reported that he would share the findings of an investigation into claims of bullying by the Banditos; however, the results still remain confidential. Former Sheriff Jim McDonnell announced that he would initiate a comprehensive study into the deputy gangs; however, it was not a formal investigation.

---

[3] Lau, Maya. "L.A. County Sheriff's Department Pays Price as Clandestine Deputy Cliques Persist." *Los Angeles Times*, Los Angeles Times, 27 Oct. 2018, www.latimes.com/local/lanow/la-me-sheriff-tattoo-liability-20181027-story.html.

Lau, Maya, and Joel Rubin. "Deputy Gangs Have Survived Decades of Lawsuits and Probes. Can the FBI Stop Them?" *Los Angeles Times*, Los Angeles Times, 14 July 2019, www.latimes.com/local/lanow/la-me-sheriff-gangs-fbi-inaction-20190714-story.html.

Most recently, Sheriff Alex Villanueva instituted a policy that prohibits department members

from participating in any groups that "Promote conduct that violates people's rights."

**Acknowledgement of Deputy Gangs in 2014 Los Angeles County PPOA Debate for Sheriff[4]**

In a 2014 Los Angeles County Profesional Peace Officers Association(PPOA) debate,

candidates running for the position of Los Angeles County sheriff shared their stance on a

variety of topics including deputy gangs. The moderator posed the question "What are your

thoughts about these alleged deputy gangs and cliques and if you are elected sheriff, will you put

a stop to them and how?" Immediately after this question was posed, former commander Robert

Olmsted vehemently stated "Let me preface by saying they are not alleged, we had some in the

past and its intolerable. As sheriff I will fire them." Olmsted further stated "When you have

deputies that throw gang signs, call themselves 'og,' have tattoos, beat up other deputies, what

would you call them? It's unacceptable." Following Olmsted, former assistant sheriff Todd

Rogers recounted his own experience dealing with deputy gangs, "So when I was a deputy and

turned down the deputy clique tattoo my sponsor, who was a senior deputy, refused to speak to

me for the rest of his career unless he had to." Rogers then stated, "These cliques are divisive by

their very nature. We don't need to have divisiveness in the LASD." Lou Vince, an LAPD

detective supervisor, reflected similar sentiments to Olmsted and Rogers, stating that "Deputy

gangs and cliques are the opposite of what professional law enforcement should be all about, and

---

[4] CH: 188. "LA County Sheriff Debate 2014." *Youtube*. https://www.youtube.com/watch?v=KH7Mf3R2Svk

as sheriff I would want to root them out." However, James Hellmold, an assistant sheriff, took a

different, less disciplinary approach to the question of deputy gangs. Hellmold stated, "We're

acting as if the LASD is the only law enforcement agency that has stations with tattoos and

monikers and things of that nature." Hellmold's comment indirectly proves that he recognizes

the prevalence of deputy gangs in the LASD. Jim McDonnell, then chief of police for the Long

Beach Police Department, posed a rhetoric question asking the audience, "Looking at gangs and

cliques, did we see them, do we have them? We absolutely see and have them." McDonnell

continued to prove his awareness of deputy gangs by naming the 2,000 Boys, the 3,000 Boys the

Regulators, the Jump Out Boys, the Banditos, and the Vikings as some examples.

13

## Significance of the East Los Angeles Sheriff's Station[5]


The East L.A. station has had a history of misconduct and questionable character.

According to available information accessible to the public, there have been three deputy gangs

---

[5] Hernandez, Miriam, et al. "Los Angeles County Sheriff's Deputy Describes Attack by Banditos Clique." *ABC7 Los Angeles*, 29 June 2019, abc7.com/lasd-deputy-describes-attack-by-banditos-clique/5370629/.

 O'CONNOR, ANNE-MARIE, and TINA DAUNT | TIMES STAFF WRITERS. "The Secret Society Among Lawmen." *Los Angeles Times*, Los Angeles Times, 24 Mar. 1999, articles.latimes.com/1999/mar/24/news/mn-20461.

McMILLAN, PENELOPE, and LOUIS SAHAGUN | TIMES STAFF WRITERS. "Lynwood Deputies' Reported Gang-Style Activity Investigated." *Los Angeles Times*, Los Angeles Times, 4 Dec. 1990, articles.latimes.com/1990-12-04/local/me-5733_1_deputies.

L.A. Deputies in Secret Club Demanded Sex from Female Trainees, Says Suit." *NBCNews.com*, NBCUniversal News Group, www.nbcnews.com/news/investigations/l-deputies-secret-club-demanded-sex-female-trainees-says-suit-n66026.

Lau, Maya, et al. "Cop Group with Matching Skull Tattoos Costs Taxpayers $7 Million in Fatal Shooting." *Los Angeles Times*, Los Angeles Times, 18 June 2019, www.latimes.com/local/lanow/la-me-sheriff-tattoo-settlement-20190618-story.html.

"Members of Deputy 'Gang' Reportedly Put Other LA County Sheriff's Deputies in Hospital After Off-Duty Brawl." *Wla*, witnessla.com/members-of-deputy-gang-reportedly-puts-other-los-angeles-county-sheriffs-deputies-in-hospital-in-brawl/.

Southern California Public Radio. "State of Affairs, Fort Apache Logo, Getting Rid of Junk Mail." *Southern California Public Radio*, 12 Apr. 2019, www.scpr.org/programs/take-two/2019/04/12/19606/.

Stoltze, Frank. "A Controversial East LA Sheriff's Station Logo Was Banned. Sheriff Villanueva Just Brought It Back." *LAist*, laist.com/2019/04/12/controversial_east_la_sheriffs_station_logo_returns.php.

Altman, Larry. "'Retired' L.A. Sheriff's Department Logo Deemed Unprofessional Making a Comeback." *KCET*, 7 May 2019, www.kcet.org/shows/socal-connected/retired-la-sheriffs-department-logo-deemed-unprofessional-making-a-comeback

at the East L.A. station. The Little Devils, also known as the Red Devils, is the earliest known

deputy gang within LASD's history. The Little Devils originated at the East L.A. station in 1971.

Just as current deputy gangs, the Little Devils wore matching tattoos of devil caricatures. It

should be noted that this deputy gang originated during the peak of the Chicano movement in

East L.A. The Cavemen deputy gang also originated at the East L.A. station; however, the most

notorious deputy gang from the East L.A. station is the Banditos. As shown in deputy Guadalupe

Lopez's lawsuit and deputy Rosa Gonzalez's lawsuit, the Banditos have a theme of sexually

harassing and discriminating against female deputies. Ultimately Lopez's lawsuit was settled for

$1,500,000 and Gonzalez's lawsuit was settled for $1,000,000, collectively costing taxpayers

millions of dollars. Just recently, seven deputies from the East L.A. station filed a lawsuit against

Los Angeles County for its failure to eliminate the hostile work environment established by the

Banditos. This lawsuit was prompted by a violent attack on rookie deputies at the hands of

members of the Banditos. All three of the complaints regarding the Banditos have been made by

deputies from the station. These instances exhibit the code of silence being broken, and reveal

the desperation and disappointment LASD's very own deputies feel toward deputy gangs.

Under Sheriff Alex Villanueva, the controversial Fort Apache logo was restored at the

East L.A. station. Previously, former Sheriff Jim McDonnell removed the logo because he felt

that it was disrespectful to the community. With

regards to the matter, McDonnell's undersheriff Neal

Tyler stated that, "Words have power. Symbols have

power" and that "It does matter whether our symbols

and our communications are civil and respectful." In a



1948 John Ford western called *Fort Apache*, the main plot of the movie revolves around an

isolated United States Army post in the middle of Apache territory. The Fort Apache logo at the

East L.A. station originated during the 1970 Chicano Moratorium when violent clashes broke out

between East L.A. deputies and anti-Vietnam protestors. During the riot more than 50 people

were injured, Los Angeles Times columnist Ruben Salazar was killed, and over 200 people were

arrested. According to the sponsors of the march, the police unjustly used tear gas on the

marchers. Peter Pitchess, the sheriff at the time of the moratorium, responded to the violence by

demanding that deputies keep a low profile. A department memo on 

the history of the logo states that, "Some in the media thought ELA

deputies took a High Profile during the riots," and that "Based on

that, Sheriff Pitchess created a Low Profile philosophy." The memo

further states that "In frustration, East LA deputies placed a pair of

boots and a helmet on the captain's desk with a note stating, 'Is this

Low Profile enough for you?' and that "The statement posed the

perspective that there is supposed to be a deputy somewhere between

the boot and helmet." Currently, the words "low profile" are displayed on the Fort Apache logo.

In addition to the words "low profile," the Fort Apache logo also displays a boot with a helmet

on top of it, and the phrase "siempre una patada en los pantalones" - meaning always a kick in

the pants. Before McDonnell had removed the logo, it was on station walls, shirt pins, swat car

bumper stickers, and a flag outside the station. Veteran Detective Leo Sanchez states that "when

the logo was there we didn't walk on it, we walked around it."  Former deputy William Pico

Rivera who was a deputy at the time of the Chicano moratorium states that "As terrifying as

some of these incidents are, you know you get that adrenaline rush, for us - fun. Always a kick."
However, community members and activists like Carlos Montes view the logo as insulting. With
regards to the meaning of the logo, Montes states, "They were in an outpost in the middle of the
desert among the savages, the savage Mexicans, the savage Chicanos. So they had to have a fort
to defend themselves." Civil rights attorney Cynthia Anderson Barker acknowledges that the
East L.A. station has a history of violating community member's civil rights, and that the
restorment of the logo "means the boots are back and we are going to trample on civil rights. It
means what rights do people have if the boot can stomp on them. It shows they are the ones that
want the power and are egging to exercise use of force. That's the message it sends to me."

Allegations of sexual harrasment, gender discrimination, and violence in the East L.A.
station justly create distrust with the community. Rather than inciting violence upon others,
deputies should carry themselves with integrity and protect people. With regards to the Fort
Apache logo, a station logo typically connotes something of importance or value to the deputies
in that particular station. The Fort Apache logo, made in commemoration of the riot, serves as a
reminder of a violent, painful time of conflict between community members and police. If
deputies at a station choose to take pride in a logo that commemorates an instance of
police-civilian conflict, what does that say about their values?

## The Little Devils[6]

The Little Devils, also known as the Red Devils, is a deputy gang in LASD that was created in 1971 at the East L.A Sheriff's station. Many deputies joined the Little Devils at majority white sheriffs stations in the 1980s. Members of the Little Devils are said to have worn tattoos with devil caricatures. Deputies who joined the Little Devils were located predominantly at sheriff's stations in majority black and Latino communities. Interestingly, this deputy gang started at the East L.A. station at the peak of the Chicano movement. There is barely any information on this specific deputy gang.

---

[6]  O'CONNOR, ANNE-MARIE, and TINA DAUNT | TIMES STAFF WRITERS. "The Secret Society Among Lawmen." *Los Angeles Times*, Los Angeles Times, 24 Mar. 1999, articles.latimes.com/1999/mar/24/news/mn-20461.

Kolts, James G. *The Los Angeles County Sheriff's Department*. July 1992, www.clearinghouse.net/chDocs/public/PN-CA-0001-0023.pdf.

McMILLAN, PENELOPE, and LOUIS SAHAGUN | TIMES STAFF WRITERS. "Lynwood Deputies' Reported Gang-Style Activity Investigated." *Los Angeles Times*, Los Angeles Times, 4 Dec. 1990, articles.latimes.com/1990-12-04/local/me-5733_1_deputies.

