```
 1                UNITED STATES DISTRICT COURT
 2           FOR THE CENTRAL DISTRICT OF CALIFORNIA
 3
 4
 5   LISA VARGAS,                   )   CASE NO.
                                    )   2:19-CV-03279-PSG-AS
 6                   Plaintiff,     )
                                    )
 7             vs.                  )
                                    )
 8   COUNTY OF LOS ANGELES,         )
     NIKOLIS PEREZ, JONATHAN ROJAS  )
 9   and DOES 1 through 10,         )
     inclusive,                     )
10                                  )
                     Defendants.    )
11   _____)
12
13
14           Video conference deposition of CARLOS ALFREDO
15       ESTRADA, taken remotely with the witness appearing
16       telephonically on behalf of the Plaintiff, at
17       California Rehabilitation Center, Norco,
18       California beginning at 9:00 a.m. and ending at
19       10:40 a.m. on Wednesday, October 7, 2020 before
20       TERI LINGENFELTER, Certified Shorthand Reporter
21       No. 5369.
22
23
24
25
```

Page 2

```
 1    APPEARANCES:

 2    For Plaintiff Lisa Vargas:

 3            GUIZAR, HENDERSON & CARRAZCO, LLP

 4            BY:  CHRISTIAN CONTRERAS, ESQ.

 5            (Via Zoom)

 6            3500 West Beverly Boulevard

 7            Montebello, California 90640

 8            Telephone (323) 725-1151

 9            Fax        (323) 597-0101

10            Email     ccontreras@ghclegal.com

11

12    For Defendants County of Los Angeles, Nikolis Perez and

13    Jonathan Rojas:

14            IVIE McNEILL WYATT PURCELL & DIGGS

15            BY:  ANTONIO K. KIZZIE, ESQ.

16            (Via Zoom)

17            444 South Flower Street, 18th Floor

18            Los Angeles, California 90071

19            Telephone (213) 489-0028

20            Fax        (213) 489-0552

21            Email     akizzie@imwlaw.com

22

23

24

25

                                            Page 3
```

```
 1              Norco, California, Wednesday, October 7, 2020

 2                   9:00 a.m. - 10:40 a.m.

 3                          ****

 4              CARLOS ALFREDO ESTRADA,

 5   having been first administered an oath, was examined and

 6   testified as follows:

 7

 8                       EXAMINATION

 9   BY MR. CONTRERAS:

10       Q    Good morning, Mr. Estrada.

11            Please state and spell your full name for the

12   record.

13       A    Carlos Estrada.  C-a-r-l-o-s E-s-t-r-a-d-a.

14       Q    Do you have a middle name?

15       A    Oh.  Yes, sir.  Alfredo.  A-l-f-r-e-d-o.

16       Q    Good morning.  My name is Christian Contreras.

17            I am one of the attorneys who represents the

18   plaintiff Lisa Vargas in her case against the County of

19   Los Angeles and individual deputies for a shooting which

20   occurred on August 12, 2018.

21            We're here pursuant to FRCP 30.

22            Mr. Estrada, you just took an oath.  That oath is

23   for you to tell the truth, the whole truth and nothing but

24   the truth.

25            There is a penalty of perjury if you misrepresent
```

```
 1              MR. KIZZIE:  Actually just one housekeeping

 2   matter.

 3              Mr. Estrada, this is Antonio Kizzie.  I'm counsel

 4   for the defendants in this case.

 5              In this deposition it's essentially a question

 6   and answer session where Mr. Contreras will ask you

 7   questions and then at some point I'll be able to ask you

 8   questions and you're obligated to answer them truthfully

 9   under oath.

10              Do you understand?

11              THE WITNESS:  Yes, I do.

12              MR. KIZZIE:  Because we're on the phone from time

13   to time after Mr. Contreras asks a question or after I ask

14   a question you may hear one of us object.

15              That's just something that lawyers do.  Due to

16   the technology I'll ask and to make this job easy for our

17   court reporter after Mr. Contreras asks a question or

18   after I ask a question if you would please just wait maybe

19   a second or two to allow either myself or Mr. Contreras to

20   object.

21              We'll say "objection" and then we'll start

22   speaking.  You should stop speaking until we're finished

23   with our objection in order to make the record as clear as

24   possible.

25              Can you do that for us?
```

                                                              Page 7

1   overnight and in the morning when we'd get off we would

2   like just like have a couple beers, you know, sort of like

3   to calm us down like to go to sleep.

4          So that's how I came to meet him.  Like I guess

5   he started working through the same company I used to work

6   with and I still hung out with the same coworkers and I

7   met him through them.

8          Q   Approximately in what month and year did you meet

9   Anthony Vargas?

10         A   Let's see.  I had just paroled in May so I want

11  to say I met him probably during the same month.  Maybe

12  May/June.  I want to say May or June.

13         Q   May or June of which year?

14         A   2018.  Sorry.

15         Q   And at which company did you meet Anthony Vargas

16  after you paroled?

17         A   No.  No.  No.  What it is -- I used to work for

18  this company called SAS and I hadn't worked with them

19  since about like maybe 2016 but like I said I still kept

20  in contact with my old coworkers because we built a little

21  friendship.

22         So I don't know when he came and started working

23  with them but that's how I came to meet him.  Through

24  those coworkers.

25         Q   From your experience with working with

Page 9

```
 1    Mr. Estrada.
 2           THE WITNESS:  Yeah.  I don't understand it.
 3    BY MR. CONTRERAS:
 4        Q    Let me ask you this.
 5             Is there a Nueva Maravilla Projects gang?
 6        A    Yes.
 7        Q    What is your understanding of someone being from
 8    that gang?
 9           MR. KIZZIE:  Objection.  The question still is
10    vague and ambiguous.
11           You can answer the question if you understand it,
12    Mr. Estrada.
13           THE WITNESS:  Yeah.  I still don't understand the
14    question.
15    BY MR. CONTRERAS:
16        Q    Okay.  What is your understanding of someone
17    being a member of the Nueva Maravilla Projects gang?
18           MR. KIZZIE:  Okay.  Objection.  It's been asked
19    already and you're just repeating the question, Counsel.
20           He indicated he did not understand what you meant
21    so just asking the same question doesn't appear to be
22    helping him.
23           Mr. Estrada, you can answer the question if you
24    understand it but if you don't understand it just indicate
25    such.
```

Page 11

```
 1    BY MR. CONTRERAS:
 2        Q    Were there people who were not from the
 3    Nueva Maravilla Projects gang who hung out at the
 4    Nueva Maravilla Projects?
 5             MR. KIZZIE:  Objection.  That's vague, ambiguous,
 6    calls for speculation as to each and every person's gang
 7    status or affiliations.
 8             You can answer the question if you know or you
 9    understand it, Mr. Estrada, but you don't have to guess or
10    speculate if you don't know the answer.
11             THE WITNESS:  Okay.  Can you repeat the question,
12    please.
13             MR. CONTRERAS:  Sure.  Ms. Court Reporter, can
14    you read back the question, please.
15             THE REPORTER:  Yes.  This is the reporter.  Give
16    me one second to find it.
17             Question:  "Were there people who were not from
18    the Nueva Maravilla Projects gang who hung out at the
19    Nueva Maravilla Projects?"
20             THE WITNESS:  Yes.
21    BY MR. CONTRERAS:
22        Q    Was Anthony Vargas a little homie to you?
23        A    I can't say he was because like I said I had
24    just -- I didn't know him very long.  I had just met him.
25        Q    Were you aware of Anthony Vargas' involvement
```

Defendants'
Objections:
Vague, Ambiguous,
Calls for Speculation,
Lacks Foundation, Leading,
Argumentative

                                                    Page 13

1    My question just to follow up on that is how did

2    you know he was involved with the church?

Defendants' Objections Irrelevant, Lacks/ Foundation, Subject of Motion in Limine

3    A    Oh.  Because sometimes like I said we would go to

4    work and stuff -- right? -- and hang out afterwards.  Well

5    sometimes he said he wasn't able to because he had to go

6    take care of some stuff -- like church stuff -- with his

7    mom.

8    Q    Is there anything else that forms your basis of

9    Mr. Vargas being involved with the church?

10    A    No, sir.

11    Q    Did you ever hear anyone call Anthony Vargas

Objection: Hearsay, Irrelevant, Argumentative, Lacks Foundation, Calls for Speculation

12    anything aside from his legal name?

13    A    Yes.  They called him Tony.

14    Q    Is Tony a gang moniker to you?

15    A    No.  Not at all.

16    Q    Is Tony short for Anthony?

17    A    Yes, sir.

18    Q    To your knowledge did Anthony Vargas ever have a

19    gang moniker?