### The Wayside Whites or Wayside Whiteys[7]

The Wayside Whites is a deputy gang operated in the Wayside Honor Rancho jail.
Clydell Crawford, an inmate at Wayside Honor Rancho, claimed that a group of guards from the
Wayside Whites jumped on and broke his leg while he was laying on the ground. Crawford filed
an $1 million dollar civil rights lawsuit against 12 deputies and then Sheriff Sherman Block. The
lawsuit characterizes the Wayside Whiteys as a "Ku Klux Klan-type organization espousing
white supremacy and having as one of its objectives the subjugation, intimidation and
terrorization" toward black inmates. There are allegations that the Wayside Whites attacked
black inmates; however, after a six month investigation performed by LASD, the department
asserted that the allegations were "unfounded." However, LASD still payed $40,000 to the
inmates. Sergeant Edward Allens, who headed the investigation, said that the name Wayside
Whites was introduced to a deputy by a black inmate. The black inmate allegedly then proceeded
to show the deputy the W hand sign. However in response, Crawford's attorney stated "I know
of several other cases in which inmates have been badly, badly beaten" and that "The
information that I have is that it is not the black people who make the W sign. It is the white
deputies. That sign is regularly flashed by deputies. It is not done in fun or jest, but for

---

[7] Connelly, Michael. "Sheriff Denies Guards Formed Gang to Beat Up Black Inmates : Castaic: A
Six-Month Inquiry Finds That 'Wayside Whities' Was Just a Mocking Name for White Guards. But a
Former Prisoner Who Says They Broke His Leg Has Sued." *Los Angeles Times*, Los Angeles Times, 11
Dec. 1990, www.latimes.com/archives/la-xpm-1990-12-11-me-6163-story.html.

"Claims of Racism and Brutality Dog Los Angeles County Sheriff 'Deputy Gangs'." *The Appeal*,
theappeal.org/claims-of-racism-brutality-dog-los-angeles-county-sheriff-deputy-gangs/.

intimidation." Two deputies in the Wayside Whites admitted to flashing a gang-like hand signal in the letter W at black inmates; however, they claim it was not done in a threatening way.

### The Vikings[8]

The Vikings, a gang of deputies belonging to the Lynwood station, were characterized as a "Neo-Nazi, white supremacist gang" by a federal judge. The Vikings were established in the 1980s and regularly harassed Black and Latino residents through using violence, intimidation

---

[8] McMILLAN, PENELOPE, and LOUIS SAHAGUN | TIMES STAFF WRITERS. "Lynwood Deputies' Reported Gang-Style Activity Investigated." *Los Angeles Times*, Los Angeles Times, 4 Dec. 1990, articles.latimes.com/1990-12-04/local/me-5733_1_deputies.

O'CONNOR, ANNE-MARIE, and TINA DAUNT | TIMES STAFF WRITERS. "The Secret Society Among Lawmen." *Los Angeles Times*, Los Angeles Times, 24 Mar. 1999, articles.latimes.com/1999/mar/24/news/mn-20461.

Philips, Darsha. "Tanaka Grilled about Ties to the 'Lynwood Vikings' Deputy Gang." *ABC7 Los Angeles*, 5 Apr. 2016, abc7.com/news/tanaka-grilled-about-ties-to-the-lynwood-vikings-deputy-gang/1276687/.

Mason, Joshua. "Tanaka & LASD: Police Corruption & Hypocrisy on Gangs." *Joshua Mason Consulting*, www.jmasonconsulting.com/lynwood-vikings-police-corruption-and-hypocrisy-on-gangs/.

Kolts, James G. *The Los Angeles County Sheriff's Department*. July 1992, www.clearinghouse.net/chDocs/public/PN-CA-0001-0023.pdf.

Reynolds, Matt. "Man Says Neo-Nazi Cops Cost Him 20 Years." *Homepage*, 16 Dec. 2011, www.courthousenews.com/Man-Says-Neo-Nazi-Cops-Cost-Him-20-Years/.

Compton Herald. "Lynwood Vikings, Others, Comprise Racist Sheriff's Gang History." *Compton Herald*, Compton Herald, 20 July 2018, comptonherald.org/lynwood-vikings-others-comprise-racist-sheriffs-gang-history/.

"LA CHAPTER 7." President's Committee on Employment of People with Disabilities, www.usccr.gov/pubs/larpt/chapter7.htm#C4.

"LASD INVESTIGATIONS: Dangerous Jails, Part 4: INTERNAL AFFAIRS – by Matt Fleischer." *Wla*, witnessla.com/dangerous-jails-part-4-internal-affairs-by-matt-fleischer/.

Hernandez, Salvador. "The Los Angeles County Sheriff's Department Is Looking Into Whether Deputy Cliques Act Like Gangs." *BuzzFeed News*, BuzzFeed News, 2 Aug. 2018, www.buzzfeednews.com/article/salvadorhernandez/la-county-sheriffs-department-deputy-cliques.

and false arrests. According to the Kolts Commission report, "Some deputies at the Department's Lynwood Station associate with the 'Viking' symbol, and appear at least in past times to have engaged in behavior that is brutal and intolerable and is typically associated with street gangs." Members of this deputy gang have tattoos, used hand signs, sprayed graffiti and used street jargon. Member's tattoos were placed on their legs, included the Lynwood Vikings symbol, and included the numbers "998," the dispatch code for an officer involved shooting. Former Undersheriff Jerry Harper characterized the Vikings "998" tattoos as "A mark of pride." Deputies belonging to this gang would spray graffiti of the Vikings symbol around the city. The

former captain at the Lynwood station disapproved of the Vikings symbol due to the fact that historically, Vikings have been "Aryan warriors who raped and pillaged." The former captain stated that most African-American deputies and some Latino deputies opposed the Vikings symbol as a result of it's Aryan overtone. Eventually, the former captain eliminated the Viking symbol due to its controversy. On the walls of the Lynwood station, racist cartoons depicting Black men were put on display. Additionally, the Vikings exhibited racist behavior such as tattooing the





racist nickname "Chango[monkey] fighter" on deputies bodies and keeping a map of Lynwood

in the shape of Africa. This deputy gang referred to themselves "The Vikings" or "LVS 25." It

was reported that deputies belonging to the Vikings called each other "OG(original gangster)" or

"homeboy." Members of the Vikings also flashed "L" signs with their hands as a symbol for the

Lynwood station. Francisco Carrillo Jr., a man who spent twenty years in prison, blames the

Vikings for framing him. Carrillo believes that if deputies belonging to the Vikings hadn't

created a false identity for him, he wouldn't have spent twenty years in prison.

      The Lynwood station is based in a predominantly Latino and Black city. Eighty-one

residents filed a federal class action suit against deputies at the Lynwood station for racism and

brutality. The federal class action suit accused 22

deputies of 43 occurrences of "Shooting, brutality,

terrorism, house trashing and excessive force." In

the end, a federal judge demanded that LASD pay

nine million dollars for lawsuits induced by the

Vikings. Former Sheriff Sherman Block was averse

to the decision made by a federal judge and



regarded it as, "Irrational and wrong." It should be noted that former L.A. County Undersheriff

Paul Tanaka was a member of this deputy gang and still has the tattoo.

## The Pirates[9]

The Pirates, a deputy gang within LASD, operated at the Firestone station. Therefore, the Pirates must have been founded before 1993 due to the fact that this very station closed in 1993. According to an article by the L.A. Times, deputies formed an "Intramural sports team" called the Pirates. However, another article by the L.A. Times referred to the Pirates as a "Group with [a] macho moniker." Ron Hernandez, the current president of the Association for Los Angeles Deputy Sheriffs, admitted to having a tattoo from the Firestone station. However, Hernandez stated that the tattoo "Signified a fellowship of hard workers, not a rogue clique." Hernandez added, "I think the department should focus more on the value of a deputy's work product." Hernandez refused to discuss his tattoo's design and any name associated with it. Unfortunately, there is limited information on when the Pirates were founded and what exactly they did.

---

[9] O'CONNOR, ANNE-MARIE, and TINA DAUNT | TIMES STAFF WRITERS. "The Secret Society Among Lawmen." *Los Angeles Times*, Los Angeles Times, 24 Mar. 1999, articles.latimes.com/1999/mar/24/news/mn-20461.

McMILLAN, PENELOPE, and LOUIS SAHAGUN | TIMES STAFF WRITERS. "Lynwood Deputies' Reported Gang-Style Activity Investigated." *Los Angeles Times*, Los Angeles Times, 4 Dec. 1990, articles.latimes.com/1990-12-04/local/me-5733_1_deputies.

Lau, Maya. "Inked with a Skull in a Cowboy Hat, L.A. County Sheriff's Deputy Describes Exclusive Society of Lawmen at California Station." *Los Angeles Times*, Los Angeles Times, 4 Aug. 2018, www.latimes.com/local/lanow/la-me-palmdale-sheriff-tattoo-20180804-story.html#.

"LA Times Puts Spotlight on Station Tattoo." LASD.News, 12 July 2018, lasd.news/2018/07/11/la-times-puts-spotlight-on-station-tattoos/.

23

## The Rattlesnakes[10]

The Rattlesnakes, a deputy gang within LASD, was mentioned among numerous other deputy gangs from a number of articles. In an article by the L.A. Times, the Rattlesnakes were regarded as a gang similar to the Vikings. The Vikings were deputy gang that were regarded as a "Neo-nazi, white supremacist gang" by a federal judge. The Rattlesnakes were also regarded as a "Group with [a] macho moniker" in another article by the L.A. Times. Unfortunately, there is no information on what exactly the Rattlesnakes did, where they were founded, and when they were founded.

---

[10] O'CONNOR, ANNE-MARIE, and TINA DAUNT | TIMES STAFF WRITERS. "The Secret Society Among Lawmen." *Los Angeles Times*, Los Angeles Times, 24 Mar. 1999, articles.latimes.com/1999/mar/24/news/mn-20461.

McMILLAN, PENELOPE, and LOUIS SAHAGUN | TIMES STAFF WRITERS. "Lynwood Deputies' Reported Gang-Style Activity Investigated." *Los Angeles Times*, Los Angeles Times, 4 Dec. 1990, articles.latimes.com/1990-12-04/local/me-5733_1_deputies.

## The Cavemen[11]

The Cavemen, a deputy gang within LASD, has been mentioned among other deputy gangs operating in LASD. The Cavemen were regarded as a "Group with [a] macho moniker" in an article by the L.A. Times. The Cavemen also originated at the East Los Angeles station. Unfortunately, there is limited information on the Cavemen and what they did.



---

[11] O'CONNOR, ANNE-MARIE, and TINA DAUNT | TIMES STAFF WRITERS. "The Secret Society Among Lawmen." *Los Angeles Times*, Los Angeles Times, 24 Mar. 1999, articles.latimes.com/1999/mar/24/news/mn-20461.

Hernandez, Miriam, et al. "Los Angeles County Sheriff's Deputy Describes Attack by Banditos Clique." *ABC7 Los Angeles*, 29 June 2019, abc7.com/lasd-deputy-describes-attack-by-banditos-clique/5370629/.

### The Regulators[12]

The Regulators, a deputy gang within LASD, operated at the Century City station. In 2013, Terry Laffitte was riding his bicycle at night. However, Laffitte did not have a light on his bike and due to this deputies Zabala and Barrios decided to cite him for an infraction. When Zabala and Barrios ordered Laffitte to get off his bicycle, he refused. Zabala and Barrios followed Laffitte back to his house, grabbed Laffitte and began to fight with him. Laffitte was rendered stomach down on the ground, put in a carotid restraint, and handcuffed on his left hand. Zabala and Barrios claim Laffitte produced a gun; however, the gun claimed to have been produced by Laffitte had no bullets in it and no fingerprints or DNA pertaining to Laffitte. Ultimately Zabala shot a bullet through Laffitte's brain and Barrios shot a bullet



---

[12] Stuart Pfeifer | Times Staff Writer. "Deputy's Lawsuit Alleges Racism at Sheriff Station." *Los Angeles Times*, Los Angeles Times, 5 Sept. 2007, articles.latimes.com/2007/sep/05/local/me-deputies5.

"Long Beach Accountability Action Group™ LAAG | Www.LAAG.us | Long Beach, CA." *The "Regulators" and the "Vikings"*, www.laag.us/2007/10/regulators-and-vikings.html.

"Regulator." Dictionary.com, Dictionary.com, www.dictionary.com/browse/regulator?s=t

"Rodonna Laffitte vs. County of Los Angeles" Deposition of Jason Zabala. 2016. PDF File.