20    A    No, sir.  Not to my knowledge.

21    Q    Was Anthony Vargas ever initiated into the

22    Nueva Maravilla Projects gang?

23    MR. KIZZIE:  Objection.  It lacks foundation,

24    calls for speculation.  As the witness indicated he

25    only knew Mr. Vargas a couple of months before the

Page 15

```
 1    you have any knowledge but you don't have to guess or

 2    speculate.

 3            MR. CONTRERAS:  No.  This is my deposition,

 4    Mr. Kizzie.

 5            Ms. Court Reporter, can you please read back the

 6    answer.

 7            THE REPORTER:  Yes.

 8            MR. KIZZIE:  Actually it's our deposition.  The

 9    court ordered that we can both attend it so --

10            MR. CONTRERAS:  But I'm the examining attorney so

11    please --

12            MR. KIZZIE:  For now.  For now and I will be the

13    examining attorney when you're done.  So what?

14            MR. CONTRERAS:  Of course.  But I asked the court

15    reporter to please read back the question.

16            Ms. Court Reporter, can you please read back the

17    question.

18            THE REPORTER:  I will if you're not speaking but

19    when you're speaking I can't look for it.  So give me a

20    minute.

21            You said question but did you actually want me to

22    read back the answer?

23            MR. CONTRERAS:  Yes.  Please read back

24    Mr. Estrada's answer to the last question.

25            THE REPORTER:  Answer:  "No.  I don't have an
```

Page 17

```
1    harassing the witness at this point.

2              MR. CONTRERAS:  No.

3              MR. KIZZIE:  Mr. Estrada, you can answer the

4    question if you --

5              MR. CONTRERAS:  Let me be clear.

6              MR. KIZZIE:  I'm not finished.

7              Mr. Estrada, you can answer the question again if

8    you have anything else to add.

9              MR. CONTRERAS:  Well I'm objecting to your

10   objection because I said whether he was ever initiated and

11   I then asked was Anthony Vargas ever jumped into the

12   Nueva Maravilla Projects gang.

13             MR. KIZZIE:  Counsel, please stop wasting time.

14   There's no such thing as an objection to an objection.

15             Mr. Estrada, you can answer the question if you

16   have any further knowledge other than what you've already

17   answered.

18             THE WITNESS:  To my knowledge no because I

19   believe that's the same question you just asked me.

20             MR. KIZZIE:  Exactly.

21             MR. CONTRERAS:  Okay.

22   BY MR. CONTRERAS:

23    Q    Did Anthony Vargas ever commit a crime for the

24   benefit of the Nueva Maravilla Projects gang?

25             MR. KIZZIE:  Objection.  It lacks foundation and
```

                                              Page 19

```
 1              MR. KIZZIE:  Objection.  That's vague.  It's an

 2    entire night's incident so you may want to start at a

 3    specific time.

 4    BY MR. CONTRERAS:

 5        Q    Immediately before the Anthony Vargas shooting

 6    were you at a candlelight vigil?

 7              MR. KIZZIE:  Vague as to immediately before.

 8              You can answer based on your recollection,

 9    Mr. Estrada.

10              THE WITNESS:  Yes, I was.

11    BY MR. CONTRERAS:

12        Q    Who was this candlelight vigil for?

13        A    That was for one of my little homies.

14        Q    Why do you call that individual your little

15    homie?

16        A    Because he was my little homie.  He was from my

17    neighborhood.

18        Q    But was Anthony Vargas from your neighborhood?

19        A    No.

20        Q    Were there people at the vigil who were not from

21    the neighborhood?

22        A    Yes.

23        Q    While you were at that vigil do you recall

24    Anthony Vargas holding a prayer circle?

25              MR. KIZZIE:  I'm going to object to the extent it
```

Page 21

```
1              You can answer again, Mr. Estrada.
2              THE WITNESS:  I just said.  I just answered
3     that.
4              MR. KIZZIE:  Exactly.
5     BY MR. CONTRERAS:
6         Q    You answered that he consumed alcohol at the
7     candlelight vigil.
8              My question is if you saw him consuming alcohol
9     after the candlelight vigil.
10        A    I think.  Yes.
11        Q    Your testimony is that you visually saw
12    Anthony Vargas consuming alcohol at the Nueva Maravilla
13    Projects gang after the candlelight vigil?
14             MR. KIZZIE:  Asked and answered just a second
15    ago.  He said yes.
16             You can answer again, Mr. Estrada.
17             THE WITNESS:  Yes.
18    BY MR. CONTRERAS:
19        Q    What type of alcohol was Anthony Vargas consuming
20    at the Nueva Maravilla Projects after the candlelight
21    vigil?
22        A    What did he have?  Beer.
23        Q    What brand of beer was Anthony Vargas consuming
24    at the Nueva Maravilla Projects gang after the candlelight
25    vigil?
```

Page 23

1       You can answer.

2           THE WITNESS:  I just remember seeing like a --

3   like I seen the police officers chasing somebody and I was

4   walking with some diapers to go take them -- I was trying

5   to go drop off some diapers to someone and as I'm walking

6   and dropping off the diapers I see -- in the distance from

7   across the parking lot I see someone running and I'm like

8   "What's going on?" and right behind him I see the sheriffs

9   chasing him and as I'm seeing that I'm like "Oh shoot.  I

10  better get going."  You know, like there's cops running

11  around.

12          So I'm trying to get to my destination and as I'm

13  going I'm still kind of glancing as I'm going to my

14  destination and now I see like -- like they're wrestling

15  or something.  You know, like they couldn't bring him down

16  or something.  There was a couple.  There was a couple of

17  them.

18          And as I'm seeing them I'm hearing sirens too in

19  the background like coming from way -- like I could hear

20  them coming from like where Floral is at and I was like

21  "Man, I really better get out of here.  Like I don't want

22  to get caught up in this."

23          So as soon as I get to the door where I'm

24  dropping the diapers I just heard gunshots like -- I want

25  to say between like -- I don't know -- between 15 and

                                                    Page 25

```
 1    BY MR. CONTRERAS:

 2        Q    We're going to break down what you saw.

 3            How long did you visually see the events

 4    regarding the Anthony Vargas shooting in terms of

 5    seconds?

 6            MR. KIZZIE:  Well I would object.  I think that's

 7    vague in terms of the Anthony Vargas shooting -- if you're

 8    referring to the whole incident -- and it's vague and

 9    ambiguous as to at what point.  When he's walking or when

10    he's delivering the diapers or what?

11            But you can answer the question if you understand

12    what's being asked, Mr. Estrada.

13            THE WITNESS:  Yeah.  I don't understand.

14    BY MR. CONTRERAS:

15        Q    Okay.  Your entire witnessing of the situation

16    was both visual and auditory.

17            My question is directed at how long did you

18    actually see the events around the Anthony Vargas shooting

19    in terms of seconds?

20            MR. KIZZIE:  Well wait.  Objection.  It's vague

21    and it misstates his earlier testimony that he dropped off

22    the diapers and then he heard gunshots.  He never

23    testified that he saw the shooting.

24            So the question as phrased assumes facts not in

25    evidence that he saw the shooting when he said that he
```

Page 27

```
 1    a minute, two.  I don't want to just guess.  Do you know
 2    what I mean?
 3         Q    Right.  Of course.
 4              Let's estimate how long it took you from when you
 5    left the unit where you were to when you were going to
 6    return to that unit.
 7              How long was that in terms of time?
 8              You can estimate.  You can estimate but, of
 9    course, don't guess.  Just estimate.  We're not asking for
10    an exact time but just an estimate, please.
11         A    Okay.  I want to say between three to
12    five minutes.
13         Q    Let's break that down then.
14              When you left your point of origin to the parking
15    lot how long did that walk take?
16         A    I believe that's the same question you just
17    asked.
18         Q    Mr. Estrada, I just want to know how long did you
19    see the wrestling with your own eyes?
20         A    That's what I'm trying to tell you.
21              Like as I was seeing what's going on I was still
22    walking.  Like I didn't stop and try to see what's going
23    on.  You know what I mean?
24              I was just trying to get out of there because I
25    see -- you know, I hear the sirens.  I know there's more
```

Page 29

1    Q    Throughout the entire time of when you visually

2  witnessed what happened was Anthony Vargas walking at any

3  point?

4        MR. KIZZIE:  Well objection.  The question as

5  phrased assumes facts not in evidence that Mr. Estrada saw

6  the whole incident between the deputies and Mr. Vargas.

7        As he previously stated he saw some of the

8  struggles and he delivered some diapers before he heard

9  the gunshots.

10        So the question as phrased assumes facts not in

11  evidence that he saw the whole thing which is not what he

12  testified to.

13        You can answer the question as you understand it,

14  Mr. Estrada.  If you understand it.

15        THE WITNESS:  Yes.  I understand.

16        No.  I never seen him walking.

17  BY MR. CONTRERAS:

18    Q    When you say that you saw Anthony wrestling with

19  the deputies could you tell if one side was overpowering

20  the other side?

21        MR. KIZZIE:  Objection.  That's vague but you can

22  answer.