"Rodonna Laffitte vs. County of Los Angeles" Deposition of Deputy Oscar Barrios. 2016. PDF File.

2016_03_21 Motion to Compel. Case no. BC526786

CH: 188. "LA County Sheriff Debate 2014." *Youtube.* https://www.youtube.com/watch?v=KH7Mf3R2Svk

through his leg. On May 18, 2013 the bullet shot into Laffitte's brain instantaneously killed him.

In a motion to compel filed by McMurray Henriks LLP on behalf of the Laffittes, the testimonies of both Zabala and Barrios were provided. Zabala has a total of five tattoos and two of these tattoos are law enforcement related. One of the law enforcement related tattoos depicts St. Michael, and the other depicts a grinning skull and torso in a law enforcement uniform with a sheriff deputy badge, hat, and gun surrounded by flames.  In a deposition on August 24, 2016, Zabala was questioned regarding his tattoo of a grinning skull and torso. Yana Henriks, an attorney for the Laffittes, asked Zabala "And can you tell me why you decided to get a tattoo?" Zabala responded by stating "Like I stated, I had been working as a police officer for some time and then working at Century Sheriff station for some time. It's a tattoo that I had seen, I was associated with another deputy that I had knew that worked Century Sheriff station, kind of like an unofficial mascot of the station, so to  speak. I know a lot of facilities and stations have, you know, their own like unofficial mascots. And then working at the station, feeling a close tie to working with other deputies at the station. Like I said, the pride of working as a deputy sheriff. Following on like my family tradition. And then having "blessed are the peacemakers"on me is kind of a reminder that, you know, I'm working as a protector of the community and serving the community and, you know, having that -- just that pride of working as a deputy sheriff."

Further in the deposition Zabala admitted that Sergeant Matt Brady, a sergeant that previously worked at the Century station, has the same tattoo as he does. Zabala disclosed that Brady had informed him that this specific tattoo is usually associated with the Century Sheriff station. When Zabala was elaborating on why the number 141 was on his tattoo, he stated that the tattoo artist said that "Every time he does a tattoo, he puts the number on there." Henriks

responded by asking " Any tattoo?" and Zabala said "No, that particular one." This signifies that

141 people had already acquired the same tattoo as Zabala from that specific tattoo artist.

Henriks asked Zabala "And when tattoo artist told you there are about 140 of same tattoos that

he did for law enforcement officers, did that surprise you?" Zabala stated "No."  In this

deposition, Zabala admitted that the tattoo artist he went to was familiar with the particular tattoo

he acquired. When Zabala was asked whether the tattoo artist he went to "Also do[es] tattoos for

other law enforcement officers?" he responded by saying "I know he did one for my partner."

Zabala's partner, Jason Ford, has the exact same tattoo as him.  Ironically, another deputy

recommended this tattoo artist to Zabala.

      It should be noted that Captain Terry Carter of the Century station was aware that many

deputies had acquired the same tattoos. Zabala and Barrios also both have tattoos of St. Michael,

a warrior angel, holding a sword and a shield that says "QUIS UT DEUS." In English, "QUIS

UT DEUS" means "Who is like God." On this tattoo, St. Michael's foot is standing on the devil.

Hitherto, Zabala testified that the tattoo he has of St. Michael is a law-enforcement related tattoo.

In a deposition, when Zabala was asked why he choose to get a tattoo of St. Michael, he stated

"Most peace officers that I've seen, some of them have St. Michael tattoos because it's a patron

saint." The tattoos on Zabala and Barrios legs demonstrates membership to the Regulators at the

Century Station. The photo of the tattoo of St. Michael was the only photograph of a tattoo that

the County provided to the Plaintiffs before the court intervened. When asked to see the tattoos

Zabala described he had, Zabala's counsel refused to even provide verified photographs. In a

deposition in 2016, Henriks asked Barrios where he went to get his tattoos. Barrios responded by

saying "I don't remember ma'am." Henriks proceeded to state "Just for the record, we have

contacted Signal Hill American Tattoo Shop and I spoke to the owner. And you guys already warned about this lawsuit, so that's witness tampering. Thats tampering with the witness." This signifies that the plaintiff had recalled which tattoo shop they went to and deliberately warned them about this lawsuit. Two anonymous letters regarding the Regulators were sent to executives from LASD in 2003. This signifies that the Regulators have been in existence since 2003. There have been numerous accusations of misconduct by Regulators. Members of the Regulators were accused of extorting money from other deputies, influencing shift schedules, influencing the administration at the Century City station, and acting like gang members. Allegedly, members of this deputy gang demanded that other deputies give a set price of money to deputies in need. According to former commander Robert Olmstead there has been a shire at the Century City station in honor the Regulators for years. In a 2014 Sheriff candidate debate Olmstead said, "There was a monument directed in the back of Century station, it's been there for almost 5 years and just recently it got ordered to be taken down and it was a monument for the Regulators."

Angel Jaimes, a deputy who is a member of the Regulators, purported that black administrators in the department hindered his career by referring to him and other Latino deputies as the Mexican Mafia. In two anonymous letters sent to Sheriff Department executives, the Regulators were referred to as being apart of the Mexican Mafia. In one letter written in 2004, an unnamed person said "Something has to be done immediately, maybe a cleaning of the station to get rid of the gang mentality of the Mexican Mafia." However, Jaimes stated that "Department administrators wronged him by referring to [the Regulators] as the Mexican Mafia." Jaimes was the sixty-third deputy to join the Regulators; however, he refuses to acknowledge how many deputies belong to it. According to Jaimes, the Regulators are "Like the

all-stars of a baseball team." He also stated that the Regulators "Are nothing more than a close-knit group of deputies." In accordance with dictionary.com, the definition of the word regulator is "A person or thing that regulates something, in particular." In jail culture, a regulator is referred to as an inmate who supervises other inmates demeanor.

## The Banditos[13]

The Banditos, a deputy gang composed of males in the LASD, sexually harassed female

trainees. Approximately 80 deputies associate with the Banditos. Members of the Banditos work

at the East L.A. Sheriff's station in Boyle Heights. Members of this deputy gang are branded with

a tattoo of a skeleton with a sombrero, a pistol, and bullet sash. The Banditos also acquired

t-shirts depicting skeletons, one saying "Wanted dead or alive." Guadalupe Lopez, a deputy who

was assigned to the East L.A. station in 2011, alleges in a civil rights lawsuit that the Banditos

---

[13] "L.A. Deputies in Secret Club Demanded Sex from Female Trainees, Says Suit." *NBCNews.com*,
NBCUniversal News Group,
www.nbcnews.com/news/investigations/l-deputies-secret-club-demanded-sex-female-trainees-says-suit-n
66026.

Kandel, Jason, et al. "LA Deputies Demanded Sex From Female Trainees: Lawsuit." *NBC Southern
California*, NBC Southern California, 29 Mar. 2014,
www.nbclosangeles.com/news/local/LA-Deputies-Secret-Club-Demanded-Sex-Female-Trainees-Lawsuit-
252957181.html.

Rubin, Joel. "L.A. County Deputies Claim Abuse by an East L.A. Sheriff's Station 'Gang'." *Los Angeles
Times*, Los Angeles Times, 7 Mar. 2019,
www.latimes.com/local/lanow/la-me-sheriff-banditos-claim-20190307-story.html.

Lau, Maya, et al. "Cop Group with Matching Skull Tattoos Costs Taxpayers $7 Million in Fatal Shooting."
*Los Angeles Times*, Los Angeles Times, 18 June 2019,
www.latimes.com/local/lanow/la-me-sheriff-tattoo-settlement-20190618-story.html.

"Members of Deputy 'Gang' Reportedly Put Other LA County Sheriff's Deputies in Hospital After Off-Duty
Brawl." *Wla*,
witnessla.com/members-of-deputy-gang-reportedly-puts-other-los-angeles-county-sheriffs-deputies-in-ho
spital-in-brawl/.

Lau, Maya. "L.A. County Sheriff's Department Pays Price as Clandestine Deputy Cliques Persist." *Los
Angeles Times*, Los Angeles Times, 27 Oct. 2018,
www.latimes.com/local/lanow/la-me-sheriff-tattoo-liability-20181027-story.html.

Garvey, Megan, and Southern California Public Radio. "L.A. County Supervisors Scathing Motion On
Sheriff Cliques." *DocumentCloud*,
www.documentcloud.org/documents/5983471-L-A-County-Supervisors-Scathing-Memo-On-Sheriff.html#d
ocument/p6/a498236.

"Sexually harrased, threatened, and demanded sex from her" as part of training. Female trainees at this station were expected to provide sexual favors to male training officers and associates in order to become a patrol deputy. Lopez was told that if she didn't give sexual favors to male officers, she would "Have problems[there]." After she refused to complete their requests, Lopez confronted retaliation in many forms including: more harassment, hazing, being run off the road by another deputy, being slammed into a wall while she held a loaded shotgun, having eggs being thrown at her car, and having a dead rat placed under her car. Lopez also alleges that she noticed favors being demanded from other female probationary officers, including demands to write reports "That were essentially fabricated." As found by investigators, one of the deputies Lopez accused of harassment told Lopez that, "Girls shouldn't even be allowed to come into this job force," and that "We're going to have to regulate." Ten deputies, most likely apart of the Banditos, were disciplined for harassing Lopez. The lawsuit was ultimately settled for $1,500,000.

  Seven older deputies belonging to the Banditos attacked several new deputies at a party. The party was in celebration of the new deputies for having completed their probation period, and for now being official members of the Sheriff's Department. One of the new deputies recounted being thrown to the ground, punched in the face, and knocked out unconscious. Another rookie recounted being choked to the point of passing out. Five young Latino deputies entangled in the fight and two veteran deputies claim to have suffered retaliation when they warned a station official about the Banditos. The claims demand tens of millions of dollars from Los Angeles County as a result of its failure to eliminate the hostile work environment the Banditos have established. The Banditos targeted deputies who refused their demands to work

overtime without pay and make questionable arrests in order to meet unofficial productivity quotas.. Benjamin Zaredini and Louis Granados, training officers, allegedly talked with a lieutenant about their concerns regarding the Banditos. However the lieutenant's attempt to investigate the allegations was blocked by the captain, and Zaredini and Granados experienced retaliation because they broke the code of silence. As a result, Granados was denied a promotion and Zarendini was demoted.

Deputy Gregory Rodriguez, a deputy from the East L.A.station and alleged member of the Banditos, was charged with committing perjury and filing a false report. These charges came after the arrest of Christopher Gray. According to Rodriguez, Gray was "Inciting [the] crowd and threatening deputies." However, this claim was proven false by a video that showed Gray calmly standing nearby and refusing to get off the sidewalk. Gray lost his job as a result of being jailed for five days.

Deputy Rosa Gonzalez of the East L.A. station filed a lawsuit against the County of Los Angeles because she claims to have been retaliated against after making a gender discrimination complaint at her station. Gonzalez claims that the misogynistic culture at the East L.A. station is bolstered by the Banditos. The Los Angeles County Supervisors authorized a $1 million settlement in this case.

### The 2,000 Boys[14]


The 2,000 Boys, a deputy gang within LASD, is operated on the second floor of Men's

Central Jail. Department management has been aware of the 2000 Boys since at least 2004.

Allegedly, members of the 2,000 Boys tattoo the number 2,000 on their necks. Deputy Ronald

Brock was a reserve officer at the Compton police department and a lieutenant with the county

office of public safety. Brock had a three month orientation assignment at Men's Central Jail

where he encountered members of the 2,000 Boys and the 3,000 Boys. While in Men's Central

Jail, Brock witnessed many deputies belonging to the 2,000 Boys abuse inmates. On one

account, Brock was told not to contribute any information to an official report regarding the

incident of abuse by deputies belonging to the 2,000 Boys. Lieutenant Mark Guerrero allegedly

intimidated Brock by telling him about how Kim Jong Un's relatives were killed for being

disloyal. After Brock tried to complain to two sergeants, one of the sergeants told him not to

testify until he concluded his one year probationary period. On another account, Seargent Mark

---

[14]  Wilson, Simone. "L.A. Sheriff's Gang 'Jump Out Boys' Reportedly Prides Itself on Officer-Involved
Shootings." L.A. Weekly, 24 May 2016,
www.laweekly.com/news/la-sheriffs-gang-jump-out-boys-reportedly-prides-itself-on-officer-involved-sh
ootings-2397238.