23        THE WITNESS:  No.  I could not tell.

24  BY MR. CONTRERAS:

25    Q    Did you ever hear anyone say "fuck you"

Defendants' Objections: Vague, Calls for Speculation

Objection: Hearsay, Irrelevant Vague

                                                Page 31

```
1   your ability, Mr. Estrada.
2           MR. CONTRERAS:  Mr. Estrada, before you answer,
3   you know, we gave the rules in the beginning and there is
4   another rule and that one is that Mr. Kizzie is allowed to
5   object but he can't make a speaking objection.
6           So any time that he adds any surplusage and, you
7   know, starts testifying himself that's not allowed.
8           So I'm going to ask you to disregard
9   his surplusage and speaking objections and just answer the
10  questions and disregard anything in addition to just the
11  basis for that objection.  Okay?
12          MR. KIZZIE:  Well I would object to that.  That
13  misstates the law, Mr. Contreras.  And don't lecture the
14  witness on the law.  He's not a lawyer.
15          So we're entitled to object as we see fit.  I'm
16  not putting words in your mouth.  I'm just simply
17  indicating my basis for the objections because as
18  Mr. Contreras also notes there has to be a clear record as
19  to the basis for these objections.
20          So Mr. Estrada, this is just kind of something
21  that happens between the parties sometimes.  You can
22  disregard that and just answer Mr. Contreras' questions to
23  the best of your ability.
24  BY MR. CONTRERAS:
25       Q     So my question was did you ever hear anyone say
```

Defendants' Objection:
Misleading, Lacks Foundation, Calls for Speculation,
Vague & Assumes Facts Not In Evidence that Mr. Estrada
Saw/Heard the WHOLE incident

Page 33

1    was your point of origin --

2        A    Yes.

3        Q    -- the units on the northern side of the

4    Nueva Maravilla Projects -- Point B which was where you

5    were dropping off the diapers in Los Cedros and then

6    Point C, back to your point of origin where you left the

7    unit.

8             Is that accurate?

9        A    No.  I don't know where you got Cedros from.  I

10   never -- Point A to Point B -- I was in Magnolias.

11       Q    Okay.  Let me correct that then.

12            So Point A was your point of origin.

13       A    Yes.

14       Q    Point B was when you were dropping off the

15   diapers and then Point C was back to Point A.

16            Is that accurate?

17       A    Yes.

18       Q    And is it your testimony that leaving from

19   Point A, going to Point B and then returning to Point C

20   which is A took approximately three to five minutes?

21       A    No.  When I went back to Point A this was like --

22   I want to say probably like an hour later.  Maybe

23   30 minutes.

24       Q    So then what happened was you left Point A, you

25   were walking to Point B to drop off the diapers and while

Page 35

```
 1    BY MR. CONTRERAS:
 2        Q    And my question to clarify that is could you tell
 3    whether the sirens were just driving around or were they
 4    approaching the scene closest to where you were?
 5        A    No.  They were approaching.  I could hear them
 6    getting closer and closer.
 7        Q    How soon after the shooting did the sirens that
 8    you heard arrive to the scene of the shooting?
 9        A    It was quick.  I want to say within minutes.
10        Q    Based off what you could hear when you were at
11    the projects did you hear anyone at the scene say
12    something to the effect of "drop the gun on him"?
13             MR. KIZZIE:  Well wait.  Objection.  That calls
14    for speculation, lacks foundation.  As the witness
15    testified he was all the way across the parking lot in
16    another apartment from the area of the shooting.  So it
17    lacks foundation that he could hear everything that was
18    being said at the scene.
19             But you can testify to your recollection,
20    Mr. Estrada.
21             THE WITNESS:  Yeah.  Like I said I could hear
22    shouting but to give you specifically word for word what
23    was being said -- it was too far to hear all that.
24    BY MR. CONTRERAS:
25        Q    Based off what you could hear did you hear anyone
```

Page 37

1  evidence and it lacks foundation that he was with

2  Mr. Vargas the whole time.  I think he indicated he saw

3  him around 10:00 and then left and then afterwards

4  delivered the diapers.

5          But you can answer based on your recollection of

6  your time with Mr. Vargas.

7          THE WITNESS:  Yes.  I never seen him with one.  I

8  never even -- I don't even think he's ever even held one.

9  BY MR. CONTRERAS:

10     Q     Would you be surprised to find out that a gun was

11  recovered at the scene allegedly belonging to

12  Anthony Vargas?

13          MR. KIZZIE:  I'll object.

14          THE WITNESS:  I couldn't be surprised because

15  it's just -- it makes no sense.  Well to me -- it makes no

16  sense to me.  What would a gun be doing right there when

17  he doesn't even own a gun?

18  BY MR. CONTRERAS:

19     Q     Let's talk about the recent interview with

20  detectives.

21          Were you interviewed by detectives from the

22  Los Angeles Sheriff's Department on May 28, 2020?

23     A     I was interviewed but I don't know the exact

24  date.

25     Q     During the recent interview with the detectives

Page 39

Defendants' Objection
Irrelevant, Improper
Lay Opinion,
Calls for Speculation,
Argumentative, Vague
Non-Responsive, Leading

1        Q      The extent of what you told Lisa Vargas was

2    essentially the extent of what you've told us today.

3           Is that accurate?

4        A    Yes, sir.

5        Q    After you spoke to Lisa Vargas at the scene of

6    the shooting after the August 12, 2018 shooting was there

7    any other times in which you spoke to Lisa Vargas?

8        A     Yes.

9        Q     How many other times did you speak to

10   Lisa Vargas after that first discussion at the scene of

11   the shooting?

12       A    I can't give you an exact number but I want to

13   say that's when I began to -- how do you say it? -- build

14   more of a relationship with her.

15          Like we started -- I started talking to her more.

16   Not mainly about the incident but more about like -- just

17   like she just tried to help me out a lot.  Like try to get

18   me to change.  Change my life.  Turn myself in to God and

19   that mainly what we always -- she just always like wanted

20   me to see like what can happen.

21          Like this isn't the lifestyle for everybody.  She

22   just wanted me to change too.  She just wanted the best

23   for everyone.

24       Q    Did you ever communicate in writing with

25   Lisa Vargas?

                                            Page 41

1      A    Yes.

2      Q    And did you give them a statement regarding what

3   you saw and heard at the scene of the incident involving

4   Anthony Vargas?

5      A    Yes.

6      Q    And were you truthful in your statement?

7      A    Yes.

8      Q    I'm sorry.  I should have specified.  My

9   apologies.  Lawyers are not as smart as we think we are

10   sometimes.

11         Were you truthful in your statement that you gave

12   to the sheriff's homicide investigators who interviewed

13   you in May of this year?

14      A    Yes.

15      Q    And is your date of birth June 17, 1989?

16      A    Yes.

17      Q    And your CDC number is C as in cat B2356.

18         Is that right?

19      A    No.  It's B as in boy D as in Denver 2356.

20      Q    Understood.  Thank you, sir.

21         And you've been incarcerated since about

22   October 28, 2018.  Is that right?

23      A    Yes.

24      Q    And going back to 2018 you just met

25   Mr. Anthony Vargas in May of 2018 when you were in the

                                              Page 43

```
 1        Q     I'm not trying to be rude.  It's just that we
 2   have a court reporter taking down everything that's said
 3   so when you say uh-huh or um-hum I know what you mean but
 4   it's --
 5        A     I'm sorry.  Yeah.
 6        Q     No apologies necessary.  I'm sorry that we have
 7   to bother you with this today and I'm going to try to be
 8   as quick as possible.  Okay?
 9        A     (No response.)
10        Q     So let me go back to my question.
11              You only knew Mr. Vargas between May 2018 and
12   August 12, 2018.  Right?
13        A     No.  Not exactly May.  I met him a couple days
14   after I paroled.
15        Q     And when did you parole?
16        A     I don't even remember.
17        Q     Do you recall telling the sheriff's homicide
18   investigators that you met Anthony Vargas in or around May
19   of 2018?
20        A     Yes.
21        Q     And a rough estimate is fine but would you
22   roughly estimate that the length of your relationship with
23   Mr. Vargas was about two to three months between in or
24   around May 2018 and then August 2018?
25        A     Yeah.  Yes.  More or less.
```

Page 45

```
 1    right?

 2        A    Yeah.   That's correct.   I never had a chance to

 3    work with him.

 4        Q    Okay.   Between May 2018 and August 2018 did you

 5    hang out with Mr. Anthony Vargas every week?

 6        A    Yes.

 7        Q    What is your best estimate for how many times a

 8    week between May 2018 and August 2018 that you hung out

 9    with Mr. Anthony Vargas?

10             A best estimate is fine.

11             Once a week.   Twice a week.

12        A    Excuse me?

13        Q    I said a best estimate is fine.   Once a week.

14    Twice a week.   Whatever you can recall.

15        A    Probably about three to four times a week.

16        Q    And between May 2018 and August 2018 when you

17    would hang out with Mr. Anthony Vargas was it you two just

18    hanging out together alone or was it you two hanging out

19    together with other people each time?

20        A    No.   It's with other people each time.   Like I

21    said like I met him through my homies which were

22    coworkers.

23        Q    Okay.   So each time that you hung out --

24        A    I never specifically -- sorry.

25             I never specificially hung out like just me and
```

                                                    Page 47

1    happening.