"LASD Deputies: Jail Co-Workers Formed Gang-Like Clique." *Police Magazine*,
www.policemag.com/channel/patrol/news/2011/05/05/deputies-l-a-sheriff-s-jail-deputies-formed-gang-lik
e-clique.aspx.

"Sheriff's Deputy Alleges Retaliation for Protesting Inmate Abuse at L.A. Jails." *MyNewsLA.com*, 19 Feb.
2015,
mynewsla.com/government/2015/02/19/sheriffs-deputy-alleges-retaliation-protesting-inmate-abuse-l-jails
/.

Garvey, Megan, and Southern California Public Radio. "L.A. County Supervisors Scathing Motion On
Sheriff Cliques." *DocumentCloud*,
www.documentcloud.org/documents/5983471-L-A-County-Supervisors-Scathing-Memo-On-Sheriff.html#d
ocument/p6/a498236.

Renfrow forced Brock to fire a stun gun at an innocent inmate. Renfrow then required Brock to falsify a statement saying that the inmate in question was aggressive towards another deputy. Brock's narrative indicates that other deputies and sergeants were aware of, and sanctioned the multiple incidents of abuse against inmates in Men's Central Jail.  The 2,000 Boys also were mentioned alongside many other deputy gangs in an article written by the LA Weekly. In order to "Earn his ink," a deputy in the 2000 Boys broke the eye socket of a complacent inmate during a beating. The "ink" he wanted to earn is a tattoo with the roman numeral II.

### The 3,000 Boys[15]

The 3,000 Boys, a deputy gang within LASD, is operated on the third floor of Men's

Central Jail. Department management has been aware of the 3000 Boys since at least 2004. This

deputy gang is known for having similar tattoos

and flashing gang hand signs. The gang hand

signs compile of deputies lifting three fingers,

signifying their allegiance to the 3,000 Boys. The

existence of this deputy gang was discovered in

2010 following an aggressive fight between

deputies at a holiday party. Approximately 6

deputies were fired after assaulting two other

deputies at this holiday party. The 6 deputies fired

all worked on the third floor where they were





---

[15] Faturechi, Robert. "L.A. County Sheriff's Department to Dismiss 6 Deputies Involved in Montebello
Assault." Los Angeles Times, Los Angeles Times, 23 Mar. 2011,
articles.latimes.com/2011/mar/23/local/la-me-deputies-fired-20110323.

1TwinKen. "The Gang Behind The Badge: Part 1 A.K.A. THE 3000 Boys." *YouTube*, YouTube, 17 July
2011, www.youtube.com/watch?v=lrDIOkzQlyc.

"The World's Largest Street Gang." Pro Libertate, 1 Jan. 1970,
freedominourtime.blogspot.com/2011/05/worlds-largest-street-gang.html.

"Sheriff's Department Probes Yet Another Secret Deputy Clique." *Wla*,
witnessla.com/sheriffs-department-probes-yet-another-secret-deputy-clique/.

Garvey, Megan, and Southern California Public Radio. "L.A. County Supervisors Scathing Motion On
Sheriff Cliques." *DocumentCloud*,
www.documentcloud.org/documents/5983471-L-A-County-Supervisors-Scathing-Memo-On-Sheriff.html#d
ocument/p6/a498236.

allegedly apart of the 3,000 Boys. Public records exhibit that deputies designated to work on the

third floor of Men's Central Jail had the highest use of force against inmates than any other floor

in the jail. From 2006 to 2010, there were 437 use of force incidents on the third floor of Men's

Central Jail. Evans Tutt, an inmate from the third floor, had a broken nose, a broken tooth,

bruises, contusions, and muscle damage after deputies brutally beat him. According to a former

top jail commander, sworn custody staff would "Earn their ink" by breaking inmates bones. The

gang signs, tattoos, and abundance of incidents of excessive force on inmates demonstrates the

corruption of deputies belonging to the 3,000 Boys.

## The Jump Out Boys[16]

The Jump Out Boys, a deputy gang within the L.A. County Sheriff's Gang Enforcement
Team, pride themselves on the shootings of majority Latino and Black gang-bangers. The
existence of the Jump Out Boys was reported in 2012 by the
L.A. Times. The Jump Out Boys are known for priding
themselves on hostile policing in many Latino communities.
The Jump Out Boys brand their members with tattoos that
depict a skull with red eyes and an OSS(Operation Safe Streets)
bandana, holding a revolver while surrounded by an ace card
and an 8 card. In the game of poker, an ace card and an 8 card is

referred to as a dead man's hand. Each deputy also has a distinct number from 1-9 on their tattoo.
After a member of the Jump Out Boys is involved in a shooting, smoke is added to the revolver
of their tattoo. Members of this deputy gang earn more respect for being involved in shootings.
The Jump Out Boy's creed states, "We are alpha dogs who think and act like the wolf, but never
become the wolf." Their creed goes on to say, "We are not afraid to get our hands dirty without

---

[16] "Curtis, Sykes v. Los Angeles County Civil Service Commision." 2017. PDF file.

Faturechi, Robert. "Secret Clique in L.A. County Sheriff's Gang Unit Probed." *Los Angeles Times*, Los
Angeles Times, 20 Apr. 2012, articles.latimes.com/2012/apr/20/local/la-me-sheriff-clique-20120420.

Voxxi. "'Jump Out Boys' Prided Themselves On Shooting Mostly Latino And Black Gang Bangers." *The
Huffington Post*, TheHuffingtonPost.com, 8 Feb. 2013,
www.huffingtonpost.com/2013/02/08/seven-members-of-la-sheriff-clique-fired_n_2645288.html.

"Sheriff Moves to Fire Deputies in Jump Out Boys Clique." *Los Angeles Times*, Los Angeles Times,
latimesblogs.latimes.com/lanow/2013/02/sheriff-fires-gang-unit-clique.html.

any disgrace, dishonor or hesitation… sometimes [members] need to do the things they don't want to in order to get where they want to be." Their creed further incites violence by saying "[members] need to get guns." The Jump Out Boy's creed has 6 sections being: Jump Out Boys Creed, Jump Out Boys Mission, The Initiation, General Information, Tattoo Meaning, and Revisions. According to this deputy gang's creed, only deputies belonging to the Gang Enforcement Team could become members. The Jump Out Boy's creed states that there is a "Black Book" and a "Black Book" keeper. This alleged "Black Book" contains the real name of deputies belonging to the Jump Out Boys, their date of initiation, dates of shootings, and the date deputies started in the Gang Enforcement Team.

The name "Jump Out Boys" was initially given to the Gang Enforcement Team by several gang members in Compton. The Sheriff's Department performed an official investigation into this deputy gang's creed and deputies suspected to be participating in the Jump Out Boys. However, Steve Whitmore, a spokesman for the LASD, declined to share details regarding the investigation. A member of the Jump Out Boys correlated it to the Boy Scouts or an Ivy League Fraternity. A total of 7 deputies belonging to the Jump Out Boys were fired for unethical conduct and for damaging LASD's reputation.

## The Grim Reapers[17]

The Grim Reapers, a deputy gang within LASD, is operated at the Lennox station.

Members of the Grim Reapers wear a tattoo of a death  hooded skull and scythe. Deputies belonging to the Grim Reapers have been accused of using aggressive tactics and preserving a code of silence among members. Caren Carl Mandoyan, a sheriff deputy who was fired for misconduct, was recently reinstated by Sheriff Alex Villanueva. Mandoyan was originally fired on account of a woman's claims of harassment, stalking, and domestic abuse. According to Mandoyan's ex-girlfriend, Mandoyan squeezed her neck and when she tried to hide from him in the bathroom, he kicked the door to break in. A video reveals that Mandoyan used a metal pry to attempt to pry open the woman's sliding glass door. Previously, Mandyoan had told internal affairs investigators that he had not tried to break into the woman's house; however, his claims were proven false by this scandalous, violent video. In an internal affairs interview conducted in 2016 Mandonan, a member of the Grim Reapers, admitted to having a reaper tattoo associated with the gang.

---

[17] Service, City News. "Skull Tattoos, Secret Society in LASD, Group Claims." *NBC Southern California*, NBC Southern California, 13 July 2018, www.nbclosangeles.com/news/local/skull-tattoos-secret-society-Deputies-Watch-Dog-McConnell-Compton-488154151.html.

"LawrenceMercantile's Public Profile." *CafePress*, www.cafepress.com/profile/lawrencemercantile.

Lau, Maya, and Matt Stiles. "Deputy Reinstated by Sheriff Villanueva Admitted to Having Tattoo Linked to Secret Society." *Los Angeles Times*, Los Angeles Times, 28 Mar. 2019, www.latimes.com/local/lanow/la-me-sheriff-mandoyan-tattoo-20190328-story.html.

Allegedly Mandoyan's tattoo is on his inner left ankle and contains the name of his station, a

grim reaper holding a scythe, and the number 98. The woman who Mandoyan harassed claims

that Mandoyan threatened her saying that as a result of his membership in the Grim Reapers, he

knew powerful people who could ruin careers in LASD.

Lawrence Mercantile designed a Lennox station Grim Reapers logo on CafePress in 2013

as seen in the picture above. Mercantile also sells t-shirts, coffee mugs, hats, clocks, and other

merchandise with the Lennox station Grim Reapers logo. In addition to selling merchandise with

the Lennox station Grim Reapers logo, Mercantile sells merchandise for numerous other deputy

gangs including the Vikings and the Jump Out Boys.

**The Buffalo Soldiers**[18]


The Buffalo Soldiers is a deputy gang within LASD. Members of this deputy gang are

allegedly black. Furthermore, there are allegations that former Undersheriff La Berge may be a

member. Unfortunately, there is a limited amount of information regarding the Buffalo Soldiers.

---

[18] "LA Times Puts Spotlight on Station Tattoo." *LASD.News*, 12 July 2018,
lasd.news/2018/07/11/la-times-puts-spotlight-on-station-tattoos/.

## CPT[19]

An unnamed deputy gang at the Compton station was discovered in 2018.  Members of
this deputy gang wear matching tattoos of a skull wearing a
helmet with the letters CPT for Compton. The skull also bears a
rifle and is encircled by flames. Deputy Samuel Aldama stated
that he acquired this tattoo 2 months before he was involved in
the shooting death of Donta Taylor, an unarmed Black man.
Aldama and deputy Mizrain Orrego were both involved in the
shooting of Taylor, but claim that Taylor was pointing a gun at
them before they fired up to 15 rounds. According to an



[19] Lau, Maya. "L.A. Sheriff Watchdogs Alarmed about New Claims of Secret Deputy Clique at Compton
Station." *Los Angeles Times*, Los Angeles Times, 13 July 2018,
www.latimes.com/local/lanow/la-me-sheriff-tattoo-compton-investigation-20180713-story.html.

"Revelation About LA Deputies' Secret Clique Sparks Calls For Investigation." *CBS Los Angeles*, CBS
Los Angeles, 14 July 2018,
losangeles.cbslocal.com/video/category/sponsored-content-insidethepalazzo/3899338-revelation-about-la-
deputies-secret-clique-sparks-calls-for-investigation/.

Lau, Maya, et al. "After Decades of Problems, New Allegations Surface of a Secret Clique within L.A.
County Sheriff's Department." Los Angeles Times, Los Angeles Times, 10 July 2018,
www.latimes.com/local/lanow/la-me-compton-sheriff-shooting-20180710-story.html.

"LASD Investigation Highlights Police Officer Tattoo Culture." *Www.theepochtimes.com*, 30 July 2018,
m.theepochtimes.com/lasd-investigation-highlights-police-officer-tattoo-culture_2607432.html.