2        A     That's what's confusing me.  I don't know the

3    exact time it was.

4        Q     Sure.  So let's back up.

5              So the last time --

6        A     It was late.

7        Q     It was very late.  Right?

8        A     Yes.

9        Q     So let's backtrack and clean that up a little

10   bit.

11             So the last time you saw Anthony Vargas was

12   when you were hanging out with him and a group of

13   other people at the Nueva Maravilla housing community

14   around 10:00 p.m. the night of August 11, 2018.  Is that

15   right?

16       A     Yes.

17       Q     And then this wrestling that you saw between the

18   two deputies and this individual who you later learned to

19   be Anthony Vargas -- you saw that much later -- possibly

20   after midnight -- on the morning of August 12th.

21             Does that sound accurate?

22       A     Yes.  It was after midnight.

23       Q     Okay.  And you at that time after midnight on the

24   morning of August 12, 2018 when you initially saw them

25   appear to be wrestling you were on your way to deliver

                                                    Page 49

1      Q     Okay.  So around 10:00 p.m. you left the area

2    that you and Anthony Vargas and other individuals were

3    hanging out at the Nueva Maravilla housing community

4    around 10 p.m. and then you left to go hang out with a

5    female friend of yours.  Right?

6      A     Yep.  Yes, sir.

7      Q     And do you know at all what happened between

8    10:00 p.m. and the time that you saw the scuffle around

9    early that morning?

10           Do you know at all what happened with that group

11   of individuals?

12     A     Repeat that, please.

13     Q     Sure.  Let me rephrase it.

14           Between 10:00 p.m. and early in the morning you

15   weren't with Anthony Vargas because you were trying to

16   deliver diapers to your female friend and hanging out with

17   her.

18           Is that accurate?

19     A     Yes.

20     Q     So you don't know what happened with

21   Anthony Vargas and the other individuals you were hanging

22   out with after 10:00 p.m. because you left to go hang out

23   with your friend.  Is that right?

24           You don't know what happened?

25     A     Yeah.  That's correct.

Page 51

1      A    Repeat that, please.

2      Q    Sure.  You know Lisa Vargas is Anthony Vargas'

3  mother.  Right?

4      A    Yes.

5      Q    And did you ever tell Lisa Vargas that you saw

6  sheriff's deputies walk up behind Anthony Vargas and shoot

7  him in the back when he was on the ground on his knees

8  with his hands up?

9        Did you ever tell her that?

10     A    No.

11     Q    And if Ms. Lisa Vargas testified under oath that

12  you told her that sheriff's deputies walked up behind

13  Mr. Anthony Vargas and shot him in his back while his

14  hands were up would that be true?

15     A    Wait.  Wait.  Repeat that, please.

16     Q    Yes.  I'm sorry if I wasn't clear.  Like I said

17  lawyers are not always as smart as we think we are.

18        If Ms. Lisa Vargas testified under oath that you

19  told her that sheriff's deputies walked up behind

20  Mr. Anthony Vargas and shot him in his back while he was

21  on his knees with his hands up would that be a lie?

22        MR. CONTRERAS:  Objection.  Calls for

23  speculation, assumes facts not in evidence, vague.

24  BY MR. KIZZIE:

25     Q    You can answer.

Page 53

```
 1        Q    I'm sorry.  What's the answer, Mr. Estrada?
 2             Mr. Contreras was talking.
 3        A    No.
 4        Q    Did you ever play any sports in high school like
 5   football or anything like that?
 6        A    Me?
 7        Q    Yes.
 8        A    Skateboard.
 9        Q    I'm going to ask you for your best estimate.  I
10   know you may not know whether something was 10 feet or
11   11 feet but I would like your best estimate as to
12   approximately how far away were you across the parking lot
13   in the complex when you saw this individual wrestling with
14   the deputies as you were walking to deliver diapers?
15             You were pretty far away.  Right?
16        A    Man.
17        Q    A best estimate is fine.
18             Two hundred feet, 400, 500 feet, 1000 feet.
19             Just whatever you can best estimate as to how far
20   away you were when you saw this individual appear to be
21   wrestling with sheriff's deputies.
22        A    Roughly about 200 feet.
23        Q    And from where you were when you were walking to
24   deliver the diapers you saw these individuals -- the
25   sheriff's deputy and this individual appear to be
```

                                                    Page 55

1      Q     And the individual that you saw appear to be

2   struggling with the deputies -- that individual appeared

3   to be wearing a dark-colored shirt and having a big body.

4   Right?

5      A     Yes.

6      Q     And from what you could see it appeared that

7   these deputies weren't able to get that big individual

8   down.  Is that right?

9            They appeared to be having difficulty with

10   that?

11      A     Yes.

12      Q     And the person that you saw struggling with the

13   deputies -- he appeared to be resisting the deputies'

14   efforts to get him down.  Is that right?

15      A     Yes.

16      Q     And when you delivered diapers to your friend you

17   knocked on her door, she opened the door and as soon as

18   you put the diapers on the floor that's when you heard

19   between 15 to 20 gunshots.  Right?

20      A     That's correct.

21      Q     And you weren't able to see the shooting happen

22   because you were at your friend's door on the other side

23   of the complex and there were buildings in the way.  Is

24   that right?

25      A     Yeah.  Just buildings.  There was a whole row of

Page 57

```
 1    I think that's pejorative.  There's good people that live

 2    there.  Not everyone who lives there commits crimes so I

 3    like to call it a housing community.

 4            The last time you saw Mr. Vargas at the

 5    Nueva Maravilla housing community or the housing complex

 6    you didn't like lift up his shirt and search him or feel

 7    around on him to see what he had on him, did you?

 8    A    Wait.  Can you repeat that, please.

 9    Q    Yes.  The last time you saw Mr. Anthony Vargas

10    around 10:00 p.m. at the Nueva Maravilla housing community

11    when you were hanging out with all of these other

12    individuals you didn't pat him down or lift up his shirt

13    to see what if anything he had on him, did you?

14    A    No.

15            MR. CONTRERAS:  Objection.  Calls for

16    speculation.

17            THE WITNESS:  No.

18    BY MR. KIZZIE:

19    Q    Your answer is no.  Right?

20    A    No.

21    Q    You never lifted up Anthony Vargas' shirt to see

22    what if anything he had on him when you were hanging out

23    with him -- right -- because you're friends?

24    A    Right.

25    Q    And what's your best estimate as to approximately
```

Page 59

BY MR. KIZZIE:

    Q    From this group of individuals wrestling you
recall somebody say "fuck you" but you couldn't make out
whose voice that was.  Is that accurate?

    A    Yes.

    Q    And in order to deliver the diapers to your
friend at some point while you were walking you had to
turn at a corner to go up to that apartment.  Is that
right?

    A    Yes.

    Q    And it's at that time that you lost sight of the
individuals wrestling.  Is that correct?

    A    That's when I lost sight.  Yes.

    Q    And did the two deputies seem smaller than this
individual that they were wrestling with?

    A    I don't recall, man.

    Q    No worries.  That's okay.  It's okay.  I know it
happened some time ago so it's no problem.  No apologies
necessary.

    And this individual that you saw wrestling with
the deputies -- before you saw the deputies get in contact
with him and begin wrestling you saw him running and
appear to trip and fall and then appear to get up and then
start running again but then the deputies got in contact
with him and that's when you saw the wrestling happening.

```
 1    Mr. Christian Contreras who has been speaking with you

 2    today?

 3        A    No.  I can't say.  I have no clue.

 4        Q    No problem.

 5             And you do know that your phone calls at this

 6    facility are recorded.  Right?

 7        A    Yes.

 8             MR. CONTRERAS:  Objection.  Relevance.

 9    BY MR. KIZZIE:

10        Q    About how long did you speak with this lawyer

11    asking you about the incident?

12             Your best estimate is fine.

13        A    I'm not sure.  Probably about 30 minutes,

14    45 minutes.

15        Q    So it's your best estimate that you spoke

16    telephonically with a lawyer asking you about the incident

17    for about 30 to 45 minutes while --

18             MR. CONTRERAS:  Objection.

19    BY MR. KIZZIE:

20        Q    -- you were incarcerated at Norco.  Is that

21    right?

22        A    I believe so.

23        Q    Did that lawyer ever ask you to say anything

24    specific?

25        A    No.
```

Page 63

1         Q       And because you were so far away you weren't able

2    to hear accurately or hear at all what was being said

3    during these 30 seconds to a minute between the time you

4    last saw them wrestling and the time you heard the

5    gunshots.  Right?

6         A       Wait.  Repeat that question, please.

7         Q       Yes.  Because you were so far away you weren't

8    able to hear what if anything was being said between

9    the 30 seconds to a minute from the time that you last

10   saw them until the time that you heard the gunshots.