Lau, Maya, et al. "Cop Group with Matching Skull Tattoos Costs Taxpayers $7 Million in Fatal Shooting."
*Los Angeles Times*, Los Angeles Times, 18 June 2019,
www.latimes.com/local/lanow/la-me-sheriff-tattoo-settlement-20190618-story.html.

"Claims of Racism and Brutality Dog Los Angeles County Sheriff 'Deputy Gangs'." *The Appeal*,
theappeal.org/claims-of-racism-brutality-dog-los-angeles-county-sheriff-deputy-gangs/.

autopsy, Taylor was shot six times. The shooting death of Donta Taylor was in June of 2016.

While testifying in a lawsuit brought by Taylor's family, Aldama stated that as many as 20 other

deputies have the same tattoo. Aldama claims that the tattoos are acquired by "Working hard" by

answering calls and making arrests. The attorney representing Taylor's family stated that this

shooting death was racially motivated. In a deposition, the attorney representing Taylor's family

asked Aldama if he had any "Ill feelings" towards African Americans. After 45 seconds, Aldama

responded by saying "I do, sir." Aldama later said he didn't understand the question and that he

doesn't have any ill-feelings towards African Americans. John Sweeney, the attorney

representing the Taylor family, is also representing another black client who alleges in a lawsuit

that Aldama and his partner seriously beat him while calling him the n-word in January 2016.

Aldama denied that his tattoo signified belonging to a deputy gang. However, historically,

members of deputy gangs in LASD have had matching tattoos such as the matching tattoos

numerous deputies at the Compton station have. The lawsuit filed by Taylor's family was settled

for $7 million .

On January 15, 2016 Aldama and Orrego jumped out of their squad car and drew their

guns at Sheldon Lockett. At the time, Lockett was standing outside of his Godmother's house in

Compton. Having been startled and scared by the drawn guns, Lockett ran. Aldama and Orrego

then declared on their radio that Lockett was armed. Subsequently, Aldama and Orrego chased

Lockett to a nearby backyard, and when Lockett tried to surrender, the deputies brutally beat him

while calling him the n-word. Although Lockett had no gun and had commited no crime, the

deputies still charged him with attempted murder. As a result, Lockett spent eight months in

county jail because he could not afford to pay bail. Eventually, the Los Angeles County District

Attorney dropped all charges against him. In an attempt to hold Aldama and Oreego accountable,

Lockett's mother filed a complaint against them with the LASD; however, no investigation or

disciplinary actions were taken. A month later, deputies broke down Lockett's mother's door and

ransacked her house. The deputies claimed to be looking for the gun Aldama and Orrego claimed

Lockett had pointed at them. A lawsuit was filed against the County of Los Angeles, LASD,

Aldama, and Orrego in July of 2018.

## The Cowboys[20]

An unnamed deputy gang at the Palmdale station brands its members with a tattoo of a skull in a cowboy hat. Deputy Oleg Polissky acquired this tattoo on his left ankle at a tattoo parlor in Lancaster three or four years ago. He was accompanied by other deputies when he attained the tattoo. Subsequently, Polissky and his associates celebrated him acquiring this tattoo at a deputy's house. At the celebration there were around twenty people, some also had the skull in a cowboy hat tattoo. Polissky claims that officers would get recruited to this deputy gang depending on how "Fair they were in their jobs." According to Polissky, the tattoo signifies "Having good morals, following the law and avoiding heavy-handed tactics." In a deposition, Polissky stated that the tattoo "Means that no one person has any less rights than any other person. You treat the public equally and without bias." There are precisely four other known deputies at the Palmdale station who have the skull and cowboy hat tattoo.

---

[20] Lau, Maya. "Inked with a Skull in a Cowboy Hat, L.A. County Sheriff's Deputy Describes Exclusive Society of Lawmen at California Station." *Los Angeles Times*, Los Angeles Times, 4 Aug. 2018, www.latimes.com/local/lanow/la-me-palmdale-sheriff-tattoo-20180804-story.html.

**The Spartans[21]**

The Spartans were acknowledged as a deputy gang in the L.A. Times article "FBI Investigating tattooed deputy gangs in Los Angeles County Sheriff's Department." According to the article, the FBI has asked for information regarding the practices and tattoos of the Spartans, among other deputy gangs.

---

[21] Lau, Maya, and Joel Rubin. "FBI Investigating Tattooed Deputy Gangs in Los Angeles County Sheriff's Department." *Los Angeles Times*, Los Angeles Times, 11 July 2019, www.latimes.com/local/la-me-fbi-investigating-sheriff-20190711-story.html.

# **Bibliography**

O'CONNOR, ANNE-MARIE, and TINA DAUNT | TIMES STAFF WRITERS. "The Secret Society
Among Lawmen." *Los Angeles Times*, Los Angeles Times, 24 Mar. 1999,
articles.latimes.com/1999/mar/24/news/mn-20461.

McMILLAN, PENELOPE, and LOUIS SAHAGUN | TIMES STAFF WRITERS. "Lynwood Deputies'
Reported Gang-Style Activity Investigated." *Los Angeles Times*, Los Angeles Times, 4 Dec. 1990,
articles.latimes.com/1990-12-04/local/me-5733_1_deputies.

Philips, Darsha. "Tanaka Grilled about Ties to the 'Lynwood Vikings' Deputy Gang." *ABC7 Los Angeles*,
5 Apr. 2016, abc7.com/news/tanaka-grilled-about-ties-to-the-lynwood-vikings-deputy-gang/1276687/.

Mason, Joshua. "Tanaka & LASD: Police Corruption & Hypocrisy on Gangs." *Joshua Mason Consulting*,
www.jmasonconsulting.com/lynwood-vikings-police-corruption-and-hypocrisy-on-gangs/.

Lau, Maya, et al. "After Decades of Problems, New Allegations Surface of a Secret Clique within L.A.
County Sheriff's Department." Los Angeles Times, Los Angeles Times, 10 July 2018,
www.latimes.com/local/lanow/la-me-compton-sheriff-shooting-20180710-story.html.

Stuart Pfeifer | Times Staff Writer. "Deputy's Lawsuit Alleges Racism at Sheriff Station." *Los Angeles
Times*, Los Angeles Times, 5 Sept. 2007, articles.latimes.com/2007/sep/05/local/me-deputies5.

"L.A. Deputies in Secret Club Demanded Sex from Female Trainees, Says Suit." *NBCNews.com*,

NBCUniversal News Group,

www.nbcnews.com/news/investigations/l-deputies-secret-club-demanded-sex-female-trainees-says-suit-n

66026.


Wilson, Simone. "L.A. Sheriff's Gang 'Jump Out Boys' Reportedly Prides Itself on Officer-Involved

Shootings." L.A. Weekly, 24 May 2016,

www.laweekly.com/news/la-sheriffs-gang-jump-out-boys-reportedly-prides-itself-on-officer-involved-sh

ootings-2397238.


"LASD Deputies: Jail Co-Workers Formed Gang-Like Clique." *Police Magazine*,

www.policemag.com/channel/patrol/news/2011/05/05/deputies-l-a-sheriff-s-jail-deputies-formed-gang-lik

e-clique.aspx.


1TwinKen. "The Gang Behind The Badge: Part 1 A.K.A. THE 3000 Boys." *YouTube*, YouTube, 17 July

2011, www.youtube.com/watch?v=lrDIOkzQlyc.


Faturechi, Robert. "L.A. County Sheriff's Department to Dismiss 6 Deputies Involved in Montebello

Assault." *Los Angeles Times*, Los Angeles Times, 23 Mar. 2011,

articles.latimes.com/2011/mar/23/local/la-me-deputies-fired-20110323.


"Curtis, Sykes v. Los Angeles County Civil Service Commision." 2017. PDF file.

Faturechi, Robert. "Secret Clique in L.A. County Sheriff's Gang Unit Probed." *Los Angeles Times*, Los

Angeles Times, 20 Apr. 2012, articles.latimes.com/2012/apr/20/local/la-me-sheriff-clique-20120420.


Voxxi. "'Jump Out Boys' Prided Themselves On Shooting Mostly Latino And Black Gang Bangers." *The

Huffington Post*, TheHuffingtonPost.com, 8 Feb. 2013,

www.huffingtonpost.com/2013/02/08/seven-members-of-la-sheriff-clique-fired_n_2645288.html.


Service, City News. "Skull Tattoos, Secret Society in LASD, Group Claims." *NBC Southern California*,

NBC Southern California, 13 July 2018,

www.nbclosangeles.com/news/local/skull-tattoos-secret-society-Deputies-Watch-Dog-McConnell-Compt

on-488154151.html.


Lau, Maya. "L.A. Sheriff Watchdogs Alarmed about New Claims of Secret Deputy Clique at Compton

Station." *Los Angeles Times*, Los Angeles Times, 13 July 2018,

www.latimes.com/local/lanow/la-me-sheriff-tattoo-compton-investigation-20180713-story.html.


"Revelation About LA Deputies' Secret Clique Sparks Calls For Investigation." *CBS Los Angeles*, CBS

Los Angeles, 14 July 2018,

losangeles.cbslocal.com/video/category/sponsored-content-insidethepalazzo/3899338-revelation-about-la-

deputies-secret-clique-sparks-calls-for-investigation/.


"Sheriff's Deputy Alleges Retaliation for Protesting Inmate Abuse at L.A. Jails." *MyNewsLA.com*, 19 Feb.

2015,

mynewsla.com/government/2015/02/19/sheriffs-deputy-alleges-retaliation-protesting-inmate-abuse-l-jails

/.


Rubin, Joel, and Victoria Kim. "Former No. 2 in L.A. Sheriff's Office Surrenders to Prison to Serve

5-Year Sentence." *Los Angeles Times*, Los Angeles Times, 16 Jan. 2017,

www.latimes.com/local/lanow/la-me-ln-tanaka-surrenders-20170116-story.html.


Faturechi, Robert. "L.A. County Sheriff's Department Intends to Fire Seven Deputies." *Los Angeles

Times*, Los Angeles Times, 6 Feb. 2013,

articles.latimes.com/2013/feb/06/local/la-me-jump-out-boys-20130207.


Kandel, Jason, et al. "LA Deputies Demanded Sex From Female Trainees: Lawsuit." NBC Southern

California, NBC Southern California, 29 Mar. 2014,

www.nbclosangeles.com/news/local/LA-Deputies-Secret-Club-Demanded-Sex-Female-Trainees-Lawsuit

-252957181.html.


"Sheriff Moves to Fire Deputies in Jump Out Boys Clique." *Los Angeles Times*, Los Angeles Times,

latimesblogs.latimes.com/lanow/2013/02/sheriff-fires-gang-unit-clique.html.


"The World's Largest Street Gang." Pro Libertate, 1 Jan. 1970,

freedominourtime.blogspot.com/2011/05/worlds-largest-street-gang.html.

Lau, Maya. "Inked with a Skull in a Cowboy Hat, L.A. County Sheriff's Deputy Describes Exclusive

Society of Lawmen at California Station." *Los Angeles Times*, Los Angeles Times, 4 Aug. 2018,

www.latimes.com/local/lanow/la-me-palmdale-sheriff-tattoo-20180804-story.html#.


"LASD Investigation Highlights Police Officer Tattoo Culture." *Www.theepochtimes.com*, 30 July 2018,

m.theepochtimes.com/lasd-investigation-highlights-police-officer-tattoo-culture_2607432.html.


Compton Herald. "Lynwood Vikings, Others, Comprise Racist Sheriff's Gang History." Compton Herald,

Compton Herald, 20 July 2018,

comptonherald.org/lynwood-vikings-others-comprise-racist-sheriffs-gang-history/.


Lau, Maya. "Inked with a Skull in a Cowboy Hat, L.A. County Sheriff's Deputy Describes Exclusive

Society of Lawmen at California Station." *Los Angeles Times*, Los Angeles Times, 4 Aug. 2018,

www.latimes.com/local/lanow/la-me-palmdale-sheriff-tattoo-20180804-story.html.


"Long Beach Accountability Action Group™ LAAG | Www.LAAG.us | Long Beach, CA." *The
"Regulators" and the "Vikings"*, www.laag.us/2007/10/regulators-and-vikings.html.