11   Right?

12        A       Right.

13        Q       And between the 30 seconds to a minute between

14   the time you last saw them and you heard the gunshots you

15   didn't see visually at all what happened at that area.  Is

16   that right?

17        A       That's right.

18           MR. KIZZIE:  I'm sorry.  Let me just cover my

19   notes.  I want to make sure that I don't ask you the same

20   question more than once if I can help it.

21   BY MR. KIZZIE:

22        Q       What is your best estimate as to how many times

23   after the date of the incident that you spoke to

24   Lisa Vargas, Anthony Vargas' mom?

25           A best estimate is fine.

                                                  Page 65

```
 1       Q    Sure.  I'm asking the location of the apartment

 2   when you dropped off the diapers.  I'm not asking you the

 3   number.  Just the location.

 4            The apartment where you dropped off the

 5   diapers -- was that on the upper floor or the bottom

 6   floor?

 7                 It's my understanding that the Nueva Maravilla

 8   housing complex apartments have two floors.  An upper

 9   floor and a bottom floor.

10            Which floor was this apartment on where you

11   delivered the diapers?

12       A    There's no floors.  Like the apartment complex --

13   it's like if it has two floors that's your whole

14   apartment.

15       Q    I see.  I see.

16       A    So it's pretty much like your house.  Like that's

17   your house.

18       Q    I see.

19            Did you ever tell Ms. Lisa Vargas that you

20   looked through a window and saw the deputies shoot

21   Anthony Vargas?

22       A    No.  I wouldn't have been able to see because

23   there's a whole row of houses still blocking.

24       Q    Understood.  Thank you.

25            And forgive me.  I know the answer to this but I
```

Page 67

```
 1        Q     And you don't know what if anything
 2   Mr. Anthony Vargas may have done immediately prior to the
 3   shooting because you weren't able to see from where you
 4   were.  Is that right?
 5        A     Exactly.
 6        Q     Got it.  And did you ever speak with the
 7   sheriff's deputies who actually fired their weapons that
 8   day as to why they did it?
 9        A     No.
10        Q     Have you ever read any police reports or
11   sheriff's investigative reports regarding what happened
12   during the incident and why?
13        A     No.
14        Q     I understand.  Okay.
15              Do you have any negative feelings towards law
16   enforcement?
17        A     Are you kidding me?  Yes.
18        Q     I understand.  You along with many, many people
19   justifiably.
20        A     Exactly.
21        Q     Prior to this incident had you ever been
22   convicted of any felonies before?
23        A     Yes.
24        Q     Which ones if you can recall?
25        A     I don't know.  Assault with a deadly weapon.
```

Page 69

Personal Court Reporters, A Veritext Company
818-988-1900

```
 1      A    I think that came with the GTA.

 2      Q    I understand.  Okay.

 3           And after you get out you plan on leaving

 4  California and turning your life around.  Right?

 5      A    Of course.

 6      Q    I understand.  Good.

 7      A    Looking out for me here.

 8           MR. KIZZIE:  I hear you.  You and a lot of other

 9  people are definitely leaving California and I wish you

10  luck.

11           I don't think I have any other questions.  I

12  appreciate your time.

13           Well one second.

14  BY MR. KIZZIE:

15      Q    From what you could see with the deputies when

16  they were wrestling with this person did they appear to be

17  trying to get this person on the ground?

18           Like trying to force him on the ground.

19      A    Yes.

20      Q    And did they appear to have trouble doing so

21  because this person was so big?

22      A    Yes.  That's correct.

23      Q    And as they were wrestling did they continue to

24  kind of move along that grassy area in front of the

25  apartment complex where you saw them?
```

                                                        Page 71

1        Q    Got it.

2             Do you know if any of the individuals you were

3    with at the Nueva Maravilla housing community had guns or

4    not?

5             MR. CONTRERAS:  Objection.  Calls for

6    speculation, assumes facts not in evidence.

7    BY MR. KIZZIE:

8        Q    If you know.  If you don't know it's fine.  I'm

9    just asking.

10       A    I didn't know.

11            MR. KIZZIE:  I understand.

12            All right, sir.  Thank you very much for your

13   time.  I don't have any further questions at this

14   moment.

15            THE WITNESS:  Thank you.

16            MR. CONTRERAS:  Thank you, Mr. Estrada.

17            So the deposition is now adjourned.

18            MR. KIZZIE:  So Mr. Estrada, we're going to

19   adjourn the deposition.  Thank you very much for your time

20   and your testimony today.

21            This is Antonio Kizzie.  I wish you a lot of luck

22   and safety during this time and I hope everything works

23   out for you.

24            Christian, what do you want to do regarding the

25   transcript?

                                              Page 73

```
 1              Am I allowed to have a copy of the paperwork of

 2       this?  Of what was just said.

 3              MR. KIZZIE:  Mr. Contreras.

 4              MR. CONTRERAS:  Well we can provide a copy to the

 5       correctional facility and it would be up to them.  We can

 6       make arrangements for that if that's okay with defense

 7       counsel.

 8              THE WITNESS:  I believe I'm allowed to through

 9       legal mail.

10              MR. CONTRERAS:  We can make it available to the

11       person who arranged this deposition and it would be up to

12       the policies of the correctional facility.

13              THE WITNESS:  I believe I am entitled to it.

14       That's why I was asking for it.

15              MR. KIZZIE:  Sure.  Mr. Contreras will have

16       custody of the original and he'll be in touch with this

17       facility regarding getting you a copy.

18              THE WITNESS:  I just wanted a copy of it.

19              MR. KIZZIE:  No worries.

20              MR. CONTRERAS:  Thank you, Mr. Estrada.

21              THE REPORTER:  Counsel, did you want that

22       conversation on the record?

23              MR. KIZZIE:  Mr. Contreras.

24              MR. CONTRERAS:  Yes.  Yes.  If possible.  Yes.

25              THE REPORTER:  All right.  Thank you.
```

Page 75

1      DECLARATION OF COURT REPORTER

2               FEDERAL JURAT

3

4           I, the undersigned, a Certified Shorthand

5      Reporter for the State of California, do hereby certify:

6           That the foregoing proceedings were taken

7      before me at the time and place herein set forth; that

8      any witnesses in the foregoing proceedings prior to

9      testifying were placed under oath; that a verbatim

10     record of the proceedings was made by me using machine

11     shorthand which was thereafter transcribed under my

12     direction; further, that the foregoing is an accurate

13     transcription thereof and that before completion of the

14     deposition a review of the transcript was not requested.

15          I further certify that I am neither

16     financially interested in the action nor a relative or

17     employee of any attorney of any of the parties.

18          IN WITNESS WHEREOF, I have this date

19     subscribed my name.

20     Dated:  October 28, 2020

21

22

23              Teri Lingenfelter

24              CSR No. 5369

25

                                        Page 77

**[answered - body]**

54:23 60:22
**anthony** 8:19,21
9:9,15 10:1 12:18
12:20 13:22,25
15:11,16,18,21
16:9 18:7,22
19:11,23 20:20,24
21:5,18,24 22:6,10
22:12,14,21 23:12
23:19,23 24:4,6,10
24:18,24 26:9
27:4,7,18 28:8,20
30:8,9,11,13,22
31:2,18 34:13
38:15,18,21,23
39:12 40:9,11,15
40:21 42:8 43:4
43:25 44:6,10,14
44:16,20 45:18
46:1,8,13,18,21,24
47:5,9,17 48:3,9
48:12,13,18 49:11
49:19 50:4 51:2
51:15,21 52:2,4,9
52:12,19,24 53:2,6
53:13,20 54:21
58:23 59:9,21
60:2,6 62:3 65:24
67:21 68:4,20
69:2
**antonio** 3:15 7:3
42:20 73:21
**anybody** 54:5
**apartment** 37:16
58:5 61:8 66:22
66:24 67:1,4,10,12
67:14 71:25
**apartments** 67:8
**apologies** 8:8 43:9
45:6 61:18

**appear** 11:21
49:25 55:20,25
56:19,23 57:1
58:12 61:23,23
71:16,20
**appearances** 3:1
**appeared** 57:2,6,9
57:13
**appearing** 2:15
**appreciate** 71:12
**approaching**
36:16 37:4,5
**approximate**
48:25
**approximately** 9:8
35:20 36:6 50:8
55:12 59:25 64:18
72:2,6
**area** 37:16 50:17
50:20 51:1 65:15
71:24 72:13
**arranged** 75:11
**arrangement**
74:10
**arrangements**
75:6
**arrested** 70:8
**arrive** 37:8
**arrived** 36:2
**aside** 15:12
**asked** 11:18 12:12
16:13 17:14 18:11
18:24 19:11,19
22:24 23:14 26:10
27:12 28:3 29:17
36:8 38:9 50:21
54:23 60:22 64:7
64:7
**asking** 11:21
28:17 29:9 42:20
62:9,13,16 63:11