"Regulator." *Dictionary.com*, Dictionary.com, www.dictionary.com/browse/regulator?s=t.


"LA Times Puts Spotlight on Station Tattoo." *LASD.News*, 12 July 2018,

lasd.news/2018/07/11/la-times-puts-spotlight-on-station-tattoos/.

52

Bermont, Bradley. "LA Sheriff Says He Won't Tolerate 'Renegade Cliques.' Here's The Backstory On

Secret Societies." *LAist*,

www.laist.com/2018/08/01/are_there_really_secret_societies_within_the_la_sheriffs_department.php.


"LA CHAPTER 7." *President's Committee on Employment of People with Disabilities*,

www.usccr.gov/pubs/larpt/chapter7.htm#C4.


"LawrenceMercantile's Public Profile." *CafePress*, www.cafepress.com/profile/lawrencemercantile.


"LASD INVESTIGATIONS: Dangerous Jails, Part 4: INTERNAL AFFAIRS – by Matt Fleischer." *Wla*,

witnessla.com/dangerous-jails-part-4-internal-affairs-by-matt-fleischer/.


"Sheriff's Department Probes Yet Another Secret Deputy Clique." *Wla*,

witnessla.com/sheriffs-department-probes-yet-another-secret-deputy-clique/.


"Rodonna Laffitte vs. County of Los Angeles" Deposition of Jason Zabala. 2016. PDF File.


"Rodonna Laffitte vs. County of Los Angeles" Deposition of Deputy Oscar Barrios. 2016. PDF File.


2016_03_21 Motion to Compel. Case no. BC526786

53

Service, City News. "LA County Calls for Study of Deputy Cliques." *NBC Southern California*, NBC

Southern California, 13 Mar. 2019,

www.nbclosangeles.com/news/local/LA-County-Study-Deputy-Cliques-507079721.html.


CH: 188. "LA County Sheriff Debate 2014." *Youtube.* https://www.youtube.com/watch?v=KH7Mf3R2Svk


Glickman, Paul. "LA Sheriff's Deputies Say Violence, Harassment And Bullying Ongoing At East LA

Station."

*LAist*, laist.com/2019/05/29/sheriffs_deputies_say_violence_harassment_and_bullying_ongoing_at_east_l

a_station.php.


Lau, Maya, et al. "Cop Group with Matching Skull Tattoos Costs Taxpayers $7 Million in Fatal Shooting."

*Los Angeles Times*, Los Angeles Times, 18 June 2019,

www.latimes.com/local/lanow/la-me-sheriff-tattoo-settlement-20190618-story.html.


"Members of Deputy 'Gang' Reportedly Put Other LA County Sheriff's Deputies in Hospital After Off-Duty

Brawl." *Wla*,

witnessla.com/members-of-deputy-gang-reportedly-puts-other-los-angeles-county-sheriffs-deputies-in-ho

spital-in-brawl/.


Southern California Public Radio. "State of Affairs, Fort Apache Logo, Getting Rid of Junk Mail." *Southern

California Public Radio*, 12 Apr. 2019, www.scpr.org/programs/take-two/2019/04/12/19606/.


Stoltze, Frank. "A Controversial East LA Sheriff's Station Logo Was Banned. Sheriff Villanueva Just

Brought It Back." *LAist*, laist.com/2019/04/12/controversial_east_la_sheriffs_station_logo_returns.php.

Altman, Larry. "'Retired' L.A. Sheriff's Department Logo Deemed Unprofessional Making a Comeback."

*KCET*, 7 May 2019,

www.kcet.org/shows/socal-connected/retired-la-sheriffs-department-logo-deemed-unprofessional-making-

a-comeback

Connelly, Michael. "Sheriff Denies Guards Formed Gang to Beat Up Black Inmates : Castaic: A Six-Month

Inquiry Finds That 'Wayside Whities' Was Just a Mocking Name for White Guards. But a Former Prisoner

Who Says They Broke His Leg Has Sued." *Los Angeles Times*, Los Angeles Times, 11 Dec. 1990,

www.latimes.com/archives/la-xpm-1990-12-11-me-6163-story.html.

"Claims of Racism and Brutality Dog Los Angeles County Sheriff 'Deputy Gangs'." *The Appeal*,

theappeal.org/claims-of-racism-brutality-dog-los-angeles-county-sheriff-deputy-gangs/.

Hernandez, Salvador. "The Los Angeles County Sheriff's Department Is Looking Into Whether Deputy

Cliques Act Like Gangs." *BuzzFeed News*, BuzzFeed News, 2 Aug. 2018,

www.buzzfeednews.com/article/salvadorhernandez/la-county-sheriffs-department-deputy-cliques.

Rubin, Joel. "L.A. County Deputies Claim Abuse by an East L.A. Sheriff's Station 'Gang'." *Los Angeles
Times*, Los Angeles Times, 7 Mar. 2019,

www.latimes.com/local/lanow/la-me-sheriff-banditos-claim-20190307-story.html.

"Members of Deputy 'Gang' Reportedly Put Other LA County Sheriff's Deputies in Hospital After Off-Duty

Brawl." *Wla*,

witnessla.com/members-of-deputy-gang-reportedly-puts-other-los-angeles-county-sheriffs-deputies-in-ho

spital-in-brawl/.

55

Lau, Maya. "L.A. County Sheriff's Department Pays Price as Clandestine Deputy Cliques Persist." *Los*

*Angeles Times*, Los Angeles Times, 27 Oct. 2018,

www.latimes.com/local/lanow/la-me-sheriff-tattoo-liability-20181027-story.html.


Garvey, Megan, and Southern California Public Radio. "L.A. County Supervisors Scathing Motion On

Sheriff Cliques." *DocumentCloud*,

www.documentcloud.org/documents/5983471-L-A-County-Supervisors-Scathing-Memo-On-Sheriff.html#d

ocument/p6/a498236.


CH: 188. "LA County Sheriff Debate 2014." *Youtube.* https://www.youtube.com/watch?v=KH7Mf3R2Svk


Lau, Maya, and Joel Rubin. "FBI Investigating Tattooed Deputy Gangs in Los Angeles County Sheriff's

Department." *Los Angeles Times*, Los Angeles Times, 11 July 2019,

www.latimes.com/local/la-me-fbi-investigating-sheriff-20190711-story.html.


Glickman, Paul. "Here Are The New Claims About A Violent Group Of LA Sheriff's Deputies Acting Like A

Gang." *LAist*,

laist.com/2019/03/08/a_new_claim_about_a_violent_group_of_la_sheriffs_deputies_acting_as_a_gang.p

hp.


Lau, Maya, and Joel Rubin. "Deputy Gangs Have Survived Decades of Lawsuits and Probes. Can the FBI

Stop Them?" *Los Angeles Times*, Los Angeles Times, 14 July 2019,

www.latimes.com/local/lanow/la-me-sheriff-gangs-fbi-inaction-20190714-story.html.

56

# EXHIBIT [F]

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   LISA VARGAS,                    )  CASE NO.
                                     )  2:19-cv-03279-PSG-AS
 6                 Plaintiff,        )
                                     )
 7            vs.                    )
                                     )
 8   COUNTY OF LOS ANGELES,          )
     NIKOLIS PEREZ, JONATHAN ROJAS   )
 9   and DOES 1 through 10,          )
     inclusive,                      )
10                                   )
                   Defendants.       )
11   _____)

12

13        VIDEO CONFERENCE/VIDEO RECORDED DEPOSITION OF

14     PERSON MOST KNOWLEDGEABLE FROM THE LOS ANGELES COUNTY

15                   SHERIFF'S DEPARTMENT

16                  Commerce, California

17                Thursday, August 6, 2020

18

19

20   Reported By:

21   Teri Lingenfelter

22   CSR No. 5369

23

24

25

                                              Page 1
```

```
 1                UNITED STATES DISTRICT COURT

 2             FOR THE CENTRAL DISTRICT OF CALIFORNIA

 3

 4

 5   LISA VARGAS,                    )  CASE NO.
                                     )  2:19-CV-03279-PSG-AS
 6                 Plaintiff,        )
                                     )
 7          vs.                      )
                                     )
 8   COUNTY OF LOS ANGELES,          )
     NIKOLIS PEREZ, JONATHAN ROJAS   )
 9   and DOES 1 through 10,          )
     inclusive,                      )
10                                   )
                   Defendants.       )
11   _____)

12

13

14          Video conference/video recorded deposition

15       of PERSON MOST KNOWLEDGEABLE FROM THE LOS ANGELES

16       COUNTY SHERIFF'S DEPARTMENT by PAUL VALLE, taken

17       on behalf of the Plaintiff, at 4900 South Eastern

18       Avenue, Commerce, California beginning at 10:03 a.m.

19       and ending at 12:40 p.m. on Thursday, August 6,

20       2020 before TERI LINGENFELTER, Certified Shorthand

21       Reporter No. 5369.

22

23

24

25

                                              Page  2
```

```
 1              An objection must be stated in a concise manner
    10:17:42 AM
 2      that's not argumentative and a non-suggestive manner.
 3              Your attorney can instruct you not to answer a
 4      question only to preserve a privilege or enforce a
 5      limitation by the court or to present a motion before the
 6      court.
 7              Is there anything I just told you right now that
 8      you don't understand?
 9              MR. KIZZIE:  One second.  One second.
10              I object to plaintiff lecturing the deponent on
11      the law.  He is not an attorney.  He is not making an
12      objection.
13              The attorney is the one making objections and who
14      governs the objections that are made.
15              So if he's lecturing the deponent I object to
    10:18:40 AM
16      that.  If he's lecturing me I object to that as well.  And
17      the deponent is not a lawyer nor has he been designated as
18      a PMK on any legal topic but Sergeant Valle, you may
19      answer.
20              THE WITNESS:  I understand.
21              MR. GUIZAR:  Thank you, sir.
22      BY MR. GUIZAR:
23      Q    So what are the Banditos?
24      A    Well --
25              MR. KIZZIE:  One second, Sergeant Valle.  Let me
```

Page 18

```
 1        think about that.
   10:19:24 AM
 2              MR. GUIZAR:  For the record counsel is thinking
 3        about an objection to object for the sake of objecting.
 4              Go ahead when you're ready.
 5              MR. KIZZIE:  No.  I'm thinking about your
 6        question because --
 7              MR. GUIZAR:  Pretty simple question, Counsel.
 8              MR. KIZZIE:  I don't think it's a simple question
 9        because I think your question of what are the Banditos can
10        only be answered based on information that has been
11        gathered from Sergeant Valle's internal affairs
12        investigation.
13              So in that respect I'm inclined to object and
14        instruct him not to answer.
15              So don't answer this yet, Sergeant Valle.
   10:20:03 AM
16              MR. GUIZAR:  I'm going to note that for the
17        record and I think that's a grounds for calling the
18        magistrate judge because this is a deposition of a person
19        most knowledgeable regarding the Banditos.
20              You're instructing him not to answer.  That's
21        what the whole deposition is.
22              I'll just terminate the deposition at this point
23        if I can't ask him what the Banditos are.
24              MR. KIZZIE:  Well one second, Counsel.
25              MR. GUIZAR:  No.  Not one second.  No.
```

Page 19

1          Are you going to instruct him not to answer?

10:20:27 AM

2          Yes or no?

3          If you're going to instruct him not to answer

4      I'll terminate the deposition right now.

5          MR. KIZZIE:  Counsel, you need to calm down.

6          MR. GUIZAR:  No.  I am calmed down.  I don't want

7      to waste time with you.

8          MR. KIZZIE:  If Sergeant Valle can answer the

9      question without revealing information that's been

10     gathered from the investigation then I will allow him to

11     answer but if he can only answer the question based on

12     information that's gathered in the ongoing incomplete

13     investigation that is subject to the official information

14     privilege as has been discussed before the magistrate

15     numerous times.

10:20:33 AM

16         So I think I would like to ask Sergeant Valle.

17         If you can answer the question without revealing

18     information that you've only gathered through the internal

19     affairs investigation that is incomplete then you can

20     answer the question but if your answer to the question is

21     only gleaned through your information gathered from the

22     ongoing incomplete internal affairs investigation then

23     indicate such and I will instruct you to not answer the

24     question.

25         Do you understand what I'm saying,

                                              Page 20

```
 1        Sergeant Valle?
     10:21:02 AM
 2             The WITNESS:  Yes.
 3             MR. KIZZIE:  Okay.  So if you can answer the
 4        question subject to the parameters that I said you can
 5        answer it but anything -- anything whatsoever -- that
 6        you've gathered from the ongoing incomplete investigation
 7        it's subject to official information privilege and you're
 8        instructed not to answer.
 9             So Sergeant Valle, I'll leave the floor to you if
10        you can answer without any information from the official--
11             MR. GUIZAR:  I'm going to rephrase the question.
12        I don't want to hear this long discussion about what he
13        thinks he's entitled to object.
14             You can object, make a statement and instruct him
15        not to answer.  I don't need to hear all this.  Either
     10:22:19 AM
16        instruct him not to answer or not.
17             I'm not going to sit here for hours listening to
18        your long diatribe, Counsel.  It's inappropriate and
19        improper.
20             Let's try it over again.  Okay?  Start again.
21             MR. KIZZIE:  Do you want to rephrase the
22        question?
23        BY MR. GUIZAR:
24        Q    You are the person most knowledgeable from the
25        County of Los Angeles regarding the Banditos.
```

Page 21

```
 1                    Is that accurate?