63:16 64:6 67:1,2
73:9 75:14
**asks** 7:13,17 12:1
18:17
**assault** 69:25 70:1
70:20
**assumes** 22:1
24:13 27:24 31:5
31:10 32:19 34:3
38:8,25 53:23
54:12 73:6
**attempted** 30:24
**attend** 17:9 44:13
**attorney** 8:3 17:10
17:13 77:17
**attorneys** 5:17
**auditory** 27:16
**august** 5:20 20:13
20:14 22:7 40:10
40:14,18,21 41:6
42:7 44:21 45:12
45:24 46:13,17,20
47:4,8,16 48:4,8
48:13,17,24 49:14
49:20,24 50:3
66:9,11
**auto** 70:17
**available** 75:10
**aware** 13:25 72:21

**b**

**b** 34:21 35:4,10,14
35:19,25 36:2,7
43:19
**b2356** 43:17
**back** 13:14 16:22
17:5,15,16,22,23
30:23,24 35:6,15
35:21 43:24 45:10
49:4 50:3,16,19
52:25 53:7,13,20
56:23

**background** 25:19
**backtrack** 49:9
**bald** 66:12,19
**based** 16:2,10 18:9
18:10,13 20:3
21:8 34:7 37:10
37:25 38:4 39:5
**basis** 8:17 15:8
33:11,17,19
**bear** 68:16
**beer** 23:22,23
50:15
**beers** 9:2
**began** 41:13
**beginning** 2:18
33:3
**behalf** 2:16
**believe** 19:19
29:16 36:11,23
63:22 64:6,6 75:8
75:13
**belonging** 39:11
**benefit** 19:24
**best** 6:21,23 32:25
33:23 41:22 46:14
47:7,10,13 50:11
55:9,11,17,19 58:3
58:7,10,15 59:25
60:4 63:12,15
65:22,25 72:2,6
**better** 24:25 25:10
25:21
**beverly** 3:6
**bible** 44:11,14,17
**big** 57:3,7 71:21
**birth** 43:15
**bit** 34:24 49:10
**blocking** 58:1
67:23
**body** 57:3

Personal Court Reporters, A Veritext Company
818-988-1900

[county - estrada]

**county** 1:8 2:8 3:12 5:18
**couple** 8:23 9:2 15:25 20:2,4 22:17,18 24:1 25:16,16 45:13
**course** 17:14 29:3 29:9 71:5
**court** 1:1 2:1 6:6 6:14,19 7:17 13:13 16:21 17:5 17:9,14,16 45:2 74:6 77:1
**cover** 65:18
**coworkers** 8:23 9:6,20,24 47:22
**crime** 19:23
**crimes** 59:2
**csr** 1:22 77:24
**custody** 74:2,5 75:16
**cv** 1:5 2:5

**d**

**d** 4:1 5:13,15 43:19
**damn** 26:22 64:15
**dark** 57:3 66:12 66:20
**date** 39:24 43:15 56:5 65:23 66:8 66:11,19 72:19 77:18
**dated** 77:20
**day** 20:15,17 38:19 46:18,19 69:8 74:14
**days** 45:13
**deadly** 69:25 70:1 70:21
**declaration** 76:4 77:1

**defendants** 1:10 2:10 3:12 7:4 74:19
**defense** 75:6
**definitely** 71:9
**deliver** 49:25 51:16 55:14,24 58:13,20 61:6
**delivered** 31:8 39:4 57:16 67:11
**delivering** 27:10 40:2 62:4
**denver** 43:19
**department** 39:22
**deposition** 1:13 2:14 6:4,9,17 7:5 17:3,8 66:18 73:17,19 74:9 75:11 76:3 77:14
**deputies** 5:19 28:8 28:13 30:8,9 31:6 31:19 32:10 34:12 34:16 48:22 49:18 52:5,10,18,24 53:6 53:12,19 54:21 55:14,21 56:13,19 56:22 57:2,7,13,13 61:14,21,21,24 64:24 67:20 68:18 68:22 69:7 71:15
**deputy** 55:25
**describe** 14:12,17 24:5,22
**destination** 25:12 25:14
**detective** 42:25
**detectives** 39:20 39:21,25 68:24
**diagram** 40:1,5
**diapers** 25:4,5,6 25:24 27:10,22

28:12,24 31:8 32:22 34:22 35:5 35:15,25 36:2 39:4 40:2 50:1,16 51:16 55:14,24 56:19 57:16,18 58:14,20 61:6 62:4 66:23 67:2,5 67:11
**different** 18:2 32:4
**difficulty** 57:9
**diggs** 3:14
**direct** 42:11
**directed** 27:17 28:19
**direction** 36:23 77:12
**discuss** 40:8
**discussion** 41:10
**disregard** 33:8,10 33:22
**distance** 25:6 36:17
**district** 1:1,2 2:1,2
**dog** 68:8
**doing** 28:16 39:16 71:20
**door** 25:23 57:17 57:17,22 58:5
**drag** 30:9
**drank** 24:3
**drew** 40:1
**driving** 37:3
**drop** 25:5 28:12 28:24 34:21 35:25 37:12 66:22
**dropped** 27:21 32:22 67:2,4
**dropping** 25:6,24 35:5,14 36:2

**due** 7:15

**e**

**e** 4:1 5:13,15
**earlier** 27:21 34:6 36:9,12 38:9
**early** 51:9,14 70:14
**easy** 7:16
**effect** 37:12 38:1,5
**efforts** 57:14
**eight** 66:6
**either** 7:19 12:12
**elapsed** 34:14,18
**email** 3:10,21
**employee** 77:17
**enforcement** 69:16
**entire** 21:2 24:19 27:15 31:1 32:1 32:20 38:20
**entitled** 6:21 33:15 75:13
**esq** 3:4,15
**essentially** 6:18 7:5 41:2
**estimate** 29:4,8,8 29:9,10 45:21,22 46:14 47:7,10,13 50:11 55:9,11,17 55:19 58:3,7,10,15 59:25 60:4 63:12 63:15 65:22,25 72:2,6,11
**estrada** 1:14 2:15 4:5 5:4,10,13,22 7:3 8:11 10:17 11:1,12,23 12:9 13:9 14:7,16 16:2 16:16,25 18:5,15 19:3,7,15 21:9 23:1,16 24:15

[good - innocent]

**good** 5:10,16 26:15,18,19 42:19 48:5 59:1 71:6 74:14
**grand** 70:17
**grassy** 71:24 72:13
**graveyard** 8:25
**ground** 52:20 53:7 60:11,11,16,16 71:17,18
**group** 44:11,13,17 49:12 51:10 61:2
**gta** 70:18 71:1
**guess** 9:4 13:9 14:8 16:3 17:1 18:17 20:4 29:1,9 32:11,14 34:8 36:21
**guilty** 70:9
**guizar** 3:3 62:22
**gun** 32:16 34:1,10 37:12 38:2,6,23 39:10,16,17 68:18
**gunfire** 36:3
**guns** 73:3
**gunshots** 25:24 26:1 27:22 31:9 32:23 34:17 52:16 57:19 58:6,14,21 64:20 65:5,10,14
**guy** 26:4,15,18
**guys** 26:23 64:7

**h**

**handful** 66:1
**hands** 52:20,25 53:8,14,21 54:22 68:5
**hang** 15:4 20:9 46:12,18 47:5,17 48:9 50:22,25 51:4,22

**hanging** 10:9 44:1 47:18,18 48:14,20 49:12 51:3,16,21 52:2,11,12 59:11 59:22 60:1 72:19
**happen** 41:20 57:21
**happened** 31:2 35:24 51:7,10,20 51:24 52:1,8 58:18 61:18 64:20 65:15 68:23 69:11
**happening** 49:1 61:25
**happens** 33:21
**harassing** 19:1
**he'll** 75:16
**hear** 7:14 15:11 25:19 29:25 31:25 32:16 33:25 36:16 36:22,24 37:5,10 37:11,17,21,23,25 37:25 38:4,5,10,12 44:16 58:5,14,21 65:2,2,8 71:8 72:23
**heard** 24:12 25:24 27:22 28:1,18 31:8 32:2,4,4,6,10 32:23 34:4,9,13,17 36:3,15 37:8 43:3 52:16 54:6,9 56:13 57:18 60:6 60:12,15,20,23 64:20 65:4,10,14 68:3
**hearing** 25:18 60:10
**heart** 26:19
**held** 39:8