       10:22:42 AM

 2          A     I was designated so.  Yes.

 3          Q     But is that an accurate statement?

 4                    Do you feel you're the person most knowledgeable

 5          from the County of Los Angeles to give testimony regarding

 6          the alleged Banditos deputy clique, gang or social club?

 7                    Whatever anyone wants to call it.

 8                MR. KIZZIE:  Well wait.  The topic is deputy

 9       clique, gang, subgroup Banditos operating out of

10       East Los Angeles station.

11                That's the actual --

12                MR. GUIZAR:  If you want to add that part -- I'm

13       the one asking the questions but if you want to add that

14       part that's fine.

15       BY MR. GUIZAR:

       10:23:14 AM

16          Q     Is that accurate, sir?

17                    Are you that person?  Most knowledgeable in the

18          entire county of Los Angeles?

19                MR. KIZZIE:  One second.  I will object that

20       Sergeant Valle has already answered and counsel has

21       indicated that he has been designated as such.

22                MR. GUIZAR:  I'm not asking him that question.

23       I'm asking him are you the person most knowledgeable.

24       BY MR. GUIZAR:

25          Q     Could you look at me right now and answer this
```

                                                        Page 22

1        question under oath that you are the person most

10:23:37 AM

2        knowledgeable from the county regarding the Banditos.  Yes

3        or no?

4                    MR. KIZZIE:  Well first off, Counsel, don't

5        harass or berate --

6                    MR. GUIZAR:  No.  I'm not harassing.  You gave a

7        description --

8                    MR. KIZZIE:  Counsel, don't harass or berate the

9        witness.

10                   MR. GUIZAR:  Are you going to instruct him not to

11       answer?

12                   Stop arguing with me.  Stop arguing with me.

13       Stop arguing.

14                   Let's take a break.

15                   MR. KIZZIE:  I'm not going off.

10:24:05 AM

16                   MR. GUIZAR:  Take a break.  I need a break.  I

17       need a break.

18                   THE VIDEOGRAPHER:  Do all counsel agree to go off

19       the record?

20                   (Mr. Guizar and Mr. Contreras left the

21                   proceeding.)

22                   MR. KIZZIE:  I have not agreed to go off the

23       record.

24                   As I've indicated -- what my objection said I

25       objected to the harassing and argumentative nature of

                                                        Page 23

1        counsel's question and I have indicated already and

10:24:16 AM

2        Sergeant Valle has indicated in answering that he has been

3        produced as the person most knowledgeable from the County

4        of Los Angeles regarding the specific investigation and

5        topic noticed.

6                Whether he personally feels that way as to

7        whether there may be somebody else more knowledgeable is

8        subject to speculation and irrelevant because he's been

9        produced and designated as such.

10               So with that being stated we can go off the

11       record.

12               THE VIDEOGRAPHER:  Is there any counsel who

13       objects to going off the record at this time?

14               MR. KIZZIE:  Plaintiff's counsel isn't present.

15       He had an episode and he walked out.

10:25:12 AM

16               Oh.  There he is.  He's back.

17               THE VIDEOGRAPHER:  Okay.

18               MR. GUIZAR:  I see you're still talking.

19       Do you want to keep talking?

20               THE VIDEOGRAPHER:  I'm the videographer.  Do you

21       want --

22               MR. GUIZAR:  You must enjoy hearing yourself.

23       Huh?  Keep talking.

24               MR. KIZZIE:  Counsel --

25               MR. GUIZAR:  You must like to talk.  Keep

                                                     Page  24

```
 1      talking.
     10:25:20 AM
 2              MR. KIZZIE:  -- please stop.
 3              MR. GUIZAR:  Are you finished?
 4              MR. KIZZIE:  I'm done.
 5              MR. GUIZAR:  Wonderful.  Okay.
 6      BY MR. GUIZAR:
 7          Q    So you're an investigator for the -- (inaudible).
 8          A    You were broken up.  What was the question again?
 9          Q    You're an investigator for the internal affairs
10      division of the sheriff's department.  Correct?
11          A    That's correct.
12          Q    So your job is to investigate this Banditos
13      situation.  True?
14              MR. KIZZIE:  Well I'll object to the extent it
15      assumes facts not in evidence as to the nature of the
     10:25:52 AM
16      investigation.
17              Sergeant Valle, you can answer in your own words
18      as to the subject of the investigation --
19              MR. GUIZAR:  Could you bring up the notice of the
20      deposition, Mr. Contreras.
21              MR. CONTRERAS:  Yes.
22              MR. GUIZAR:  Bring it up.
23              MR. CONTRERAS:  I need the host to enable me to
24      screen share, please.
25              THE VIDEOGRAPHER:  Stand by.
```

Page 25

```
 1              MR. GUIZAR:  I'm very close to terminating this
     10:26:27 AM
 2    deposition for your information because I don't think you

 3    produced the proper person.

 4              I didn't want an investigator.  I asked for the

 5    person most knowledgeable regarding the Banditos, Counsel.

 6              Let me finish talking.

 7              I asked for the person most knowledgeable

 8    regarding the Banditos.  This is a classic sandbag and I'm

 9    very disappointed you would be so unprofessional to do

10    this.

11              MR. KIZZIE:  Counsel, please calm down.

12              (Simultaneous talking.  Inaudible.)

13              MR. GUIZAR:  I'm not finished.

14              MR. KIZZIE:  All right.

15              MR. GUIZAR:  He's only been involved for four
     10:26:48 AM
16    months -- four months -- and you want him to be the person

17    for me to ask questions about the Banditos and provide me

18    with -- you're going to sandbag me like that?  It's not

19    going to happen.

20              MR. KIZZIE:  Are you done?  Are you done,

21    Counsel?

22              MR. GUIZAR:  Bring it up.  Bring it up.

23              I'm fed up with you.

24              THE VIDEOGRAPHER:  Which counsel is attempting to

25    bring up --
```

Page 26

```
 1            MR. GUIZAR:  You've crossed the line, Counsel.
10:27:11 AM
 2     You've crossed the line.
 3            MR. KIZZIE:  Counsel, calm down.
 4            THE VIDEOGRAPHER:  Christian, you're the one
 5     trying to bring up the --
 6            MR. CONTRERAS:  Yes.
 7            THE VIDEOGRAPHER:  All right.  Hold on, please.
 8            MR. GUIZAR:  We're bringing up a document here.
 9            MR. KIZZIE:  Counsel, considering your diatribe
10     that you just said --
11            MR. GUIZAR:  It's a sandbag, Counsel.  You know
12     it.  You know what you did.
13            MR. KIZZIE:  We are free to designate who we
14     choose as the person most knowledgeable --
15            MR. GUIZAR:  No, you're not.  That's not what the
10:27:43 AM
16     federal rules ask for you to do.
17     BY MR. GUIZAR:
18        Q    Mr. Valle.  Mr. Valle.
19            MR. KIZZIE:  -- on that topic.
20     BY MR. GUIZAR:
21        Q    Mr. Valle.
22        A    Yes.
23        Q    Do you see on the screen it says "Plaintiff's
24     Notice of Taking Videotaped Deposition of the Person Most
25     Knowledgeable from the County of Los Angeles Sheriff's
```

Page 27

1        Department Regarding the Deputy Gangs and the Bandito
10:28:01 AM

2        Gangs Operating out of the East Los Angeles Station"?

3                Do you see that?

4        A      Partially.  Yes.  It's kind of blocked with the

5        screen on the right of all the images of the people that

6        are attending the meeting.

7        Q      Okay.  So are you the person most knowledgeable

8        from the County of Los Angeles Sheriff's Department?

9                In other words are you the person who knows the

10       most about the Banditos gang and other gangs operating out

11       of East Los Angeles?

12               Yes or no, sir?

13               MR. KIZZIE:  All right.  So objection as stated

14       earlier.  Sergeant Valle is being produced and has been

15       designated as the person most knowledgeable regarding the
10:28:39 AM

16       topic at hand.

17               If counsel -- in an effort to try to get this

18       moving along if counsel simply asks Sergeant Valle what

19       has he been tasked to investigate --

20               MR. GUIZAR:  No.  No.  No.  I'm not asking for an

21       investigation.

22               (Simultaneous talking.  Inaudible.)

23               MR. GUIZAR:  I'm not going to ask the questions

24       you want.  You want me to go down that route because

25       you're going to instruct him not to answer.  No.  I'm not

                                                    Page 28

```
 1        particular investigation that is ongoing and that would be
   10:34:22 AM
 2      official information privilege.
 3            Sergeant Valle, don't answer the question.
 4            MR. GUIZAR:  I'm just asking him if he's done
 5      that.  I'm not asking if he found out.  I'm just asking if
 6      he's done that.  If he's asked anybody to see if he could
 7      see their tattoos.
 8            MR. KIZZIE:  Well asking what's been done in an
 9      investigation is asking the specifics of the
10      investigation.  I'm sorry.  Judge Sagar has already
11      indicated such.
12            MR. GUIZAR:  All right.  I'll move on.
13            MR. KIZZIE:  I'll instruct the witness not to
14      answer.
15            Don't answer the question, Sergeant Valle.
   10:34:59 AM
16      BY MR. GUIZAR:
17        Q    What is your understanding of what the Banditos
18      gang, clique, social club -- what is your understanding
19      that it is?
20            Since you're the person most knowledgeable tell
21      me about it.
22            MR. KIZZIE:  Okay.  So Sergeant Valle, as
23      discussed earlier you can answer this question if you can
24      answer it without referring to information gathered from
25      the investigation.
```

Page 34

```
 1              Do you understand?                          10:35:27 AM

 2              THE WITNESS:  I do.

 3              MR. KIZZIE:  Okay.  You can answer.

 4              THE WITNESS:  I cannot answer that question

 5    because what I know about it is through my active

 6    investigation.

 7              MR. KIZZIE:  All right.

 8              MR. GUIZAR:  Okay.  So we're going to end this

 9    deposition.  You were improperly designated.  We're going

10    to end this deposition.  I'm going to take this up.  I'll

11    take it to the judge.

12              I'm done.  That's it.

13              MR. KIZZIE:  Counsel --

14              MR. GUIZAR:  There's nothing more I can ask.

15              MR. KIZZIE:  Counsel, I'm not --               10:35:41 AM

16              MR. GUIZAR:  What should I ask?

17              MR. KIZZIE:  Counsel, I'm not finished with my

18    objection.

19              Then based on --

20              MR. GUIZAR:  There's no objection.  He's already

21    answered.  What are you objecting to?  Your own witness?