**help** 12:11 40:25 41:17 65:20
**helping** 11:22
**henderson** 3:3
**hereof** 76:6
**high** 55:4
**hispanic** 66:12,20
**hold** 10:15
**holding** 21:24
**home** 66:4
**homeboy** 50:6
**homicide** 42:24 43:12 45:17 62:8
**homie** 13:22 21:15 21:16
**homies** 21:13 26:3 28:10 47:21
**honestly** 14:22 62:23
**hope** 70:13 73:22
**hopefully** 8:5 70:14
**hosting** 44:16
**hour** 35:22
**house** 56:15 67:16 67:17
**housekeeping** 7:1 8:5
**houses** 67:23
**housing** 44:18 48:19 49:13 50:20 51:3 59:3,5,5,10 60:2 67:8 72:20 73:3
**huh** 6:13 44:3,23 45:3 72:25,25
**hum** 6:12 45:3
**humberto** 62:22
**hundred** 55:18
**hung** 9:6 13:3,18 47:8,23,25 48:2,12

**hurt** 26:4,6,8

**i**

**immediately** 21:5 21:7 69:2
**imwlaw.com** 3:21
**incarcerated** 43:21 63:20
**incident** 16:1 20:17 21:2 24:19 27:8 28:21 31:6 32:1,20 40:19 41:16 43:3 44:21 56:6 62:9,13,17 63:11,16 65:23 66:9,11,19 68:23 69:12,21 72:19
**includes** 32:10
**inclusive** 1:9 2:9
**indicate** 11:24
**indicated** 11:20 15:24 39:2
**indicating** 33:17
**individual** 5:19 21:14 48:23 49:18 55:13,20,25 56:12 56:24 57:1,2,7 61:15,20 64:23
**individuals** 51:2 51:11,21 55:24 58:4,12,20 59:12 60:10,17 61:2,12 73:2
**indulge** 64:1
**indulging** 8:7
**industries** 50:6
**information** 66:18
**initially** 49:24
**initiated** 15:21 16:9 18:7 19:10
**innocent** 26:23

Page 6

[location - objection]

location   67:1,3
lodge   74:5
long   13:24 14:4,18
   16:10 26:17 27:3
   27:17 28:19 29:4
   29:7,15,18 30:3,6
   36:6 63:10
longer   70:11
look   17:19
looked   67:20 68:4
looking   71:7
los   1:8 2:8 3:12,18
   5:19 35:5 39:22
lost   61:11,13 74:7
lot   25:7 26:6,8
   29:15 30:4 37:15
   41:17 46:16 55:12
   56:2 71:8 73:21
luck   71:10 73:21

**m**

machine   77:10
magnolias   35:10
mail   75:9
maintain   74:1,5
male   62:10,12
man   25:21 26:14
   26:16,18,20,22,23
   55:16 60:5,12
   61:16 72:9
maravilla   10:14
   10:22 11:5,17
   12:20 13:3,4,18,19
   15:22 16:9 18:7
   18:23 19:12,24
   20:10 22:10,13,22
   23:12,20,24 24:7
   24:23 35:4 38:22
   44:1,18 48:19
   49:13 50:19 51:3
   58:24 59:5,10
   60:2 67:7 72:20

73:3
matter   7:2 12:1
mcneill   3:14
mean   20:25 26:15
   29:2,23 30:3 45:3
meaning   18:13
means   6:10,16
meant   11:20
mednik   36:24
meet   9:4,8,15,23
member   11:17
   12:5,18
membership   14:7
memory   30:18
merchandising
   44:7
met   8:22,23 9:7,11
   13:24 43:24 44:6
   44:10 45:13,18
   47:21 50:4 66:16
middle   5:14
midnight   49:20,22
   49:23 50:20,23
minute   17:20 29:1
   58:9,9,11,16,19
   64:18 65:3,9,13
minutes   29:12
   35:20,23 36:7,13
   37:9 63:13,14,17
misrepresent   5:25
misstates   27:21
   33:13
mom   15:7 40:13
   62:3 65:24
moment   73:14
monetary   42:6
money   64:10,12
   64:15
moniker   15:14,19
montebello   3:7

month   9:8,11
months   15:25
   16:10 20:2,4
   45:23 68:25
morning   5:10,16
   9:1 42:19 48:23
   49:20,24 51:9,14
   52:5,10
mother   40:9 53:3
mouth   33:16
move   20:13 24:4
   71:24
movie   68:7
moving   72:1,3,7
   72:11
multiple   20:1
murdered   50:5
mutual   48:14

**n**

n   4:1
name   5:11,14,16
   15:12 42:19 62:12
   62:21 77:19
nature   6:13
necessary   45:6
   61:19
need   6:11 18:5
   36:21 38:7
negative   69:15
neighborhood
   21:17,18,21
neither   77:15
never   10:3,11,12
   27:22 31:16 35:10
   39:7,8 44:10 46:1
   46:25 47:2,24,25
   48:2 52:15 54:1,3
   54:5 59:21 66:16
   66:17 68:18
night   38:19 49:14
   50:3

night's   21:2
nikolis   1:8 2:8
   3:12
nine   66:6
noises   68:3
nope   60:8 64:14
   68:14 72:25
norco   1:15 2:17
   5:1 63:20
northern   35:3
notes   33:18 65:19
nueva   10:14,22
   11:5,17 12:20
   13:3,4,18,19 15:22
   16:9 18:7,23
   19:12,24 20:10
   22:10,13,22 23:12
   23:20,24 24:7,23
   35:4 38:22 44:1
   44:18 48:19 49:13
   50:19 51:3 58:24
   59:5,10 60:2 67:7
   72:20 73:3
number   41:12
   42:5 43:17 67:3

**o**

o   5:13,15
oath   5:5,22,22 6:2
   6:10 7:9 42:22
   53:11,18 77:9
object   7:14,20 8:4
   12:7,13,22 14:2
   21:25 24:8 27:6
   30:15 32:8 33:5
   33:12,15 36:18
   38:7,25 39:13
objecting   19:9
objection   7:21,23
   10:16,24 11:9,18
   13:5 14:5,14
   15:23 16:12 18:11

Page 8

[question - seconds]

16:25 17:15,17,21
17:24 18:5,15,18
18:25 19:4,7,15,19
22:21 23:8 24:13
24:14,22,25 27:11
27:17,24 28:2,5,15
28:19 29:16 30:20
31:4,10,13 32:23
32:25 33:25 34:3
37:2 45:10 48:7
65:6,20 74:25
**questions** 7:7,8
14:6 33:10,22
38:17 42:11,13,20
62:19 64:7 71:11
73:13
**quick** 37:9 45:8
**quickly** 70:14
**quote** 38:1,6

**r**

**r** 5:13,13,15
**reach** 62:20
**read** 13:14 16:22
17:5,15,16,22,23
69:10
**really** 24:2 25:21
26:4,5 30:2
**reason** 6:22
**recall** 21:23 22:3,4
45:17 47:14 60:9
60:14,18,19 61:3
61:16 62:12,21,25
69:24
**received** 64:12
**recollection** 21:8
30:17 34:7 37:19
39:5
**record** 5:12 6:18
7:23 8:5 33:18
75:22 76:1,2
77:10

**recorded** 63:6
**recovered** 39:11
**referred** 60:6
**referring** 22:19
27:8
**regarding** 14:6
24:6,20 27:4 38:9
38:18 43:2 68:23
69:11 73:24 75:17
**rehabilitation**
2:17
**relationship** 18:14
41:14 45:22
**relative** 77:16
**relevance** 63:8
**remember** 25:2
45:16 62:24 64:2
64:5
**remotely** 2:15
**repeat** 10:19 13:11
28:15 34:15 38:3
51:12 52:7 53:1
53:15 54:16 59:8
65:6 66:15
**repeating** 11:19
**rephrase** 8:13
46:7 51:13 66:25
**reported** 1:20
**reporter** 2:20 6:14
6:20 7:17 13:13
13:15,15 16:21
17:5,7,15,16,18,25
45:2 74:15,15,22
75:21,25 77:1,5
**reports** 69:10,11
**represents** 5:17
**requested** 77:14
**resisting** 57:13
**response** 45:9
**retail** 44:7

**return** 29:6
**returning** 35:19
**review** 30:5 77:14
**right** 6:25 8:24
10:21 15:4 22:19
25:8 29:3 30:4
34:2 39:16 42:10
43:18,22 44:2,8,22
45:12 46:2,4,5,24
47:1 48:4,15,20,24
49:7,15 50:1,6,17
50:22 51:5,23
52:6,13,16,17 53:3
54:3,8 55:15 56:3
56:6,10,11,15,20
56:24 57:4,8,14,19
57:24 58:16,21
59:19,23,24 61:9
62:1,5 63:6,21
64:22,25 65:5,11
65:12,16,17 68:15
69:4 70:6,7,13,21
71:4 72:15 73:12
74:11,13 75:25
**ring** 34:13,17
36:15
**robbery** 70:2,3,6
72:21
**robbing** 72:23
**rojas** 1:8 2:8 3:13
**rough** 45:21
**roughly** 45:22
55:22
**route** 34:25
**row** 57:25 67:23
**rude** 45:1
**rule** 33:4
**rules** 33:3
**run** 30:24,25
**running** 25:7,10
61:22,24