22              MR. KIZZIE:  Stop.

23              MR. GUIZAR:  What are you objecting to?

24              MR. KIZZIE:  Stop and stop raising your voice.

25              MR. GUIZAR:  What are you talking for?
```

Page 35

```
 1              MR. KIZZIE:  Please stop and stop raising your
10:36:07 AM
 2     voice.
 3              Objection.  Instruct the witness not to answer
 4     based on official information privilege.
 5              Counsel, you knew going into this deposition that
 6     Judge Sagar had upheld the official information privilege
 7     as to this investigation so your frustration and purported
 8     surprise that you're not able to go into the facts of it
 9     is absurd.
10              So objection.  Instruct the witness not to
11     answer.
12              MR. GUIZAR:  Do you want to meet and confer on
13     that right now?  Do you want to meet and confer on that
14     right now and get this thing over with?
15              MR. KIZZIE:  Meet and confer about what?
10:36:46 AM
16              MR. GUIZAR:  This depo notice was of the person
17     most knowledgeable regarding the Banditos gang operating
18     out of East Los Angeles Sheriff's which by the way
19     Judge Sagar told me that I should set it that way and
20     you're objecting to the information that Judge Sagar said
21     that I should solicit from a person most knowledgeable.
22              MR. KIZZIE:  Judge Sagar did not --
23              MR. GUIZAR:  You're trying to use the judge's
24     ruling on a completely different matter which was
25     questions about an investigation that occurred regarding
```

Page 36

1        referring to.

11:35:09 AM

2        BY MR. GUIZAR:

3            Q     Referring to the situation where there was a

4        fight where some deputies allegedly hazed some deputies

5        after the graduation of a training day and there were

6        deputies that beat up some other deputies.

7            A     Okay.  No.  That's not what I'm investigating.

8            Q     What are you investigating?

9            MR. KIZZIE:  You can answer.  Sergeant Valle, you

10       can answer without revealing any specifics about the

11       investigation in response to the question.

12            Go ahead.

13            THE WITNESS:  It's a hostile work environment.

14       It's a violation of one of their policies of equality.

15       BY MR. GUIZAR:

11:35:52 AM

16            Q     And is there a deputy clique known as the

17       Banditos that operates out of the East L.A. station?

18            MR. KIZZIE:  Object and instruct the witness not

19       to answer.  Official information privilege that is the

20       subject of an ongoing incomplete investigation.

21            Don't answer the question, Sergeant Valle.

22       BY MR. GUIZAR:

23            Q     Besides doing investigations on the assignment

24       that you talked about have you talked to anybody else in

25       the County of Los Angeles regarding the Banditos gang?

Page 52

1        but Sergeant Valle, if you understand the question and

11:38:00 AM

2        what it's asking and if you understand it to not be asking

3        who you've spoken with in furtherance of the investigation

4        then I'll allow you to answer but if you understand the

5        question to mean who you have spoken with from the county

6        in furtherance of this investigation then I have to

7        instruct you not answer.

8                So Sergeant Valle, in your understanding of the

9        question how do you understand the question?

10               THE WITNESS:  Since I'm still -- the only

11       information that I have is related to the active

12       investigation and I can't answer that.

13               MR. KIZZIE:  Okay.  Then I will have to object

14       and instruct the witness not to answer on official

15       information privilege.

11:40:16 AM

16               MR. GUIZAR:  Okay.

17       BY MR. GUIZAR:

18          Q    Did you first learn about the Banditos as a

19       result of getting involved in this investigation four

20       months ago?

21               MR. KIZZIE:  Sergeant Valle, you can answer that

22       question as long as it doesn't involve divulging any facts

23       or information from any ongoing investigation.

24               MR. GUIZAR:  That is disingenuous and

25       inappropriate because he already said he's only been

                                                    Page 55

```
 1      result of this investigation.
11:41:54 AM
 2      BY MR. GUIZAR:
 3          Q      Before you got involved in this investigation
 4      would it be accurate you had no knowledge about the
 5      Banditos deputy gang or clique?  Right?
 6          A      That's correct.
 7              MR. KIZZIE:  One second.  One second.
 8              Same objection.  Further generally moving forward
 9      if you can answer the question without revealing facts --
10              MR. GUIZAR:  He's already answered.
11              MR. KIZZIE:  Don't interrupt me, Counsel.
12              If you can answer the question without revealing
13      facts --
14              MR. GUIZAR:  Don't talk so much.
15              MR. KIZZIE:  Counsel, please stop.  Okay?  Please
11:42:36 AM
16      stop.
17              MR. GUIZAR:  Why do you do that?
18              MR. KIZZIE:  Please stop.
19              MR. GUIZAR:  He's already answered.
20              MR. KIZZIE:  Counsel, please stop.
21              If you can answer the question without revealing
22      facts that are based on any ongoing investigation then
23      that's fine.
24              And you answered the prior question just kind of
25      generally moving forward.  That's kind of the rubric that
```

Page 57

1        I (inaudible).

         11:42:41 AM

2                Go ahead, Counsel.

3        BY MR. GUIZAR:

4            Q    So would it be accurate to say that in August

5        of 2018 that you were not aware of the Banditos gang.

6        Is that correct?

7                MR. KIZZIE:  Same objection.

8                If you can answer the question without revealing

9        any facts gleaned from any ongoing investigation you can

10       answer.

11               THE WITNESS:  Okay.  Yes.  I never heard of it

12       before I was assigned to the case.

13               So you said August.  That's pretty long ago.

14       BY MR. GUIZAR:

15           Q    I said August 2018.

         11:43:17 AM

16           A    Yeah.  That's a couple years ago.

17           Q    So the only time you ever heard about the

18       Banditos deputy clique or gang was when you got involved

19       in the investigation and then you read materials.

20               Would that be accurate?

21           A    Yes.

22               MR. KIZZIE:  All right.  Objection.

23               MR. GUIZAR:  He's already said yes.

24               MR. KIZZIE:  Well that's fine but same objection.

25               Go ahead.

                                                   Page 58

1          if that's an ongoing investigation, sir?"

11:56:44 AM

2                    MR. KIZZIE:  You can answer that, Sergeant Valle.

3                    THE WITNESS:  I do not know.

4     BY MR. GUIZAR:

5          Q     Okay.  Well do you know if any deputies from the

6     Exterminators --

7                    Let me rephrase it a little bit.  Lay a

8     foundation.

9                    This notice of person most knowledgeable included

10    Banditos and other gangs out of East L.A. station.

11                   If you look at the notice it's very clear.  It's

12    right here in plain English.  Okay?

13                   So it includes any other gangs that may be

14    working there.

15                   So do you know if any -- and I don't know if you

11:57:03 AM

16    investigated the Exterminators but do you know if any

17    Exterminators are working or transferred to the

18    East L.A. station from Compton?

19                   MR. KIZZIE:  I'm going to object to the extent

20    that this -- well one this is going far afield I think of

21    the PMK designation because as we discussed, Counsel -- we

22    discussed that this would be involving Banditos.  Okay?

23                   So this is what he was produced for.  Not

24    regarding a Compton gang --

25                   MR. GUIZAR:  What do you think "others" means?

                                                      Page 72

1          MR. KIZZIE:  I'm not finished, Counsel.  I'm not

11:57:34 AM

2     finished.

3          MR. GUIZAR:  What do you think "others" means?

4          MR. KIZZIE:  Counsel, I'm not finished.

5          This deposition is not regarding any alleged

6     clique or subgroup or gang operating --

7          MR. GUIZAR:  All right.  We'll see if the judge

8     agrees with that.

9     BY MR. GUIZAR:

10        Q    Go ahead.

11        MR. GUIZAR:  Are you going to instruct him not to

12    answer or not?  I don't want to hear your long story.

13        MR. KIZZIE:  Please stop.  Okay?  Please just

14    stop.

15        MR. GUIZAR:  You please stop.

11:57:57 AM

16        MR. KIZZIE:  Stop.

17        MR. GUIZAR:  You stop.

18        MR. KIZZIE:  Counsel, this is not regarding any

19    alleged deputy clique or subgroup operating out of Compton

20    station that may have been transferred to East L.A.

21    station or not.

22        Okay.  You and I discussed the parameters of this

23    depo because it was unclear.  You may not recall that but

24    I do.  And we have e-mail correspondence on that.

25        So in the sense that the information that

Page 73

```
 1        then you can answer.  However this is beyond the PMK
   12:00:52 PM
 2        designation.
 3                  MR. GUIZAR:  No, it's not.
 4        BY MR. GUIZAR:
 5            Q    Go ahead, sir.  Answer the question, please.
 6            A    I have heard of the -- I have heard of that name
          and it's just through what's been going on in the media.
 7
 8        The television news, et cetera.
 9            Q    Is that all you know?
10                  The full extent is what you've heard about them
11        is in the media?
12                  MR. KIZZIE:  One second.  Same objection.  Asked
13        and answered but you can answer.
14                  THE WITNESS:  That is correct.
15        BY MR. GUIZAR:
   12:01:32 PM
16            Q    And just to be clear you don't know anything
17        about the investigation regarding what happened at Kennedy
18        Hall.  Right?
19                  You weren't involved in that investigation I
20        understand.
21            A    That is correct.  I was not involved at all.
22            Q    Do you know any of the following deputies?
23                  Art Hernandez.
24            A    No.
25            Q    Alfred Gonzalez?
```

Page 77

```
 1      A    No.                                        12:02:13 PM

 2      Q    Benjamin Zaredini?

 3      A    No.   I don't believe so.

 4      Q    David Casas?

 5      A    No.

 6      Q    Luis Granados?

 7      A    No.

 8      Q    Oscar Escobedo?

 9      A    No.

10      Q    Ariela Lemus?

11      A    What was the first name?

12      Q    Ariela Lemus.

13      A    Are you asking if I know them personally?

14      Q    Yeah.  Do you know them?

15      A    I do not.                                  12:02:56 PM

16      Q    Do you know Eddie Gidabalton (phonetic)?

17           MR. KIZZIE:  I'll object that this information

18   about anything about them is one vague and two it's

19   information that anything about them -- well I know for a

20   fact that is the subject of an ongoing internal affairs

21   investigation and is beyond the scope of this PMK notice.

22           So if Sergeant Valle knows anything about the

23   aforementioned persons outside of the ongoing internal

24   affairs investigation pertaining to the Kennedy Hall

25   incident then you can answer but if your only source of
```

Page 78

```
1        BY MR. GUIZAR:

  12:11:52 PM

2            Q    So you're part of an investigation ongoing --

3    quote/unquote ongoing investigation that you got involved

4    in four months ago.  So four months ago would be I guess

5    at the beginning of the pandemic in March.

6                 Could you give me a specific date, please?  So

7    that way I'll have a barometer.

8            A    I don't have a specific date.  I'm estimating.

9            Q    So four months ago -- right now we're in August.

10   July, June, May, March.

11                So four months ago would be March.

12                Would it be accurate that that's when you first

13   got involved in investigating the alleged Banditos gang

14   out of East L.A.?

15           A    Yes.  It was towards the beginning of 2020.

  12:12:28 PM

16           Q    So you came in here to today's deposition with

17   information that you gathered from your work in that

18   investigation that you were assigned.  Is that true?

19           A    Yes.

20           Q    And that's the full extent of the information

21   that you have.  Right?

22           A    That's correct.

23                MR. GUIZAR:  Can we take a five minute break and

24   we'll be back.

25                THE VIDEOGRAPHER:  Do all counsel agree to go off
```

                                                        Page 86

```
 1              DECLARATION OF COURT REPORTER

 2                     FEDERAL JURAT

 3

 4              I, the undersigned, a Certified Shorthand

 5    Reporter for the State of California, do hereby certify:

 6                   That the foregoing proceedings were taken

 7    before me at the time and place herein set forth; that

 8    any witnesses in the foregoing proceedings prior to

 9    testifying were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further, that the foregoing is an accurate

13    transcription thereof and that before completion of the

14    deposition a review of the transcript was requested.

15                   I further certify that I am neither

16    financially interested in the action nor a relative or

17    employee of any attorney of any of the parties.

18                   IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20    Dated:  August 12, 2020

21

22

23

24              Teri Lingenfelter

25              CSR No. 5369

                                              Page 102
```