**s**

**s** 5:13,13
**safety** 73:22
**sas** 9:18 10:1 20:9
44:7 46:21,25
**saw** 22:12,21 23:8
23:11 24:5,9,23
27:2,23,25 28:13
28:17,20 30:7,13
30:22 31:5,7,11,18
34:4,12,16 36:1
39:2 43:3 48:17
48:22,25 49:11,17
49:19,24 51:8
52:3,10,15,23 53:5
54:4,11,18,21
55:13,20,24 56:12
56:19 57:1,12
58:23 59:4,9
60:10,16 61:20,21
61:22,25 62:4
64:19 65:4,10,14
67:20 68:7,18
71:25 72:3,7,11
**saying** 16:23,24
26:21 32:3 60:25
**scene** 36:16 37:4,8
37:11,18 38:1
39:11 40:22 41:5
41:10 43:3
**school** 55:4
**scuffle** 48:22 51:8
**search** 59:6
**second** 7:19 10:15
12:11 13:16 22:25
23:14 26:11 32:17
38:24 71:13 72:17
**seconds** 27:5,19
58:9,11,16,19
64:18 65:3,9,13

Page 10

[surplusage - vargas]

surplusage 33:6,9
surprised 39:10
   39:14
swore 6:14

**t**

t 5:13
take 6:9 15:6 25:4
   29:15 36:6
taken 2:15 6:4
   72:21 77:6
talk 39:19
talking 41:15 55:2
tattoos 66:12,20
tecate 24:2
technology 7:16
telephone 3:8,19
telephonically
   2:16 6:11 63:16
   64:4
tell 5:23 29:20
   31:19,23 37:2
   38:14 40:20 46:16
   52:23 53:5,9 64:2
   67:19 68:2,9
telling 45:17 60:19
teri 1:21 2:20
   77:23
terms 24:23 27:4,7
   27:19 28:20 29:7
   36:7
testified 5:6 6:6
   20:1,8 27:23
   31:12 32:22 34:6
   37:15 53:11,18
testify 37:19
testifying 33:7
   77:9
testimony 6:10,21
   6:23 14:24 23:11
   27:21 35:18 73:20

thank 8:2,7 12:16
   42:10,15 43:20
   67:24 72:15 73:12
   73:15,16,19 74:14
   74:22 75:20,25
theft 70:17
thereof 77:13
thing 16:24 19:14
   31:11 32:24 34:4
things 6:13
think 18:25 22:16
   22:24 23:10 26:10
   27:6 30:15 36:8
   38:9 39:2,8 43:9
   53:17 56:8 59:1
   68:15 71:1,11
   74:20
thirty 58:9
thought 26:2 28:9
three 29:11 35:20
   36:13 45:23 47:15
time 6:14 7:12,13
   19:13 21:3 26:17
   28:23,24 29:7,10
   30:2 31:1 33:6
   34:14,17,20,20,23
   38:20 39:2,6
   46:25 47:19,20,23
   48:12,17,25 49:3,5
   49:11,23 50:24
   51:8 52:2,3,12
   58:3,4,7,15,19,23
   59:4,9 61:11,18
   64:19,21 65:3,4,9
   65:10,14 71:12
   72:16 73:13,19,22
   74:6,8 77:7
times 12:1,10 20:2
   41:7,9 46:12,14
   47:7,15 65:22
   66:6

today 6:21,23 8:15
   40:6 41:2 45:7
   63:2 64:8 73:20
told 40:23,23,24
   41:1,2 53:12,19
   54:3,5,10,17,20
   60:14 62:3
tony 15:13,14,16
   26:3
touch 75:16
transcribed 6:20
   77:11
transcribing 6:15
transcript 73:25
   77:14
transcription
   77:13
transpired 8:17
trial 74:6,9
tried 41:17
trip 61:23
trouble 71:20
true 53:14 54:11
   54:18,22
truth 5:23,23,24
   8:15
truthful 43:6,11
truthfully 7:8
try 29:22 41:17
   45:7
trying 25:4,12
   29:20,24 30:1
   45:1 51:15 71:17
   71:18
turn 41:18 61:8
turning 71:4
twenty 50:12,12
twice 18:25 47:11
   47:14
two 7:19 12:11
   22:16,18 29:1

45:23 47:17,18
   48:10,22 49:18
   55:18 56:19 61:14
   67:8,13
type 23:19 26:14

**u**

uh 6:13 44:3,23
   45:3
um 6:12 45:3
undersigned 77:4
understand 6:2
   7:10 8:1,12,13
   10:5,18,25 11:2,11
   11:13,20,24,24
   12:2 13:9 24:14
   27:11,13 28:2,4
   31:13,14,15 42:22
   56:17 69:14,18
   71:2,6 73:11
understanding
   10:2,13 11:7,16
   34:24 67:7
understood 10:6
   43:20 67:24
unfortunately
   48:6 68:1
unit 29:5,6 35:7
united 1:1 2:1
units 35:3
unquote 38:2,6
upper 66:23 67:5
   67:8

**v**

vague 10:16,24
   11:10 12:22 13:5
   21:1,7 27:7,8,20
   30:16 31:21 32:18
   53:23 54:12
vargas 1:5 2:5 3:2
   5:18 8:19,21 9:9

Personal Court Reporters, A Veritext Company
818-988-1900

[year - zoom]

| | |
|---|---|
| **year**  9:8,13 42:25 | |
|   43:13 | |
| **years**  70:12 | |
| **yep**  51:6 | |
| **younger**  32:7 | |
| **z** | |
| **zoom**  3:5,16 | |

Personal Court Reporters, A Veritext Company
818-988-1900

```
            VERITEXT LEGAL SOLUTIONS
      COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.
```

1  Humberto Guizar, Esq. (SBN 125769)
2     *hguizar@ghclegal.com*
   Christian Contreras Esq. (SBN 330269)
3     *ccontreras@ghclegal.com*
4  **GUIZAR, HENDERSON & CARRAZCO, LLP**
   3500 W. Beverly Boulevard
5  Montebello, California 90640
6  Telephone: (323) 725-1151; Facsimile: (323) 597-0101

7  Attorneys for Plaintiff, LISA VARGAS

8
   **RICKEY IVIE (S.B.N.: 76864)**
9  rivie@imwlaw.com
   **MARINA SAMSON (S.B.N.: 315024)**
10 msamson@imwlaw.com
11 **IVIE McNEILL WYATT PURCELL & DIGGS,**
   444 S. Flower Street, 18th Floor
12 Los Angeles, CA 90017-2919
13 Tel.   (213) 489-0028; Fax       (213) 489-0552
   Attorneys for Defendants, **COUNTY OF LOS ANGELES, et.al.**
14
15            **UNITED STATES DISTRICT COURT**
16        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

17 LISA VARGAS,                        ) **Case No.: 2:19-cv-03279-MEMF-AS**
18                   Plaintiff          ) *[Hon. Maame Ewusi-Mensah*
                                        ) *Frimpong, United States District*
19               v.                     ) *Judge*
                                        ) **INDEX RE: JOINT**
20 COUNTY OF LOS ANGELES,              ) **STIPULATIONS AND**
   NIKOLIS PEREZ, JONATHAN             ) **OBJECTIONS DEPOSITION**
21 ROJAS, and DOES 1 through 10,        ) **TESTIMONY OF CARLOS**
   inclusive,                          ) **ESTRADA**
22                                      )
23                 Defendants           )
                                        )
24 ─────────────────────────────
                                       *[Filed Concurrently with Notice of*
25                                     *Lodging of Deposition Transcript of*
                                       *Carlos Estrada]*
26
27                                     Trial Date:        April 6, 2023
                                       Time:              8:00 a.m.
28                                     Courtroom:         8B

                                    i
       **INDEX RE: DEPOSITION TESTIMONY OF CARLOS ESTRADA**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

**INDEX RE: DEPOSITION TESTIMONY OF CARLOS ESTRADA**

II.   **PLAINTIFF'S OFFERINGS OF DEPOSITION TESTIMONY OF CARLOS ESTRADA (PHASE II)**

| Page 11 | Line(s) 5-6; |
|---------|--------------|
| Page 12 | Line(s) 5-6; 18-21; 24 |
| Page 13 | Line(s) 17-20; 25 |
| Page 14 | Line(s) 9-10 |
| Page 15 | Line(s) 1-7; 11-20 |
| Page 21 | Line(s) 12-22 |
| Page 22 | Line(s) 12-20 |
| Page 23 | Line(s) 19-22 |
| Page 25 | Line(s) 23-25 |
| Page 26 | Line(s) 1-6; 8-9; 13-24 |
| Page 38 | Line(s) 14-16 |
| Page 60 | Line(s) 6-8 |
| Page 61 | Line(s) 2-5 |

III.   **DEFENDANTS' OFFERINGS OF DEPOSITION TESTIMONY OF CARLOS ESTRADA**

**INDEX RE: JOINT STIPULATIONS AND OBJECTIONS TO DEPOSITION TESTIMONY OF CARLOS ESTRADA**